## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HERITAGE FOUNDATION )
214 Massachusetts Ave. N.E. )
Washington, D.C.  20002 )
 )
MIKE HOWELL )
214 Massachusetts Ave. N.E. )
Washington, D.C.  20002 )
 )
       *Plaintiffs*, )
 )
v. )    Case No. 23-cv-1854
 )
U.S. DEPARTMENT OF JUSTICE )
950 Pennsylvania Ave. N.W. )
Washington, D.C.  20408 )
 )
       *Defendant*. )

## COMPLAINT AND PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs THE HERITAGE FOUNDATION and MIKE HOWELL (collectively "Plaintiffs") for their complaint against Defendant DEPARTMENT OF JUSTICE ("DOJ" or "Department") allege on knowledge as to Plaintiffs, and on information and belief as to all other matters, as follows:

## INTRODUCTION AND SUMMARY

1.     This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel the Department to produce records responsive to a March 10, 2023 FOIA request concerning the investigation of Robert Hunter Biden by United States Attorney for the District of Delaware, David Weiss.  FOIA Request EOUSA-2023-001623 (Mar. 10, 2023) ("Request" or "Plaintiffs' FOIA Request") (Ex. 1).  Specifically, this action seeks to compel production of

1

documents related to requests from the U.S. Attorney for the District of Delaware, David C

Weiss to Department of Justice Headquarters for Special Counsel status, and for documents

related to attempts by U.S. Attorney Weiss to bring charges against Mr. Biden in a venue other

than the District of Delaware.

    2.      A good deal of the conduct of the State must, by its nature, be in secret.  That is

certainly the case with some aspects of law enforcement.  But at the same time, there are events

so grave—so essential—to our constitutional order that if we are to keep our Republic, the

American people must have a full accounting of the facts.  No matter how sensitive, the

American people must know.  Valid interests in secrecy may well be set aside to some extent by

such transparency.  But that is the entire point.  Secrecy in such cases is to say "all the laws but

one to go unexecuted, and the Government itself go to pieces lest that one be violated".[1]  Only

via the facts being made fully public can the matter be put as intended to the "vicissitudes of

political controversy"[2] and the American people exercise their basic and fundamental power to

hold the government to account.  In such a case, transparency cannot be anything but a good for

"who ever knew Truth put to the worse, in a free and open encounter?"[3]  This case presents such

an occurrence.  The American people must know.

    3.      It is common knowledge that the son of the President of the United States, Robert

Hunter Biden, has been under investigation by the Federal Government for years as to a variety

of serious felonies ranging from tax evasion to serving as a foreign agent for (likely) China.

Since President Joseph R. Biden was sworn in on January 20, 2021, the public has hotly debated

---

[1] Abraham Lincoln, *July 4 Message to Congress* (July 4, 1861).
[2] *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).
[3] John Miton, *Areopagitica: A Speech for the Liberty of Unlicensed Printing to the Parliament of England* (1644).

whether the Department of Justice will enforce the law without fear or favor, or serve as an errant "princeling's" Pretorians.  The Attorney General of the United States, Merrick Garland, has repeatedly stated under oath that the former is the case.  He has repeatedly referenced that the United States Attorney for the District of Delaware appointed by President Trump, David Weiss, has full authority over the case and may bring charges anywhere in the country with the full cooperation of the Department of Justice.  For this reason, Attorney General Garland has resisted repeated calls for the appointment of a Special Counsel to investigate Hunter Biden.

4.      On June 22, 2023, the House Committee on Ways and Means released the transcribed interviews of two Internal Revenue Service ("IRS") criminal investigators—and a contemporaneous memorandum.  In the interviews the Whistleblowers were not placed under oath, however, they were admonished that lying to Congressional investigators is a crime pursuant to 18 U.S.C. § 1001.  The Whistleblowers testified that U.S. Attorney Weiss sought to charge Hunter Biden with felony tax charges in the District of Columbia and the Northern District of California, but in each case, the local U.S. Attorney—both appointed by President Biden—blocked him from doing so.  In the case of the District of Columbia, on October 7, 2022, U.S. Attorney Weiss specifically told one of the whistleblowers that he sought to bring felony tax charges in the District of Columbia, but was blocked from doing so by the U.S. Attorney for the District of Columbia, Matthew Graves.  U.S. Attorney Weiss further stated to the whistleblower that he then requested Special Counsel authority from Main Justice to allow him to bring such charges directly, but was denied.  This meeting was documented in a contemporaneous memorandum which another participant in the October 7, 2022 meeting contemporaneously confirmed—in writing—as fully accurate.

5.      Sworn testimony of Attorney General Garland before Congress is simply irreconcilable with the whistleblowers' testimony.  Plaintiffs' FOIA Request goes directly to that issue.  If the whistleblowers are correct, U.S. Attorney Weiss' Office should have responsive records that will corroborate the whistleblowers.  If there is some other explanation, the lack of records or the content of those records will provide the American people with necessary answers.

6.      Making the case for transparency all the more important here is the June 20, 2023 announcement that Hunter Biden will plead guilty to misdemeanor tax charges with no jail time and receive a deferred prosecution agreement on a felony gun charge.  Many say this is the classic "sweetheart" deal.  And more to the point, it would seem to vitiate much if not all of the Department's asserted need for secrecy in this matter, because as Hunter Biden's own lawyer put it, "the five-year investigation into Hunter is resolved."[4]  Indeed, Attorney General Garland himself has stated he would support a decision by U.S. Attorney Weiss to testify.  Moreover, not only does there no longer appear to be an active investigation, but questions as to the structure and authority of a prosecutorial team are far removed from the merits of the case.

7.      Thus, we reach one of those situations where the American people must know. Has the Attorney General of the United States misled Congress, or worse, perjured himself? Every time that question has been seriously asked, weeks of public Congressional hearings have exhaustively explored the underlying issues for the American people.  The American people must know.

8.      Consider the principles at stake.

- No man is above the law.[5]

_____

[4] *See infra* at ¶ 96.
[5] *See, e.g.*, *Prohibitions Del Roy*, 77 E.R. 1342, 1343, 12 Co. Rep. 64 (Privy Counsel Chamber 1609).

- "Justice is justly represented blind, because she sees no difference in the parties concerned.  She has but one scale and weight, for rich and poor, great and small."[6]

- "The United States wins its point whenever justice is done its citizens in the courts."[7]

- "[T]hose norms require that like cases be treated alike.  That there not be one rule for Democrats and another for Republicans; One rule for friends and another for foes; One rule for the powerful and another for the powerless; One rule for the rich and another for the poor; Or different rules depending upon one's race or ethnicity."[8]

If the whistleblowers statements under pain of felony are correct, every one of these fundamental principles is laid low—wasted and desolate.  A state of affairs where there is a substantial question as to whether the Attorney General misled Congress is intolerable.  That is why production of the records sought by Plaintiffs is essential.  And why it is essential now.

## **PARTIES**

9.      Plaintiff The Heritage Foundation is a Washington, D.C.-based nonpartisan public policy organization with a national and international reputation whose mission is to "formulate and promote public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense."  Heritage Foundation, About Heritage, *found at* https://www.heritage.org/about-heritage/mission (last visited June 26, 2023).  Heritage is a not-for-profit IRC section 501(c)(3) organization which

---

[6] William Penn, *Some Fruits of Solitude in Reflections and Maxims* (1682).
[7] *Attorney General Merrick B. Garland Delivers Remarks at the Office of Access to Justice's Gideon Celebration* (Mar. 17, 2023).
[8] *Attorney General Merrick Garland Addresses the 115,000 Employees of the Department of Justice on His First Day* (Mar. 11, 2021).

engages in substantial dissemination of information to the public.  Heritage operates a national news outlet, *The Daily Signal*.

10.     Plaintiff Mike Howell leads The Heritage Foundation's Oversight Project and is an author for *The Daily Signal*.  The Oversight Project is an initiative aimed at obtaining information via Freedom of Information Act requests and other means in order to best inform the public and Congress for the purpose of Congressional oversight.  The requests and analysis of information is informed by Heritage's deep policy expertise.  By function, the Oversight Project primarily engages in disseminating information to the public.  Oversight Project, *found at* https://www.heritage.org/oversight (last visited June 26, 2023); Twitter, *found at* @OversightPR, https://twitter.com/OversightPR (last visited June 26, 2023).

11.     Defendant DOJ is a federal agency of the United States within the meaning of 5 U.S.C. § 552(f)(1) whose mission is to "uphold the rule of law, to keep our country safe, and to protect civil rights."  *About DOJ*; Our Mission, *found at* https://www.justice.gov/about#:~:text=Mission,and%20to%20protect%20civil%20rights. (June 26, 2023).

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(B) because this action is brought in the District of Columbia and 28 U.S.C. § 1331 because the resolution of disputes under FOIA presents a federal question.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant DOJ's principal place of business is in the District of Columbia.

# FACTUAL BACKGROUND

## The Hunter Biden Investigation & Calls for a Special Counsel

14.     The investigation into President Biden's son, Hunter Biden, evidently began in

2018.  *See* Michael Balsamo, *Justice Dept. Seeks Resignations of Trump-era US attorneys*,

Assoc. Press (Feb. 8, 2021), *found at* https://apnews.com/article/donald-trump-politics-biden-

cabinet-b48026fe9d00fe9b046ba8087bec1262 (last visited June 23, 2023).

15.     The investigation involves Hunter Biden's business with the Ukrainian energy

company, Burisma Holdings Limited, and CEFC China Energy, a now-defunct Chinese

conglomerate with reported ties to the Chinese Communist Party and the People's Liberation

Army[9], as well as a laptop computer belonging to Hunter Biden obtained by FBI investigators

from a Delaware computer repair shop.  Request at 6.  The investigation encompassed potential

criminal tax conduct, violations of 18 U.S.C. 922(g)(3), false statements to the United States

government, violations of the Mann Act (18 U.S.C. § 2421), and violations of the Foreign

Agents Registration Act (11 U.S.C. § 601 *et seq.*) (collectively, the "Hunter Biden

Investigation").

16.     The Hunter Biden Investigation became public knowledge in October 2020, mere

weeks before the 2020 Presidential Election.  *See* App. A 175.[10]

17.     Calls for the appointment of a Special Counsel began almost immediately

following the 2020 Presidential Election.  Among the first was United States Representative Ken

---

[9]  Matt Viser, et. al. *Inside Hunter Biden's Multimillion-dollar Deals with a Chinese Energy Company*, Wash. Post, Mar. 30, 2022, *found at* https://www.washingtonpost.com/politics/2022/03/30/hunter-biden-china-laptop/ (last visited June 26, 2023).

[10]  Plaintiffs submitted three Appendices with their FOIA Request in support of their Application for Expedited Processing.  Appendix, Appendix B, and Appendix C.  The form of Appendix citation used herein is App. [Letter][page].

Buck who, in a December 7, 2020 letter to then-Attorney General William P. Barr, wrote "[s]imilar to when the DOJ appointed Special Counsel Robert S. Mueller III, it is critical that this investigation continue free from political interference, no matter who is in the White House." Letter from Representative Ken Buck to Attorney General William P. Barr (Dec. 7, 2020), App. C 001.

18.     Significant media attention has been devoted to coverage of concerns that the Hunter Biden Investigation cannot be independent absent the appointment of a Special Counsel. *See* App. A at 006, 009, 013, 039, 076, 081, 083, 095–096, 101, 135, 137, 140, 142, 144, 155,157, 160–161, 167, 169, 172, 174, 191–192, 194, 197, 200, 204–205, 207, 209, 215, 227, 244, 253, 255, 260, 281, 287.

19.     Coverage has extended to the possibility that political pressure—and thus a lack of political independence—prevents a real investigation (and possible prosecution) of Hunter Biden pursuant to the laws of the land that apply to the average American. *See* App. A at 013,019, 023–025, 035–037, 039, 041–042, 058, 086, 103, 141, 157–158, 172, 180, 194, 199–202, 240, 262, 272, 277, 284–285, 287, 311–313, 321, 329–330.

20.     This coverage is not limited to the speculation of the punditry but goes directly to the concerns of Senators and Members of Congress. *See* App. A 86–88, 255–56, 284–292.

21.     David Weiss has been the U.S. Attorney for the District of Delaware since February 22, 2018.  Prior to his nomination and confirmation, he served as Acting United States Attorney for the District of Delaware following the dismissal of then-United States Attorney Charles Oberly on March 10, 2017.  He was nominated by President Donald J. Trump on the enthusiastic recommendation of Delaware's two Democratic Senators.  Assoc. Press, *President to Nominate David Weiss for U.S. Attorney in Delaware*, The News Journal. (Nov. 18, 2017), ,

*found at* https://www.delawareonline.com/story/news/local/2017/11/18/president-nominate-david-weiss-us-attorney-delaware/877686001/ (last visited June 24, 2023).

22.     Then-Attorney General Barr tasked U.S. Attorney Weiss with overseeing the Hunter Biden Investigation.

23.     Attorney General Barr resisted calls to appoint a Special Counsel to the Hunter Biden Investigation stating, "[t]o this point I have not seen a reason to appoint a special counsel and I have no plan to do so before I leave."  App. A at 144.

24.     Attorney General Barr further stated that in his estimation, the Hunter Biden Investigation was "being handled responsibly and professionally" by Mr. Weiss.  *Id.*

25.     While it is customary for new incoming Presidential Administrations to request the resignations of political appointees of the prior Administration, including U.S. Attorneys, the Biden Administration asked Mr. Weiss to stay on in his role as U.S. Attorney for the District of Delaware.  *See* Michael Balsamo, *Justice Dept.* s*eeks resignations of Trump-era US attorneys*, Assoc. Press (Feb. 8, 2021) *found at* https://apnews.com/article/donald-trump-politics-biden-cabinet-b48026fe9d00fe9b046ba8087bec1262 (last visited June 26, 2023).

26.     President Biden nominated Merrick Garland for Attorney General on January 20, 2021.  On March 1, 2021, the Senate Judiciary Committee held his nomination hearing.  He was confirmed by the Senate on March 10, 2021 and was sworn in as Attorney General on March 11, 2021.

27.     During Attorney General Garland's confirmation hearings, Members of Congress and the media sought assurances that U.S. Attorney Weiss would remain in place until the close of the Hunter Biden Investigation, or, in the event of his dismissal, a Special Counsel would be

appointed.  *See, e.g.*, Letter from Representative Ken Buck to Attorney General Merrick Garland (Feb. 17, 2021) (Ex. 2).

28.     During Attorney General Garland's confirmation hearing, he declined to provide assurances regarding U.S. Attorney Weiss' independence:

> And similarly with Mr. Durham, I don't know anything about that investigation other than what I've read in the media.  And again, that—that investigation has been proceeding discreetly, not publicly, as all investigations should.  I understand that the Delaware U.S. attorney was permitted to stay on as U.S. attorney, and I, again, have absolutely no reason to doubt that that was the correct decision.

*Nomination of Merrick Garland to Be Attorney General:  Hearing Before the Sen. Comm. on the Judiciary*, 117th Cong., CQ Trans. at *72 (Feb. 22, 2021) (Ex. 3); Garland also testified he had not discussed the Hunter Biden Investigation with the President or others.  *Id.* at *15–16.

### Attorney General Garland's Statements Concerning U.S. Attorney Weiss and a Special Counsel for the Hunter Biden Investigation

29.     Attorney General Garland has testified before Congress repeatedly on:  (1) U.S. Attorney Weiss' authority and power over the Hunter Biden Investigation; and (2) the question of whether to appoint a Special Counsel for the Hunter Biden Investigation.

30.     **October 21, 2021.  House Judiciary Committee.[11]**

- "[Mr. BUCK]:  I have sent a letter to the Department of Justice before your tenure asking them to appoint a special counsel to investigate Hunter Biden.  I have today sent a letter to you, and I am asking you now will you appoint a special counsel to investigate Hunter Biden?

   Attorney General GARLAND:  For the same reason that I am not able to respond to questions about investigations of the former President or of anyone else I am not able to discuss any investigations, pending or otherwise with respect to any citizen of the United States.

---

[11]  Attorney General Garland testified on oath.  *Oversight of the United States Department of Justice:  Hearing Before the H. Comm. on the Judiciary*, 117th Cong., 1st Sess., 8 (Oct. 21, 2021).

Mr. BUCK:  Mr. Attorney General, I worked for the Department of Justice for 15 years.  You are allowed to tell us whether you will appoint a special counsel.  You may not tell us whether you are investigating or not investigating a particular matter, but you are allowed to tell us whether you will appoint a special counsel.  That is my question.

Attorney General GARLAND:  Well, apparently, I just received the letter today from you and will be taking it under advisement, but I wasn't aware that you had sent me a letter."

*Oversight of the United States Department of Justice*:  Hearing Before the H. Comm. on the Judiciary, 117th Cong., 80 (Oct. 21, 2021) (Ex. 4).

- "Mr. MCCLINTOCK:  No, but let me—there have been multiple reports that Hunter Biden made enormous sums of money, and he has admitted that is because of his family ties.  Now, that by itself might not be a crime, but there have also now been multiple reports that emails and other communications from Hunter Biden have indicated that his finances were intermingled with those of his father's, including a text to his daughter complaining that half of his earnings were going to his father.  If that doesn't call for an independent investigation of the President, what would?

  Attorney General GARLAND.  So, I am not going to comment about this investigation, but as everyone knows there is an investigation going on in Delaware by the U.S. Attorney who was appointed by the previous Administration.  I can't comment on it any further than that.

  Mr. MCCLINTOCK:  That is being done under the Justice Department, not independently and the Justice Department answers to the President who is implicated in these emails.

  Chair NADLER:  The time of the gentleman is expired."  *Id.* at 206.

31.    **April 26, 2022 Senate Appropriations Subcommittee on Justice, Science, and**

**Related Agencies**:

WILLIAM HAGERTY:  Thank you, Senator Shaheen.  And thank you Ranking Member Moran for holding this hearing.  Thank you, Attorney General for being back with us today.  I want to touch on something that's *a great concern to my constituents* and I think frankly to the *confidence of many people in our system* that you control through the Department of Justice.

And that's the matter of the Hunter Biden investigation.  It received a great deal of press, but I want to ask you a bit about how the communications have worked

within your department with the White House on this.  First, have you been briefed on the Hunter Biden investigation matter yourself, General Garland?

MERRICK GARLAND:  So the Hunter Biden investigation, as I said even in my own nomination confirmation hearing, *is being run by and supervised by the United States Attorney for the District of Delaware.*

WILLIAM HAGERTY:  I'm aware of that.  But he reports to you.

MERRICK GARLAND:  *He is supervising the investigation.*  And I'm. you know, I'm not at liberty to talk about internal Justice Department deliberations, *but he is in charge of that investigation.  There will not be interference of any political or improper kind.*

WILLIAM HAGERTY:  And—and are any senior officials in your department being briefed or?

MERRICK GARLAND: *Again, he is the supervisor of this investigation and, you know, the normal processes of the department occur.  But he is the supervisor of this investigation.*

WILLIAM HAGERTY:  Well, if—if you won't be able to say whether there have been communications there, I'd—I'd like for you to tell me or answer this question, if you would.  Would you think it would be appropriate for the President of the United States to call you into the Oval Office and tell you that his son didn't break the law regarding this matter?

MERRICK GARLAND:  Absolutely not.  And the President has not done that.  And the President is committed not to interfere not only in that investigation, but any other kind of—

WILLIAM HAGERTY:  —Well, I agree with you.  But—

MERRICK GARLAND:  —Investigation—

WILLIAM HAGERTY:  —But I—I do wonder this then.  Why the President is resorting to TV and having his surrogates go on TV to say just that message.  Earlier this month White House Chief of Staff Ron Klein stated on national television that quote, "The President is confident that his son didn't break the law."

And the White House communications director said that President Biden maintains his position that his son did nothing that was unethical.  This is on national television.  The President's already told his subordinates clearly—these are people that he can fire will—that he and his family did nothing wrong.  *How*

*can the American people be confident that his Administration is conducting a serious investigation?*

MERRICK GARLAND:  Because we put the investigation in the hands of a Trump appointee from the previous Administration who's the United States Attorney for the District of Delaware.  And because you have *me as the Attorney General, who is committed to the independence of the Justice Department from any influence from the White House in criminal matters.*

WILLIAM HAGERTY:  Well, I think the observation here is terribly critical because there's an obvious conflict of interest here because of those who are investigating the Biden family and their enterprise can be fired by the head of the family who's being investigated.  That is, Joe Biden can fire the attor—the Attorney General in Delaware.

He can—he can have an impact on all of your staffing.  And I want to ask you this. Un—*under what circumstances do you consider or how do you evaluate whether you would appoint a Special Counsel?*

MERRICK GARLAND:  I think this is—this is a fact and law question in each case determining it and depending upon how cases go forward and the question of whether the Justice Department with its normal processes can—should continue.

I want to be clear though.  Special Counsels are also employees of the Justice Department.

We don't have an independent counsel statute anymore.  Both the Democrats and the Republicans experimented with this.  And I—I think probably in the end neither side liked it.  And that's why we ended up with the law not being reauthorized.  But in any event, the Special Counsel is also an employee of the Justice Department.

WILLIAM HAGERTY:  Have you had any consideration about whether to do this or—

MERRICK GARLAND:  —Again, I think our internal deliberations have to stay within the department.

WILLIAM HAGERTY:  Again, I'll just restate that—*that there's an obvious conflict there that raises concerns amongst my—amongst my constituents.*  I'd like to turn to some public evidence though.  There are emails and photographs that show that President Biden, while he was Vice President, met several of Hunter Biden's business associates including a Burisma executive.

That's the energy company that paid Hunter Biden a million dollars per year to sit on its board.  And a Russian billionaire who paid Hunter's firm 3.5 million around

13

the same time.  All of this is while President Biden was running portions of the United States foreign policy including Ukraine.  There's evidence that Hunter Biden paid for Joe Biden's living expenses while he was Vice President.

A Hunter Biden email from 2010 entitled JRB Bills, Joe R. Biden bills, it discusses paying for the upkeep of Joe Biden's large stake front—lake—lakefront home.  There's another 2010 email from a Biden confidant to Hunter Biden saying, quote, "Your dad just called me.  He could use some positive news about——Future earnings potential.["]

To me this suggests that Joe Biden's $231,000 salary is—taxpayer funded salary and lifestyle as Vice President of United States weren't enough to support his lifestyle.  That same confidante of—and also Joe Biden's business partner made nine visits to the White House between between 2009 and 2013 and met with Joe Biden in the West Wing while Joe Biden was Vice President.

And we have a text message from Hunter Biden to his daughter stating that don't worry.  Unlike Pop, meaning Joe Biden, I won't make you give me half your salary.  So it seems President Biden was serving as Vice President and running US foreign policy at the same time that his son Hunter Biden was raking in money from shade—shady foreign business deals.

And this was money that was being diverted to benefit Vice President Biden.  So General Garland, do you have any reason to dispute the evidence that indicates that President Biden was involved with and using money from Hunter Biden's business deals?

MERRICK GARLAND:  Senator, following the longstanding rule of the Justice Department we don't discuss investigations or evidence that maybe—may or may not be relevant to investigations.  *That's a matter for the United States Attorney's office that's investigating the case.*

WILLIAM HAGERTY:  Well the—

JEANNE SHAHEEN:  —Thank you, Senator—

WILLIAM HAGERTY:  —That's great.  Thank you.

*A Review of the President's Fiscal Year 2023 Funding Request for the U.S. Department of Justice:  Hearing before the S. Comm. on Appropriations, Subcomm. on Justice, Science, and Related Agencies*, 117th Cong., CQ Trans. at *16–18 (Apr. 26, 2022) (emphases added) (Ex. 5).

32.     **March 1, 2023, Senate Judiciary Committee.**[12]

- "CHUCK GRASSLEY:  Recent lawfully protected whistleblower disclosures to my office indicate that the Justice Department and the FBI had at one time over a dozen sources that provided potentially criminal information relating to Hunter Biden.  The alleged volume and similarity of the information would demand that the Justice Department investigate the truth and accuracy of the information.  According to what—accordingly, what steps has the Justice Department taken to determine the truth and accuracy of information provided?  Congress and the American people, I think, have a right to know.

  MERRICK GARLAND:  So, as the committee well knows from my confirmation hearing, I promise to leave—I promised to leave the matter of Hunter Biden in the hands of the US attorney for the District of Delaware, who was appointed in the previous administration.  So, any information like that should have gone or should—or should have gone to that US attorney's offices and the FBI squad that's working with him.  I have pledged not to interfere with that investigation, and I have carried through on my pledge.

  CHUCK GRASSLEY:  In April 2022, you testified to Senator Haggerty that the Hunter Biden investigation was insulated from political interference because it was assigned to—as you just now told me, to the Delaware attorney's office.  However, that could be misleading because, without special counsel authority, he could need permission of—of another US attorney in certain circumstances to bring charges outside the District of Delaware.  I'd like clarification from you with respect to these concerns.

  MERRICK GARLAND:  The—the US attorney in Delaware has been advised that he has full authority to—to make those kind of referrals that you're talking about, or to bring cases in other jurisdictions if he feels it's necessary.  And I will assure that, if he does, he will be able to do that.

  CHUCK GRASSLEY:  Does the Delaware US attorney lack independent charging authority over certain criminal allegations against the president's son outside of the District of Delaware?

  MERRICK GARLAND:  He would have to bring—if it's in another district, he would have to bring the case in another district.  But as I said, I promise to ensure that he's able to carry out his investigation and that he be able to run it.  And if he needs to bring it in another jurisdiction, he will have full authority to do that.

---

[12]  Attorney General Garland testified on oath.  *Oversight of the Department of Justice: Hearing Before the Sen. Comm. on the Judiciary*, 118th Cong., CQ Trans. at \*5–6 (Mar. 1, 2023).

CHUCK GRASSLEY:  If you provided the Delaware US attorney with special counsel authority, isn't it true that he wouldn't need permission from another US attorney to bring charges?

MERRICK GARLAND:  Well, it's a kind of a complicated question.  If it—under the regulations, that kind of act, he would have to bring to me under—to the attorney general.  Under the regulations, those kind of charging decisions would have to be brought.  I would then have to, you know, authorize it and permit it to be brought in another jurisdiction.  And that is exactly what I promised to do here already, that if he needs to do—bring a case in another jurisdiction, he will have my full authority to do that.

CHUCK GRASSLEY:  Has the Delaware US attorney sought permission from— permission of another U.S. attorney's office, such as in the District of Columbia or in California, to bring charges?  If so, was it denied?

MERRICK GARLAND:  So, I—I don't know the answer to that.  I do—and I don't want to get into the internal elements of decision making by the US attorney.  But he has been advised that he is not to be denied anything that he needs.  And if that were to happen, it should ascend through the department's ranks.  And I have not heard anything from that office to suggest that they're not able to do everything that the US attorney wants to do.

CHUCK GRASSLEY:  Well, let me give you my view.  If Weiss, the US attorney there in Delaware, must seek permission from a Biden appointed US attorney to bring charges, then the Hunter Biden criminal investigation isn't insulated from political interference as you've publicly proclaimed."

*Oversight of the Department of Justice*:  *Hearing Before the Sen. Comm. on the Judiciary*, 118th Cong., CQ Trans. at *30–32 (Mar. 1, 2023) (Ex. 6).

- "TED CRUZ:  Well, let me say in particular on Hunter Biden.  I very much hope that an investigation of Hunter Biden is focused not just on his own personal substance abuse issues, but on connections to his father and potential corruption.  That is the matter of public concern and why people are concerned.  And it was striking that the leak that came out from DOJ suggested this is just going after some poor—poor person struggling with drugs, instead of looking at the very real evidence of corruption.  Will you commit that the investigation will actually examine the public corruption aspect and not simply scapegoat Hunter Biden as an individual?

  MERRICK GARLAND:  I can't comment about the investigation, other than to say that all the matters involving Mr. Hunter Biden are the purview of the US attorney in Delaware.  He's not restricted in his investigation in any way."

*Id.* at 138.

**Congressional Oversight of Attorney General Garland's Actions as Concerns the Hunter Biden Investigation**

33.     On September 16, 2022, thirty-three United States Senators wrote to Attorney

General Garland requesting that U.S. Attorney Weiss be extended special counsel protections

and authorities to conduct the Hunter Biden Investigation.  The Letter reads in relevant portion:

> Under Department of Justice regulations and federal law, you have the power to provide special counsel authorities and protections to U.S. Attorney Weiss.  Given that the investigation involves the President's son, we believe it is important to provide U.S. Attorney Weiss with special counsel authorities and protections to allow him to investigate an appropriate scope of potentially criminal conduct, avoid the appearance of impropriety, and provide additional assurances to the American people that the Hunter Biden investigation is free from political influence.

App. C004.

34.     On February 28, 2023, Representative Jim Jordan, Chairman of the House

Judiciary Committee, wrote to Attorney General Garland ("February Letter") requesting:

1.  All documents and communications sent or received by David Weiss or any employee of the U.S. Attorney's Office for the District of Delaware referring or relating to special counsel status for the investigation concerning Hunter Biden; and

2.  All documents and communications between or among employees of the U.S. Attorney's Office for the District of Delaware and employees of any other U.S. Attorney's Office with venue to bring charges against Hunter Biden or his associates in that jurisdiction.

App. B 001.  The letter requested a response by March 14, 2023.  The February Letter almost

completely overlaps with Plaintiffs' FOIA Request.

35.     To Plaintiffs' knowledge, DOJ has not responded to the February Letter.

**PLAINTIFFS' FOIA REQUEST**

36.     Plaintiffs submitted their FOIA Request on March 10, 2023.  The Request seeks:

1.  All documents and communications sent or received by David Weiss or any employee of the U.S. Attorney's Office for the District of Delaware referring or relating to Special Counsel status for the investigation concerning Hunter Biden; and

17

2.  All documents and communications between or among employees of the U.S.
    Attorney's Office for the District of Delaware and employees of any other U.S.
    Attorney's Office with venue to bring charges against Hunter Biden or his associates
    in that jurisdiction.

Request at 1.

37.     The Request sought expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and

28 C.F.R. § 16.5(e)(1)(iv) because the Request concerns "a matter of widespread and exceptional

media interest in which there exist possible questions about the government's integrity that affect

public confidence." *Id.* at 6–10.  The Request included a five-page analysis supplemented by

343 pages of appendices to support its request for expedited processing.  *Id.*

38.     The Request summarized the rationale for expedited processing as follows:

> Additionally, there is sustained national media cover of, and interest in,
> accusations by Senators and Members of Congress, national news organizations,
> other public figures, and subject matter experts questioning why the Attorney
> General has not appointed Special Counsel to handle the Hunter Biden
> investigation, which demonstrates that those officials lack at a minimum,
> confidence that justice will be seen without a Special Counsel.  At worst, these
> allegations reflect a direct lack of confidence in the integrity of the
> Department.  Moreover, the Department's failure to appoint a Special Counsel in
> the Hunter Biden investigation when the FBI *itself* has stated it has enough
> evidence to criminally charge Hunter Biden can only breed distrust in the
> Department's ability to independently investigate Hunter Biden and his activities
> without appointing a Special Counsel.

*Id* at 10.

39.     The Request sought a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) because

the Heritage Foundation is a 501(c)(3) nonprofit and Plaintiff Howell is an author at *The Daily*

*Signal*, a major news outlet.  *Id.* at 4–5.

40.     DOJ, through the Office of Information Policy ("OIP"), provided its initial

response to the Request on March 16, 2023.  FOIA Response FOIA-2023-00888 (Mar. 16, 2023)

(Ex. 7).  OIP processes FOIA requests for OIP and the Offices of the Attorney General, Deputy

Attorney General, Associate Attorney General, Public Affairs, Legislative Affairs, and Legal Policy.  The OIP response suggested Plaintiffs direct their request to the Executive Office for United States Attorneys ("EOUSA") and did not indicate whether a search had been performed.

41.    On March 21, 2023, DOJ's Criminal Division provided an acknowledgment letter notifying Plaintiffs that the Request was misdirected to the Criminal Division and had been routed to EOUSA.  Acknowledgement Letter FOIA Request CRM301927723 (Mar. 21, 2023) (Ex. 8).

42.    On March 23, 2023, EOUSA provided an acknowledgment letter designating the Request reference number EOUSA-2023-001623, invoking "unusual circumstances" pursuant to 5 U.S.C. § 551(a)(6)(B), extending the time limit to respond by ten additional business days, and assigning the request to the "complex track."  Acknowledgment Letter FOIA Request EOUSA-2023-001623 (Mar. 23, 2023) (Ex. 9).

43.    On March 27, 2023, EOUSA granted Plaintiffs' request for expedited processing without specifying the grounds for said grant.  Grant of Expedited Processing Letter FOIA Request EOUSA-2023-001623 (Mar. 27, 2023) (Ex. 10).

44.    On April 4, 2023, DOJ's Office of Legal Counsel responded that a search of its files located no documents responsive to the Request and that the Request had been referred to EOUSA.

45.    More than 30 days have passed since the Plaintiffs' FOIA Request was sent via email and received by the Department on March 10, 2023.  Thirty working days from March 10, 2023 is April 21, 2023.

46.    As of the filing of this Complaint, the Department has neither informed the Plaintiffs of any determination as to whether it will comply with the Request, nor produced any

records in response to the Request.  The Department has not responded to Plaintiffs' request for a

fee waiver.

## DEVELOPMENTS SUBSEQUENT TO CONSTRUCTIVE EXHAUSTION RELEVANT TO REQUEST

### IRS Whistleblowers Come Forward and Claim that DOJ and Others Delayed and Engaged in Inappropriate Conduct Concerning the Hunter Biden Investigation

47.     On April 19, 2023, an IRS whistleblower, through their attorney, anonymously

sent a letter to the Chairs and Ranking Members of the Senate Finance and Judiciary

Committees, the House Committees on Ways and Means and Judiciary, and Senator Charles

Grassley as Co-Chair of the Whistleblower Protection Caucus, to make a protected

whistleblower disclosure pursuant to 5 U.S.C. § 2302(b)(8)(C) and 26 U.S.C. § 6103(f)(5).

Letter from Mark D. Lytle to Members of Congress (Apr. 19, 2023) (Ex. 11) ("April 19 Letter").

Without mentioning Hunter Biden or any current government employee by name, the April 19

Letter indicated that "the protected disclosures:  (1) contradict sworn testimony to Congress by a

senior political appointee, (2) involve failure to mitigate clear conflicts of interest in the ultimate

disposition of the case, and (3) detail examples of preferential treatment and politics improperly

infecting decisions and protocols that would normally be followed by career law enforcement

professionals in similar circumstances if the subject were not politically connected."  *Id*. at 1–2.

The whistleblower was later identified as career IRS Criminal Supervisory Special Agent Gary

Shapley ("Shapley").  Contemporaneous news reports about the anonymous letter indicated that

the letter was in reference to the Hunter Biden Investigation.  *See, e.g.*, Farnoush Amiri, *IRS*

*Agent Alleges Hunter Biden Probe is Being Mishandled*, AP News (Apr. 20, 2023), *found at*

https://apnews.com/article/hunter-biden-irs-whistleblower-joe-biden-investigation-

ce0c0769e61e7b5886af37a0cfa7cc32 (last visited June 25, 2023).

48.     In early May 2023, Attorney General Garland responded to the whistleblower's allegations, stating "[y]es, it's still the case that I stand by my testimony, and I refer you to the U.S. attorney for the District of Delaware who is in charge of this case and capable of making any decisions that he feels are appropriate."  Alexander Malin, Katherine Faulders, Will Steakin, and Lucien Bruggerman, *Garland Responds to IRS Agent's Claim Hunter Biden Probe is Being Mishandled*, CBS News (May 2, 2023), *found at* https://abcnews.go.com/Politics/garland-responds-irs-agents-claim-hunter-biden-probe/story?id=99018645 (last visited June 26, 2023).

49.     On May 15, 2023, Shapley's attorneys wrote to the same recipients of the April 19 Letter to inform them that their client (who was still anonymous at the transmission of the letter) was "informed that he and his entire investigative team from the ongoing and sensitive investigation of the high-profile, controversial subject about which our client sought to make whistleblower disclosures to Congress.  He was informed the change was at the request of the Department of Justice."  Letter from Mark D. Lytle and Tristan Leavitt to Members of Congress, May 15, 2023 (Ex. 12) ("May 15 Letter").  The May 15 Letter received widespread media attention.  *See, e.g.*, Steven Nelson, *IRS Removes Investigative Team in Hunter Biden Probe in Move Whistleblower Calls "Clearly Retaliatory"*, N.Y. Post (May 15, 2025), *found at* https://nypost.com/2023/05/15/irs-cans-investigative-team-from-hunter-biden-probe-in-move-whistleblower-claims-is-clearly-retaliatory/ (last visited June 26, 2023); Bradford Betz, *IRS Removes "Entire Investigative Team" in Hunter Biden Probe, Whistleblower Claims Retaliation:  Report*, Fox News (May 15, 2023) *found at* https://www.foxnews.com/politics/irs-removes-entire-investigative-team-hunter-biden-probe-whistleblower-claims-retaliation-report (last visited, June 26, 2023); Bart Jansen, *IRS Whistleblower Alleges Removal of "Entire Investigation Team" from Hunter Biden Probe*, USA Today (May 16, 2023), *found at*

https://www.usatoday.com/story/news/politics/2023/05/16/hunter-biden-investigation-irs-team-removed/70222248007/ (last visited June 26, 2023).

50.    On May 22, 2023, a second IRS whistleblower came forward corroborating Shapley's account of the dismissal of the investigative team.  *See* Steven Nelson, *Second Hunter Biden Whistleblower Emerges After Dismissal Despite Five Years on Case*, N.Y. Post (May 22, 2023), *found at* https://nypost.com/2023/05/22/second-hunter-biden-irs-whistleblower-emerges-after-five-years-on-case/ (last visited June 26, 2023).  This individual has remained anonymous.

51.    On May 24, 2023, Shapley revealed his identity in his first public interview.  Jim Axelrod, et. al., *IRS Whistleblower Speaks:  DOJ "Slow-Walked" Tax Probe Said to Involve Hunter Biden*, CBS (May 24, 2023), *found at* https://www.cbsnews.com/news/irs-whistleblower-tax-probe-hunter-biden/ (last visited June 26, 2023).  In the interview, Shapley said "there were multiple steps that were slow-walked—were just completely not done—at direction of the Department of Justice."  *Id*.

## Continued Congressional Oversight

52.    On May 25, 2023, House Judiciary Committee Chairman Jim Jordan wrote to Attorney General Garland requesting documents and communications related to the allegations in the May 15 Letter regarding the removal of the IRS investigative team from an ongoing investigation, all documents and communications between or among DOJ and IRS referring or relating to any investigations involving both parties, and all documents and communications between DOJ and the US Attorney's Office for the District of Delaware referring or relating to the removal of an IRS investigative team from an ongoing investigation on or around May 15, 2023.  Letter from the Hon. Jim Jordan to the Hon. Merrick Garland (May 25, 2023) (Ex. 13).

53.     Chairman Jordan's letter notes that his requests are the result of a letter received from an IRS Criminal Supervisory Special Agent whistleblower.  The whistleblower was subsequently revealed to be Shapley.

54.     On June 7, 2023, U.S. Attorney Weiss—*not* Attorney General Garland—sent Chairman Jordan a response, writing "[y]our May 25th letter to Attorney General Garland was forwarded to me, with a request that I respond on behalf of the Department."  Letter from David C. Weiss to Chairman Jordan (June 7, 2023) (Ex. 14).  The letter continued by making an oblique reference to what from context can only be the Hunter Biden Investigation and stated:

> If my assumption is correct, I want to make clear that, as the Attorney General has stated, I have been granted ultimate authority over this matter, including responsibility for deciding where, when, and whether to file charges and for making decisions necessary to preserve the integrity of the prosecution, consistent with federal law, the Principles of Federal Prosecution, and Departmental regulations.

*Id.*  U.S. Attorney Weiss refused to respond to Chairman Jordan's questions on the grounds that Chairman Jordan's request related to an on-going investigation.  *Id.* at 1–2.  The letter closed:

> In February 2021, I was asked to remain as United States Attorney for the District of Delaware to continue my oversight of the matter.  Since that time, I have fulfilled my responsibilities, consistent with Department practices and procedures, and will continue to do so.  Throughout my tenure as U.S. Attorney my decisions have been made—and with respect to the matter must be made—without reference to political considerations.

*Id.* at 2.

55.     On June 22, 2023, Chairman Jordan responded to U.S. Attorney Weiss, again asking for the information and documents responsive to his May 25 letter.  Letter from the Hon. Jim Jordan to the Hon. David C. Weiss (June 22, 2023) (Ex. 15).  Relevant here, Chairman Jordan explained at length that information about alleged whistleblower retaliation through staffing decisions has nothing to do with the merits of any on-going case.  *Id.* at 1.  Chairman Jordan also sought additional information "in light of the unusual nature of your response on behalf of Attorney General Garland," such as, information related to U.S. Attorney Weiss' June

7 letter, including a list of individuals who drafted or assisted in drafting the response, the name

of the party who forwarded the letter, and whether U.S. Attorney Weiss had any discussions with

Attorney General Garland or any other individual at DOJ about the May 25 letter.  *Id.* at 2–3.

Chairman Jordan sought a response by 5:00 p.m. on July 6, 2023.

**The IRS Whistleblower's Sworn Testimony on U.S. Attorney Weiss' Authority and Special Counsel Status**

56.     On June 22, 2023, the Committee on Ways and Means voted to authorize the

release of transcribed interviews with two whistleblowers.  *See* H. Comm. on Ways and Means

Vote Tally (June 22, 2023) (Ex. 16).  Both whistleblowers testified to a number of highly

troubling events and testified that they were subject to extensive retaliation.

57.     The First Whistleblower, revealed to be Shapley, appeared before the House

Ways & Means Committee for a closed-door transcribed interview with bipartisan Committee

Staff on May 26, 2023.  Transcript of Interview of Gary A. Shapley, Jr. (May 26, 2023) (Ex. 17)

("Shapley Trans.").  Shapley was not under oath, but Committee staff admonished him that his

testimony was subject to 18 U.S.C. § 1001, which makes it a crime to lie to Congressional

investigators.  *Id.* at 5.

58.     Shapley has been an IRS agent since 2009 and has served as a Supervisory

Special Agent or Acting Assistant Special Agent in Charge since April of 2018.  *Id.* at 8–9.  Prior

to October of 2022, Shapley had received numerous awards from both the IRS and the

Department.  *Id.* at 9.  Shapley testified that his experience included "investigat[ing] and

manag[ing] some of the largest cases in U.S. history and of the history of the agency, recovering

over $3.5 billion for the United States Government."  *Id.*

59.     Shapley supervised the IRS Criminal Investigations component of the Hunter

Biden investigation from January 2020 through May 15, 2023.  *Id.* at 12, 32.  He did so in his

capacity as leader of "the International Tax and Financial Crimes group, or the ITFC," which "is comprised of 12 elite agents who were selected based on their experience and performance in the area of complex high-dollar international tax investigations." *Id.* at 12.

60.     Shapley testified that he had "absolutely no political activities in [his] past." *Id*. at 11.  He continued by stating "I vote for the candidate, not the party.  I have voted for Presidents with both an R and/or a D in front of their names." *Id.*

61.     The Second Whistleblower remained anonymous.  Bipartisan House Ways and Means Committee Staff took his testimony in a closed door transcribed interview on June 1, 2023.  Transcript of Interview of [REDACTED] (June 1, 2023) (Ex. 18) ("WB 2 Trans.").  Chairman Smith was also present for the interview.  Like the Shapley interview, Committee staff admonished WB 2 that their testimony was subject to 18 U.S.C. § 1001, but not on oath.  *Id.* at 5.

62.     WB 2 is a 13-year veteran of the IRS (*id.* at 11) who since November of 2018 served on the International Tax and Financial Crimes group." *Id.* at 12.  WB 2 initiated the IRS investigation of Hunter Biden and served as case agent.  *Id.* at 17.

63.     WB 2 took time at the outset of his testimony to address certain public attacks directed at him:

> I'm an American, and my allegiances are to my country and my government.  I'm also a gay man.  I have a husband, two dogs, a home, and a life full of family and friends.  But above all else, I'm a human being.  My sexuality doesn't define me as a person.  It's just who I love.  I'd like to say one more thing regarding this topic of sexuality, especially since it's the start of Pride Month.  But people have said that I'm gay and people have said, because I'm gay and that I am working as the case agent on this investigation, that I must be a far-left liberal, perfectly placed to fit some agenda.  This was stuff that was on social media regarding me.  I can tell you that I am none of those things.  I'm a career government employee, and I have always strived to not let politics enter my frame of mind when working cases.

*Id.* at 10.  He continued, "I've tried to stay so nonpolitical that in the last Presidential election I voted but had decided to not vote for the Presidential candidate because I didn't want to be asked

that question in a court proceeding in the future and I didn't want to show any potential bias."
*Id.*

64.     That said, WB 2 indicated that "[m]y political beliefs are simple.  I'm as middle

of the road as they come but would consider myself to be a Democrat.  When I was younger, I

grew up in a conservative household.  I also held conservative beliefs.  But over time those

beliefs have changed."  *Id*. at 10.

65.     WB 2 noted that he "paid for [his] own flight to be here in front of you," and

testified further he had "not accepted any payments from anyone in coming here, and I have

legal representation through my attorney, Dean Zerbe."  *Id.* at 9.

66.     Both Whistleblowers testified at length to a variety of alarming conduct—

including claims of retaliation accompanied by substantial documentation and corroboration.

67.     Pertinent here, Shapley testified that in March of 2022, U.S. Attorney Weiss'

Office and attorneys at the DOJ Tax Division ("DOJ Tax") recommended prosecution of Hunter

Biden in the District of Columbia for felony tax violations related to tax years 2014 and 2015.

Shapley Trans. at 23–24.  He also provided a signed recommendation in which the AUSA in

U.S. Attorney Weiss' Office managing the case—Leslie Wolf—concurred in those charges.  *Id.*

at Ex. 2.  Shapley testified that  "I know Weiss agreed with these charges" when asked whether

Weiss himself concurred.  *Id.* at 142, *see also id.* 141–43.

68.     Shapley testified that DOJ Tax prepared a prosecution memorandum that was

presented to the U.S. Attorney's Office for the District of Columbia.  *Id.* at 24.  Shapley stated he

and WB 2 asked to be present for the presentation of the case to the District of Columbia, "but

were denied."  Shapley Trans. at 24; *accord* WB 2 Trans. at 36.  Shapley forthrightly offered that

he had not seen the prosecution memorandum, but that it was "described to me as supporting those years [2014 & 2015] and charging those years." *Id.* at 64–65.

69.     WB 2 testified at some point in this process "on or about March 14th 2022" the team from U.S. Attorney Weiss Office and DOJ Tax had a conference with Hunter Biden's counsel to hear Hunter Biden's explanations for why he ought not be charged.  WB 2 Trans. at 34.

70.     WB 2 testified that:

I am told that it [the case] was sent to the line attorneys in the D.C. U.S. Attorney's Office.  They got my prosecution report, all the information that we had, and said, hey, we want to open up this case here.  The line attorneys there said, here's the process. We'll get you guys going.

*Id.* at 36.

71.     Shapley testified that he believed that AUSA Wolf and Mark Daly, the lead attorney from the Department's Tax Division (Shapley Trans. at 36) presented the case to the First Assistant in the District of Columbia.  *Id.* at 65.  Shapley confirmed WB 2's testimony concerning the result of that meeting:  "Mark Daly telephoned the case agent [WB 2] and stated that the First Assistant at the D.C. U.S. Attorney's Office was optimistic and had stated she would assign an AUSA to assist."  Shapley Trans. at 24; *accord id.* at 65 ("and the first meeting was Mark Daly called my case agent [WB 2] and said, 'Hey, looks good, they're going to assign AUSA.'").

72.     WB 2 then testified that:

[A] couple days later after that meeting, I get a phone call.  And this is—from my recollection, from Mark Daly, the DOJ Tax attorney.  And I think he was a little bit too forward with his information he gave me.  But he basically said that now that the U.S. Attorney looked at the case, they don't want to move forward with it.  And essentially what he told me is that not only are they not going to join the case and give us assistance—so give us another AUSA, give us someone to help there—they also told our prosecutors that they don't think we have—that we

can—or they don't think that we have the charges—or not the ability, but the
evidence for the charges to charge in D.C.  So not only was it a, no, we're not
going to help you, but it was a, you shouldn't bring the charges here, essentially.

WB 2 Trans. at 36.[13]  Shapley again confirmed this testimony:  "Just a couple days later, Mark

Daly called the case agent back and told him that the President Biden appointee to the United

States Attorney for the District of Columbia, Matthew Graves, personally reviewed the report

and did not support it."  Shapley Trans. at 23; *accord id.* at 65 ("And then it was 2 or 3 days

later, Mark Daly calls and says, 'No, they don't support it.  So we're basically dead in the

water.'").

     73.    At that point both Shapley and WB 2 testified that they performed additional

investigative work to further develop the case for prosecuting the 2014 and 2015 tax years and

held additional meetings to discuss bringing charges for those years in the District of Columbia.

Shapley testified that he thought the additional investigative work was being performed because

U.S. Attorney Weiss had independent authority to charge the case in the District of Columbia:

"From March 2022 through October 7th, 2022, I was under the impression that, based on AG

Garland's testimony before Congress and statements by U.S. Attorney Weiss and prosecutors,

that they were still deciding whether to charge 2014 and 2015 tax violations."  *Id.* at 25.

     74.    Shapley explained that "For 2 months we were working to combat the potential

defenses."  *Id.* at 65.  WB 2 described the process as follows:

So that all happened.  So we're no longer talking about D.C. anymore.  Now we
have—the defense is presented 2014, 2015, and I was having a lot of issues with
the DOJ Tax attorneys and the AUSA regarding 2014 to 2015, because now

---

[13]  WB 2 also summarized the events as follows:  "So the first impression from the D.C. U.S.
Attorney's Office was, yeah, this all looks great.  Here's the process.  It didn't sound like they
were going to move to say no to it.  It sounded like, hey, the lower-level attorneys were like,
whatever we need to do to get this going.  And then it changed.  So, I mean, that was frustrating
for me.  But at the end of the day—they're following this normal process that they call[ed] it."
WB 2 Trans. at 36.

they're doubting it.  So what we ended up doing is reinvestigating all of it.  We ended up looking at the evidence, and we found emails that actually showed that Hunter Biden [had] planned [for] what happened that caused him to essentially evade his taxes for 2014.  We presented this.  We dug into it.  We figured this all out. . . .  But we dug through this all.  And then we were like, we finally figured it out.  This is why this happened.  And it felt like the line attorneys weren't listening to us.  They weren't following the evidence.  They were saying, well, they provided this defense, so that's the way it has to be, versus us looking at it like, well, no, let's figure out the way that the evidence shows us.

WB 2 Trans. at 37.

75.    Both Shapley and WB 2 testified concerning a June 15, 2022 meeting at Main

Justice.  As WB 2 recounted it:

And at that same time—so this is in mid-June—we met with David Weiss and all the leadership.  Including FBI, ASAC, SAC, all the people from FBI, and Stuart Goldberg, the [Acting Assistant Attorney General] of Tax Division.  We all met in D.C.  We were able to present on the findings regarding 2014, 2015, the case, and moving forward related to it.

WB 2 Trans. at 38.  Asked who exactly was in the meeting, WB 2 testified:

So you had the SAC and ASAC at the time of FBI.  You had my leadership, which included my supervisor.  Gary Shapley.  That included my SAC at the time.  So that would have been Darrell Waldon.  And I believe my DFO was also present there.  I could be wrong on that.  His name was Mike Batdorf.  Stuart Goldberg was there.  He was the DAG.  David Weiss was there.  Lesley Wolf, Jack Morgan, Mark Daly, and then the agents from the FBI who were part of the case team.

*Id.* at 164.

76.    In WB 2's view the purpose of the meeting had been misrepresented to the IRS

Team:

So June 15th, 2022, the meeting with Stuart Goldberg, [Acting Deputy Assistant Attorney General].  The meeting with DOJ Tax at Main DOJ where the purpose of the meeting was misrepresented to the agents.  We had no idea that they were going to bring up a huge presentation to everyone there regarding the reasons why we shouldn't charge this case.

*Id.* at 160–161.

77.    WB 2 testified that "Jack Morgan and Mark Daly" (DOJ Tax attorneys) gave the presentation; U.S. Attorney Weiss did not.  *Id.* at 161.  WB 2 was later asked by Minority Counsel "[b]ut they had a whole presentation prepared on their decision not to charge?"  *Id.* at 164.  WB 2 responded by reiterating and reaffirming his prior testimony:  "It wasn't on their decision not to charge.  It was all the reasons why we shouldn't charge for 2014, 2015."  *Id.*  WB 2 then explained that in his view the issues raised by the presentation as cutting against prosecution had been completely dealt with by the additional investigation:  "And what me and the investigator did is we figured it out.  We found out stuff after that that we didn't know before."  *Id.*  WB 2 explained elsewhere, "[w]e were constantly pushing David.  We were pushing our leadership with—I'm using the wrong word.  We were reciting what the evidence showed."  *Id.* at 38.

78.    Shapley testified consistently:

[T]hat 6-15-2022 meeting at Main DOJ, Stuart Goldberg, Weiss, and everyone underneath is there, every level of everyone underneath is there.  And this was when DOJ Tax was kind of giving a presentation about potential problems with '14, '15.  Now they've already tried to bring it to D.C.  They already requested special counsel and got denied. So now they're kind of trying to make this evidential issue for those years.  So on the side of that, in a break, Weiss comes up and he's talking to me on the side, and comes up, the case agent.  And Weiss was like, you guys always convince me, I agree with this, and then DOJ Tax tells me something else.  So I know that Weiss agreed with these charges, and—I don't know.  At the end of the day, they should've been charged.  I offered to give prosecution recommendation reports from previous cases to show precedent, to show specific examples of this loan issue and how this would follow a precedent in other cases being charged, and it just kind of fell on deaf ears.

Shapley Trans. at 142.

79.    The Whistleblowers' testimony documents continuing discussions with the Department concerning charging Hunter Biden in the District of Columbia for the 2014 and 2015 tax years.  Shapley testified that:

In our July 29th, 2022, prosecution team call, AUSA Wolf told us that United States Attorney Weiss indicated that the end of September would be his goal to charge the 2014 and 2015 years, because they did not want to get any closer to a midterm election.  She also said:  "The X factor on timing will include any delay defense counsel has requested."

Shapley Trans. at 27.

80.     WB 2 testified that:

Ultimately, what happened is we have a meeting.  A phone call.  It's in early August.  And we get a phone call, all the teams on it together.  So AUSA Lesley Wolf, Carly Hudson, Jack Morgan, and Mark Daly, DOJ Tax.  And they say at that meeting that we are going to approve the recommendation of charges for the—and this is from my recollection.  They are going to approve the recommendation of charges for the 2017, 2018, and 2019 tax years and that the venue for those—the appropriate venue for those is California.  They were not approving 2014, 2015.  And I don't remember if it included 2016.  I can't remember that off the top of my head. . . .  I want to say one more thing.  We also learned that they gave what's called discretion.  This is what I was told.  This is from my memory.  But that they didn't get full on approval.  They gave discretion to charge the case.  From my understanding with Tax Division, if they were to approve the charges, according to policy, California would have to charge the case.

WB 2 Trans. at 38–39.

81.     WB 2 further testified:

So we have one last meeting with David Weiss, U.S. Attorney in Delaware, in early September—it was either end of August, early September 2022—to talk about the 2014, 2015 tax year.  And at that meeting, David says to us—and this is from my recollection—that he agrees with us regarding the 2014, 2015 tax year.  They're great.  Yes, we investigated it.  We figured it out.  But he has been getting concerns from DOJ Tax regarding the tax years because they viewed that, at a trial—that it could affect the later years.  That the information regarding the subject's brother's death, the substance abuse—that all those things could play a huge role and cause the jury to say essentially—to have sympathy for him and to not convict on the charges.  At that time, David is telling us, well, I'm still weighing it.  I love the 2014, 2015.  Essentially, I want to charge it.  And at that meeting, he tells us—we ask him, when are we going to charge?  And he says, well, hopefully end of September.  It was kind of up in the air.

*Id.*  WB 2 elaborated on this meeting:

In that meeting he had alluded that DOJ Tax was of the mindset that the jury's sympathy—related to the death of his brother and the drug use—would affect the later tax years, and that David, at that time, was weighing whether to go forward based on that or not because he was getting swayed one way or the other.  And David said he felt strongly with the evidence and what we were presenting.

*Id*. at 91.

82.    On October 7, 2022, the critical meeting for the purposes of this case occurred.

*E.g.*, Shapley Trans. at 28–29.  Shapley testified that the following individuals were present:

So from the FBI it was SAC Tom Sobocinski, ASAC Ryeshia Holley. IRS SAC Darryl Waldon.  I was ASAC at the time, and I was there.  And it was U.S. Attorney David Weiss and then Shawn Weede. And Shannon Hanson.  So I don't know what Shawn Weede and Shannon Hanson's titles are, but they were like David Weiss' one and two type person.  Probably crim chief, first assistant, that area.

*Id.* at 178–179.

83.    Shapley's testimony described the meeting as follows:

The next meeting was in person on October 7th, 2022, and it took place in the Delaware U.S. Attorney's Office.  This meeting included only senior-level managers from IRS CI, FBI, and the Delaware U.S. Attorney's Office.  This ended up being my red-line meeting in our investigation for me.  United States Attorney Weiss was present for the meeting.  He surprised us by telling us on the charges, quote:  "I'm not the deciding official on whether charges are filed," unquote.  He then shocked us with the earth-shattering news that the Biden-appointed D.C. U.S. Attorney Matthew Graves would not allow him to charge in his district.  To add to the surprise, U.S. Attorney Weiss stated that he subsequently asked for special counsel authority from Main DOJ at that time and was denied that authority.  Instead, he was told to follow the process, which was known to send U.S. Attorney Weiss through another President Biden-appointed U.S. Attorney.  This was troubling, because he stated that, if California does not support charging, he has no authority to charge in California.  Because it had been denied, he informed us the government would not be bringing charges against Hunter Biden for the 2014–2015 tax years, for which the statute of limitations were set to expire in one month.  All of our years of effort getting to the bottom of the massive amounts of foreign money Hunter Biden received from Burisma and others during that period would be for nothing.  Weiss also told us that if the new United States Attorney for the Central District of California declined to support charging for the 2016 through 2019 years, he would have to request special counsel authority again from the Deputy Attorney General and/or the Attorney General.  I couldn't understand why the IRS wasn't told in the summer of 2022

that D.C. had already declined charges.  Everyone in that meeting seemed
shellshocked, and I felt misled by the Delaware United States Attorney's Office.
At this point, I expressed to United States Attorney Weiss several concerns with
how this case had been handled from the beginning.  The meeting was very
contentious and ended quite awkwardly.  It would be the last in-person meeting I
had with United States Attorney Weiss.

*Id.* at 28–29.

84.     Shapley prepared a contemporaneous email to his supervisors to document the

October 7 meeting.  As he testified:

A.  . . .  I realized the gravity of what I just witnessed, so I didn't want it to be a
memo to file that didn't go anywhere else.  So I did this to ensure that my
information was corroborated right then, right there.
Q.  Right.
A.  So that people couldn't—
Q.  Right.  So this is essentially your contemporaneous notes from that business
meeting, correct?
A.  Yeah.

*Id.* at 149.  Shapley indicated that he "told [SAC Waldon] that I would be the one that would

summarize it [the October 7 Meeting] for Mike, the DFO, Batdorf, and I said that I'd cc you so

that you can confirm."  *Id.*

85.     The memorandum reads as follows:

**From:** Shapley Gary A Jr < ▮▮▮▮▮▮▮▮▮▮ >
**Sent:** Friday, October 07, 2022 6:09 PM
**To:** Batdorf Michael T < ▮▮▮▮▮▮▮▮▮▮ >
**Cc:** Waldon Darrell J < ▮▮▮▮▮▮▮▮▮ >
**Subject:** Sportsman Meeting Update

Mike,

Darrell asked me to shoot an update from todays meeting.  Darrell – feel free to comment if
I miss something.

1. Discussion about the agent leak – requested the sphere stay as small as possible
   a. DOJ IG will be notified
   b. FBI – HQ is notified and they refer it to their Counter Intelligence squad in a
      field office for investigation
   c. IRS-CI – **We need to make a referral to TIGTA** – What do you need from me
      on this action item?
2. **Weiss stated that he is not the deciding person on whether charges are filed**
   a. I believe this to be a huge problem – inconsistent with DOJ public position
      and Merrick Garland testimony
   b. Process for decision:
      i. Needs DOJ Tax approval first – stated that DOJ Tax will give
         "discretion" (We explained what that means and why that is
         problematic)
      ii. No venue in Delaware has been known since at least June 2021
      iii. Went to D.C. USAO in early summer to request to charge there –
      Biden appointed USA said they could not charge in his district
         1. USA Weiss requested Special counsel authority when it was
            sent to D.C and Main DOJ denied his request and told him to
            follow the process

EXHIBIT

10

iv.  Mid-September they sent the case to the central district of
California – coinciding with the confirmation of the new biden
appointed USA – decision is still pending

v.  If CA does not support charging USA Weiss has no authority to
charge in CA –

1.  He would have to request permission to bring charges in CA
from the Deputy Attorney General/Attorney General
(unclear on which he said)

vi.  With DOJ Tax only giving "discretion" they are not bound to bring
the charges in CA and **this case could end up without any charges**

3.  They are not going to charge 2014/2015 tax years

a.  I stated, for the record, that I did not concur with that decision and put on
the record that IRS will have a lot of risk associated with this decision
because there is still a large amount of unreported income in that year from
Burisma that we have no mechanism to recover.

b.  Their reason not to charge it does not overcome the scheme and affirmative
acts – in my opinion

4.  FBI SAC asked the room if anyone thought the case had been politicized – we can
discuss this is you prefer

5.  No major investigative actions remain

6.  Both us and the FBI brought up some general issues to include:

a.  Communication issues

b.  Update issues

c.  **These issues were surprisingly contentious**

Always available to discuss.  Have a great weekend!

Text Description automatically generated

Shapley Trans. Ex. 10.  SAC Waldon expressly confirmed the accuracy of Shapley's account of

the October 7 meeting in writing:

| | |
|---|---|
| **From:** | Waldon Darrell J |
| **To:** | Shapley Gary A Jr; Batdorf Michael T |
| **Subject:** | RE: Sportsman Meeting Update |
| **Date:** | Tuesday, October 11, 2022 7:27:14 AM |
| **Attachments:** | image001.png |

Good morning, all –

Thanks, Gary. You covered it all. I am taking care of referral to TIGTA.

Mike – let me know if you have any questions.
Darrell

*Darrell J. Waldon*
*Special Agent in Charge*
*Washington, D.C. Field Office*
*(C)* ▓▓▓▓▓▓▓

*Id.*

86.     Shapley was questioned specifically on his written account of U.S. Attorney

Weiss' authority:

> Q.  . . .  It's pretty remarkable that the U.S. attorney on October 7th said he is not
> the deciding official.  Did he say it in those words?
> A.  Yeah.  He said, I am not the deciding person on whether charges are filed.
> Q.  So there's no ambiguity, he was crystal clear in what he was saying?
> A.  It was how I understood it, and it was also how the special agent in charge
> understood it.

*Id.* at 151.

87.     Shapley was candid that he obtained his information on U.S. Attorney Weiss'

authority and actions directly from U.S. Attorney Weiss, but did not have independent

knowledge:  "All I know is what he told me he did, and that's all I Can say, I think, to that."  *Id.*

at 143.  Shapley was also forthright that he did not know precisely when U.S. Attorney Weiss

sought and was denied special counsel status:

> Q.  I know you're not sure of when the U.S. Attorney for Delaware asked for
> special counsel status, but do you have a timeframe?  Sometime between March
> of January of 2023?  Is that fair?
> A.  My understanding was that it was right in March after he was told by Matthew
> Graves that they didn't support it.

*Id.* at 101–02.

88.     WB 2 was not present at the October 7, 2023 meeting, but his testimony

concerning what he was told about the meeting both corresponds with Shapley's account and

reflects Shapley's contemporaneously related account:

> MAJORITY COUNSEL 1.  On the issue of special counsel authority, do you
> know whether U.S. Attorney Weiss requested special counsel authority?
> Mr. [REDACTED].  I only know this secondhand from what my supervisor told
> me after that October 7th meeting, that—
> MAJORITY COUNSEL 1.  And this is what you know—[who did you hear this]
> from secondhand?
> Mr. [REDACTED].  I know this from Gary—my supervisor, Gary Shapley—
> telling me about what happened during that meeting.  That—
> Mr. Zerbe.  Let's go off.

[Discussion off the record.]

Mr. [REDACTED].  So I heard it was a contentious meeting.  My SAC and my supervisor were there.  There were members from FBI there.  And they had asked him about this, about bringing the case in D.C., and he explained that he was essentially told no.  And then he went back and asked for special counsel authority, and they told him no.  I don't think they said who he went back to, but they told him no.

BY MAJORITY COUNSEL 1:

Q.  So you don't know who he requested special counsel authority from?

A.  Yes, I do not know that.  But I know that they ultimately said:  No, follow the normal process.

Q.  Do you know when he requested special counsel status?

A.  That, I do not know.

Q.  Do you know if he did it more than one time?

A.  That, I do not know.

WB 2 Trans. at 114–115; *accord id.* at 40 ("October 7th was the meeting with the leadership and David Weiss.  And that's where those statements were made regarding David saying, I'm not the deciding official on whether charges are filed.  He has no authority to charge in California, essentially, is what is told to me about that meeting.").

89.     Shapley and WB 2 both indicated that their involvement on the Hunter Biden Investigation was substantially reduced from this point on until their removal from the case on May 15, 2023.

90.     Shapley did testify that "[i]n January of this year, I learned United States Attorney Estrada had declined to bring the charges in the Central District of California."  Shapley Trans. at 31; *accord id.* at 152.  WB 2 testified consistently.  *See* WH 2 Trans. at 158–59.  Shapley also testified:

Q.  And do you know if he asked for special counsel status at any time before he brought the case to the Central District of California?

A.  For California?

Q.  Yes.

A.  I don't know that.  But in the October 7th meeting, he did say that if California tells him no, he has no authority to charge in California, and that he would have to request special counsel authority in order to charge it.

Shapley Trans. at 102.

91.     Both whistleblowers testified to a number of further important events in 2023.

Specifically relevant here, Shapley testified:

> On March 16th, 2023, DOJ Tax Mark Daly was overheard on his telephone by
> one of my agents.  Mark Daly was talking to DOJ Tax Attorney Jack Morgan.
> Mr. Daly stated that they would give United States Attorney Weiss the approvals
> required if he wanted them, but that he had no idea where he planned to charge
> Hunter Biden.  This indicates that after the Central District of California declined
> to allow charges to be brought there, the only route to United States Attorney
> Weiss was to request special counsel authority.  It appears that this case was not
> moving forward until Senator Grassley asked pointed questions that held AG
> Garland accountable.

*Id.* at 31–32.

92.     Both Whistleblowers were questioned at length as to their views on whether

Attorney General Garland's testimony on April 26, 2022 and March 1, 2023 concerning U.S.

Attorney Weiss' independence and authority was consistent with their knowledge of the facts.

*See* Shapley Trans. at 66–70; WB 2 Trans. at 109–114.  WB 2 did not directly opine on the

matter, reserving the ultimate judgement to the Committee.  Shapley, on the other hand, did

engage in factual analysis at several points.

93.     First:

> Q.  . . . Senator Grassley, on March 1st of 2023, so a whole year had gone by,
> asked the Attorney General about this, and the Attorney General responded—you
> mentioned this—"I promised to leave the matter of Hunter Biden in the hands of
> the U.S. attorney for the District of Delaware . . . I have pledged not to interfere
> with that investigation, and I have carried through on my pledge."  Is that a true
> statement?
> A.  It's not accurate.  No, it's not accurate

Shapley Trans. at 67.

94.     Second:

> Q.  . . . .  Okay. I'll just say it again.  The Attorney General said that he, meaning
> U.S. Attorney Weiss, "has full authority to make those kind[s] of referrals that

you are talking about or bring cases in other jurisdictions if he feels it's necessary. And I will assure that if he does, he will be able to do that."  Are you aware that the Attorney General responded in that way?
A.  Yes, I am.
Q.  Is that true?
A.  No, that's not.  Based on what actually happened, as well as the statements provided by U.S. Attorney Weiss, those statements are false.

*Id.* at 68.

95.    Third:

Q.  . . . .  And the Attorney General followed up, and he said:  "I don't know the answer to that, and I don't want to get into the internal elements of the decision making by the U.S. attorney.  But he has been advised that he is not to be denied anything he needs.  And if that were to happen, it should ascend through the Department's ranks.  But I have not heard anything from that office to suggest that they're not able to do everything the U.S. attorney wants to do."  Do you think it's conceivable that the DAG's office or the head of DOJ Tax kept that information from the Attorney General?
A.  I feel like it's my opinion that you wouldn't make statements like that if you thought that was the case.

*Id.* at 70.

## **Robert Hunter Biden is Charged**

96.    On June 20, 2023, press reported that Hunter Biden had reached a plea agreement

with the United States.  *Hunter Biden to Plead Guilty to Tax-Related Misdemeanors as Part of a*

*Plea Agreement*, NBC News (June 20, 2023), *found at* https://www.nbcnews.com/politics/joe-

biden/hunter-biden-plea-deal-income-tax-case-gun-charges-rcna90144 (last visited June 24,

2023).  Hunter Biden's attorney put out the following statement:

"With the announcement of two agreements between my client, Hunter Biden, and the Unites States Attorney's Office for the District of Delaware, it is my understanding that the five-year investigation into Hunter is resolved.  Hunter will take responsibility for two instances of misdemeanor failure to file tax payments when due pursuant to a plea agreement.  A firearm charge, which will be subject to a pretrial diversion agreement and will not be the subject of the plea agreement, will also be filed by the Government.  I know Hunter believes it is important to take responsibility for these mistakes he made during a period of turmoil and

addiction in his life.  He looks forward to continuing his recovery and moving
forward."

*Id.*

97.     On June 20, 2023, the Department of Justice filed two informations with the U.S.

District Court for the District of Delaware.  The first information ("Tax Information") (*United*

*States v. Robert Hunter Biden*, No. 23-mj-274 (MN) (D. Del. June 20, 2023) (ECF No. 2)) (Ex.

19)) charged Hunter Biden with two misdemeanor counts of willful failure to pay federal income

tax for the tax years 2017 and 2018 (26 U.S.C. § 7203) and the second ("Firearm Information")

(*United States v. Robert Hunter Biden*, No. 23-cr-61 (MN) (D. Del. June 20, 2023) (ECF. No. 2)

(Ex. 20) charged Hunter Biden with possession of a firearm by a person who is an unlawful user

of or addicted to a controlled substance (18 U.S.C. § 922(g)(3)).

98.     The Informations were accompanied by a letter signed by Special Assistant U.S.

Attorney Leo J. Wise requesting the Court schedule a consolidated initial appearance on the

firearm charge and an initial appearance and change of plea hearing on the tax charges.  Letter

from Leo J. Wise to Clerk of Court, *United States v. Robert Hunter Biden*, No. 23-mj-274 (MN)

(D. Del. June 20, 2023) (ECF No. 1); Letter from Leo J. Wise to Clerk of Court, *United States v.*

*Robert Hunter Biden*, No. 23-cr-61 (MN) (D. Del. June 20, 2023) (ECF. No. 1).

99.     U.S. Attorney Weiss released a statement that same day reading:

The United States Attorney for the District of Delaware filed charges
today against Robert Hunter Biden ("Hunter Biden") of Los Angeles.  Hunter
Biden has been charged with two misdemeanor tax offenses and a felony firearm
offense and has agreed to enter a plea of guilty to the tax offenses and enter into a
pre-trial diversion agreement with regard to the firearm charge at a proceeding to
be scheduled by the assigned United States District Court judge.

According to the tax Information, Hunter Biden received taxable income
in excess of $1,500,000 annually in calendar years 2017 and 2018.  Despite owing
in excess of $100,000 in federal income taxes each year, he did not pay the
income tax due for either year.

According to the firearm Information, from on or about October 12, 2018 through October 23, 2018, Hunter Biden possessed a firearm despite knowing he was an unlawful user of and addicted to a controlled substance.

Hunter Biden is charged with two violations of failure to pay income tax and one violation of unlawful possession of a firearm by a person prohibited.  If convicted, he faces a maximum penalty of 12 months in prison on each of the tax charges and a maximum penalty of 10 years in prison on the firearm charge.  Actual sentences for federal crimes are typically less than the maximum penalties.  A federal district court judge will determine any sentence after taking into account the U.S. Sentencing Guidelines and other statutory factors.

U.S. Attorney's Office for the District of Delaware, *Tax and Firearm Charges Filed Against Robert Hunter Biden* (June 20, 2023), *found at* https://www.justice.gov/usao-de/pr/tax-and-firearm-charges-filed-against-robert-hunter-biden (last visited June 26, 2023).

100.    Hunter Biden is currently scheduled to appear before Judge Maryellen Noreika on July 26, 2023 for both cases.  Dkt., *United States v. Robert Hunter Biden*, No. 23-mj-274 (MN) (D. Del.); Dkt., *United States v. Robert Hunter Biden*, No. 23-cr-61 (MN) (D. Del. June 20, 2023) (ECF. No. 1) (Ex. 21).  The tax matters are also set for a plea hearing on July 26, 2023.  Order, *United States v. Robert Hunter Biden*, No. 23-mj-274 (MN) (D. Del. June 21, 2023) (ECF No. 3) (Ex. 22).

**Attorney General Garland and the White House Respond to the IRS Whistleblowers' Testimony**

101.    On June 23, 2023, Attorney General Garland held a press conference along with Deputy Attorney General Lisa Monaco and other senior Department officials ostensibly to announce major indictments of fentanyl traffickers.  Attorney General Garland was questioned about the whistleblowers' testimony.

Q:  Yesterday whistleblower Testimony came out from an IRS supervisory special agent current supervisory special agent who insists he was in a meeting with U. S. Attorney David Weiss, who on October 2022 claims in front of multiple people that he was told not to pursue the Hunter Biden investigation not

to bring charges in 2022.  You said Previously you stayed out of the hunter Biden investigation.  It's been on David Weiss to figure that out. Can you once and for all shed a little light in there seems to be a little confusion on what's going on here.

GARLAND:  Happy to.  As I said at the outset, Mr. Weiss, who was appointed by President Trump as the U. S attorney in Delaware and assigned this matter during the previous administration.  Would be permitted to continue his investigation and to make a decision to prosecute.  Anyway in which he wanted to and in any district in which he wanted to Mr. Weiss has since sent a letter to the House Judiciary Committee, confirming that he had that authority.  I don't know how it would be possible for anybody to block him from bringing a prosecution given that he has this authority.

Q:  Never told no

GARLAND:  I'd say he was given complete authority to make all decisions on his own.

Q:  Just to follow up on that one of the allegations of the IRA supervisors apparently made well of involved the fact that Mr. Weiss reportedly wanted to Have the powers conferred on special counsels was that request ever made.  And if so, uh Did you?  Why did you reject it?

GARLAND:  It was not the only person with authority to Make somebody a special counsel or refused to make somebody. A special counsel is the attorney general.  Mr. Weiss never made that request to me.

Q:  Just following that, can you explain the rationale for not appointing a special counsel?

GARLAND:  In this case, Mr. Weiss had in fact more authority than a special counsel would have.  He has complete, he has and had compete authority to bring a case anywhere he wants in his discretion.

Q:  I mean, with the exception of what you've said today, you've deferred all other questions related to the 100 investigation to Mr. Weiss.  Mr. Weiss has declined to comment on any of this.  With the exception of his letter to the House judiciary that just says that he had the ultimate authority to charge and where to charge but on the specific allegations that these whistleblowers are brought forward.  There's very detailed allegations.  Would you authorize him to answer to some of this more specific allegations that these IRS with whistleblowers have come forward with?

GARLAND:  I would support Mr. Weiss explaining or testifying on these matters when he deems it appropriate.

Q:  Mr. Attorney General, Republicans in Congress have flirted with the idea of holding the FBI director and content.  Um it's become a talking point on the campaign trail.  Um The alleged corruption in the FBI and other federal law enforcement agencies.  Do the American people have cause to be concerned about the integrity of the components of this Justice Department? What do you have to say about how they're acting.

GARLAND:  I certainly understand that some have chosen to attack the integrity of the Justice Department as components and its employees by claiming that we do not treat like cases alike.  This constitutes an attack on an institution that is

essential to American democracy and essential to the safety of the American people. Nothing could be further from the truth.  You've all heard me say many times that we Make.  Our case is based on the facts and the law.  These are not just words.  These are what we live by their the foundation of the way we make these decisions.  The agents of the FBI as well as the DEA.  The ATF the  deputy U.S. marshals every day, often at great personal risk, Protect the American people and secure its safety.  Our cases are based on their work. I could not be more proud to work with them.  Thank you.  Thank you.

*DOJ Officials Announce Arrests and Disruptions of the Fentanyl Precursor Chemical Supply*

*Chain*, (Jun. 24, 2023), *found at* https://www.youtube.com/watch?v=zCl0qDy8M-

I&ab_channel=TheJusticeDepartment. (last visited June 26, 2023).

102.    During the June 23, 2023 White House Press Briefing, Both National Security

Counsel Coordinator for Strategic Communications John Kirby and Press Secretary Karine Jean-

Pierre refused to answer the questions about the Whistleblower disclosures and Mr. Kirby

abruptly left the Q&A.  *See* White House Press Conference (June 23, 2023) (Ex. 23).

**Speaker McCarthy Demands Answers and Raises Possible Impeachment**

103.    On June 25, 2023, House Speaker Kevin McCarthy released the following tweet:



> **Kevin McCarthy** ✔ @SpeakerMcCarthy · 3h                            ···
>
> We need to get to the facts, and that includes reconciling these clear disparities. U.S. Attorney David Weiss must provide answers to the House Judiciary Committee.
>
> If the whistleblowers' allegations are true, this will be a significant part of a larger impeachment inquiry into... Show more
>
> >  **Byron York** @ByronYork · 17h
> >
> > IRS whistleblower Gary Shapley testified that US Atty in charge of Hunter investigation, David Weiss, said he wanted to bring charges in DC but was denied. Many of you balked. Didn't happen! No way Shapley could know that! Now, here's some more from Shapley:
> >
> > June 23, 2023
> >
> > Mark D. Lytle                                  Jason Foster and Tristan Leavitt
> > Nixon Peabody LLP                              Empower Oversight
> >
> > In an October 7, 2022, meeting at the Delaware U.S. Attorney's Office, U.S. Attorney David Weiss told six witnesses he did not have authority to charge in other districts and had thus requested special counsel status. Those six witnesses include Baltimore FBI Special Agent in Charge Tom Sobocinski and Assistant Special Agent in Charge Ryeshia Holley, IRS Assistant Special Agent in Charge Gary Shapley and Special Agent in Charge Darrell Waldon, who also independently and contemporaneously corroborated Mr. Shapley's account in an email, now public as Exhibit 10, following p. 148 of his testimony transcript. Mr. Shapley would have no insight into why Mr. Weiss's would make these statements at the October 7, 2022 meeting if they were false. That Mr. Weiss made these statements is easily corroborated, and it is up to him and the Justice Department to reconcile the evidence of his October 7, 2022 statements with contrary statements by Mr. Weiss and the Attorney General to Congress.

104.    Speaker McCarthy elaborated on his tweet during an appearance on Fox & Friends the morning of June 26, 2023:

> MCCARTHY . . . .  I mean they even waited to get the six-year statute of limitation off where they—Burisma money, he didn't get charged for.  Some of the highest prosecution.  They want to have a special counsel and now we're seeing that the DOJ did—the attorney general declined that, even though he's saying something different.  So, we have requested, by July 6th, Weiss to come in

44

and answer these questions because the IRS whistleblowers took copious notes during those meetings, coming back with the date, the six people in it. And he took these notes but he e-mailed everybody back, this is what was said during the meeting.

KILMEADE: So, will you have both there? Will you have Weiss there and Shapley there, who came forward?

EARHARDT: The whistleblower.

KILMEADE: The IRS whistleblower.

MCCARTHY: The thing people don't realize is, every single day we're bringing people in. This is why you're getting this information.

KILMEADE: Maybe not together.

MCCARTHY: This is why you have bank statements now. This is why you know about the 1023. This is why you know about WhatsApp. We're continuing to do our information much different than anybody else. I wish none of this would ever happen or go forward with somebody in elected office.

*      *      *

I mean they even waited to get the six-year statute of limitation off where they— Burisma money, he didn't get charged for. Some of the highest prosecution. They want to have a special counsel and now we're seeing that the DOJ did—the attorney general declined that, even though he's saying something different. So, we have requested, by July 6th, Weiss to come in and answer these questions because the IRS whistleblowers took copious notes during those meetings, coming back with the date, the six people in it. And he took these notes but he e-mailed everybody back, this is what was said during the meeting. Yes, but what's interesting is, the IRS whistleblower, that has no political background, took copious notes, can tell you the date, can tell you the people in the meeting. And so what we can do is sit—

DOOCY: And he said what the U.S. attorney said.

MCCARTHY: So we could bring six other people in. And the U.S. attorney, you said this here, but the attorney general says something different. Said you had all power, and you did not.

DOOCY: Right. So, ultimately, you know, people are looking in and it looks suspicious.

MCCARTHY: It's more than looks suspicious.

Transcript, Fox & Friends (June 26, 2023) (Ex. 24).

105.    The sum of the Administration's response to date can be captured in a release

from Spokesman Ian Sams:

"Speaker McCarthy and the extreme House Republicans are proving they have no positive agenda to actually help the American people on the issues most important to them and their families. The President and his entire Administration are spending this whole week traveling the country to talk about the important economic progress we have made over the last two years – creating more than 13 million jobs as we've sparked the strongest recovery of any country in the world – and laying out the Biden plan to put the middle class ahead of those at the very top. Perhaps Congressional Republicans are desperate to distract from their own plan to give even more tax cuts to the wealthy and big corporations and add more than $3 trillion to the deficit, but instead of pushing more partisan stunts intended only to get themselves attention on the far right, they should work with the President to actually put the middle class and working Americans first and expand the historic progress to lower costs, create jobs, boost U.S. manufacturing and small businesses, and make prescription drugs more affordable."

### FIRST CLAIM FOR RELIEF
**Violation FOIA, 5 U.S.C. § 552**
**Failure to Conduct Adequate Searches for Responsive Records**

106.     Plaintiffs re-allege the foregoing paragraphs as if fully set out herein.

107.     FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  Attorney General, *Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

46

108.     Plaintiffs properly requested records within the possession, custody, and control
of Defendant.

109.     Defendant is subject to FOIA and therefore must make reasonable efforts to
search for requested records.

110.     Defendant has failed to promptly review agency records for the purpose of
locating and collecting those records that are responsive to Plaintiffs' FOIA Request.

111.     Defendant's failure to conduct searches for responsive records violates FOIA and
DOJ regulations.

112.     Plaintiffs have a statutory right to the information they seek.

113.     Defendant is violation of FOIA.

114.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of
FOIA.  Plaintiffs are being denied information to which they are statutorily entitled and that is
important to carrying out Plaintiffs' functions as a non-partisan research and educational
institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless
Defendant is compelled to comply with the law.

115.     Plaintiffs have no adequate remedy at law.

116.     Plaintiffs have constructively exhausted their administrative remedies.

**SECOND CLAIM FOR RELIEF**
**Violation of FOIA, 5 U.S.C. § 552**
**Wrongful Withholding of Non-Exempt Responsive Records**

117.     Plaintiffs re-allege the foregoing paragraphs as if fully set out herein.

118.     FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in
government operations is a priority of th[e Biden] . . . Administration."  Attorney General,

47

*Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

119.     Plaintiffs properly requested records within the possession, custody, or control of Defendant.

120.     Defendant is subject to FOIA, and therefore must release to a FOIA requester any non-exempt records and provide a lawful reason for withholding any records.

121.     Defendant is wrongfully withholding non-exempt records requested by Heritage by failing to produce any records responsive to Plaintiffs' FOIA Request.

122.     Defendant is wrongfully withholding non-exempt-agency records requested by Plaintiffs by failing to segregate exempt information in otherwise non-exempt records responsive to Plaintiffs' FOIA Request.

123.     Defendant's failure to provide all non-exempt responsive records violates FOIA and DOJ regulations.

124.     Plaintiffs have a statutory right to the information they seek.

125.     Defendant is in violation of FOIA.

126.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied information to which they are statutorily entitled and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

127.     Plaintiffs have no adequate remedy at law.

128.     Plaintiffs have constructively exhausted their administrative remedies.

**THIRD CLAIM FOR RELIEF**
**Violation of FOIA, 5 U.S.C. § 552**
**Failure to Provide Expedited Processing Despite Purported Grant of Request to Expedite**

129.    Plaintiffs re-allege the foregoing paragraphs as if fully set out herein.

130.    FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration." *Attorney General, Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

131.    Plaintiffs requested expedited processing in the Request pursuant to 5 U.S.C. § 552(a)(6)(E) and 28 C.F.R. § 16.5(e)(1)(iv).

132.    The Department has failed to process the Request in an expedited manner. While the Department purported to grant expedited processing by its March 27, 2023 letter, the Department did not indicate when it would provide agency records and Plaintiffs have received no records responsive to the Request.

133.    Defendant has failed to process the Request "as soon as practicable."  5 U.S.C. § 552(a)(6)(E)(iii).

134.    Defendant's failure to expeditiously provide all non-exempt responsive records violates FOIA and DOJ regulations.

135.    Plaintiffs have a statutory right to the information they seek.

136.    Defendant is in violation of FOIA.

137.    Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied information to which they are statutorily entitled and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational

institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

138.    Plaintiffs will be irreparably harmed if they do not receive a complete production by July 21, 2023, because they will be unable to make use of the records to educate the American public in advance of Hunter Biden's July 26, 2023 plea hearing and as part of on-going House oversight activity and possible impeachments.  In particular, without the information sought by the Request, the American people may be unable to file pleadings with the court in that case expressing their views and potentially opposing the plea agreement as against the interests of Justice.

139.    Plaintiffs have no adequate remedy at law.

140.    Plaintiffs have constructively exhausted their administrative remedies.

**FOURTH CLAIM FOR RELIEF**
**Violation of FOIA, 5 U.S.C. § 552**
**Wrongful Denial of Fee Waiver**

141.    Plaintiffs re-allege the foregoing paragraphs as if fully set out herein.

142.    FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  *Attorney General, Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

143.    Plaintiffs properly requested records within the possession, custody, or control of Defendant.

144.    Defendant has constructively denied Plaintiffs' application for a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(ii) & (iii) and 28 C.F.R. §16.10(k).

145.    The Request does not have a commercial purpose because Heritage is a 501(c)(3) nonprofit, Howell acts in his capacity as a Heritage employee, and release of the information sought does not further Plaintiffs' commercial interest.

146.    Plaintiffs are members of the news media as they "gather[] information of potential interest to a segment of the public, use[] . . . [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience" via Heritage's major news outlet, *The Daily Signal*.  5 U.S.C. § 552(a)(4)(a)(ii).

147.    Disclosure of the information sought by the Request also "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government."  5 U.S.C. § 552(a)(4)(A)(iii).

148.    Defendant has "failed to comply with a[]time limit under paragraph (6)" as to the Request.  5 U.S.C. § 552(a)(4)(A)(viii)(I).

149.    Plaintiffs have a statutory right to a fee waiver.

150.    Defendant is in violation of FOIA by denying a fee waiver.

151.    Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied a fee waiver to which they are statutorily entitled and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

152.    Plaintiffs have no adequate remedy at law.

153.    Plaintiffs have constructively exhausted their administrative remedies.

**FIFTH CLAIM FOR RELIEF**
**Violation of FOIA, 5 U.S.C. § 552**
**Statutory Bar Against Charging Fees**

154.     Plaintiffs re-allege the foregoing paragraphs as if fully set out herein.

155.     FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  Attorney General, *Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

156.     Plaintiffs properly requested records within the possession, custody, or control of Defendant.

157.     The Request does not have a commercial purpose because Heritage is a 501(c)(3) nonprofit, Howell acts in his capacity as a Heritage employee, and release of the information sought does not further Plaintiffs' commercial interest.

158.     Plaintiffs are members of the news media as they "gather[] information of potential interest to a segment of the public, use[] . . . [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience" via Heritage's major news outlet, *The Daily Signal*.  5 U.S.C. § 552(a)(4)(a)(ii).

159.     Disclosure of the information sought by the Request also "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government."  5 U.S.C. § 552(a)(4)(A)(iii).

160.     Defendant has "failed to comply with a[]time limit under paragraph (6)" as to the Request.  5 U.S.C. § 552(a)(4)(A)(viii)(I).

161.     Defendant has not determined "more than 5,000 pages are necessary to respond to this request," or discussed with Plaintiffs how Plaintiffs "could effectively limit the scope of the request."  5 U.S.C. § 552(a)(4)(A)(viii)(II)(cc).

162.     Defendant is currently statutorily barred from charging fees related to Plaintiffs'

FOIA Request.  Therefore, Plaintiffs have a statutory right to have the Request processed without

being charged any fees.

163.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of

FOIA.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to

comply with the law.

164.     Plaintiffs have no adequate remedy at law.

165.     Plaintiffs have constructively exhausted their administrative remedies.

**WHEREFORE** as a result of the foregoing, Plaintiffs pray that this Court:

A.     Enter a preliminary and permanent injunction compelling Defendant to process
       and produce all non-exempt responsive records by July 21, 2023.

B.     Order Defendant to conduct a search or searches reasonably calculated to uncover
       all records responsive to Plaintiffs' FOIA Request;

C.     Order Defendant to produce, within twenty days of the Court's order, or by such
       other date as the Court deems appropriate, any and all non-exempt records
       responsive to Plaintiffs' FOIA Request and indexes justifying the withholding of
       any responsive records withheld in whole or in part under claim of exemption;

D.     Enjoin Defendant from continuing to withhold any and all non-exempt records
       responsive to Plaintiffs' FOIA Request;

E.     Enjoin Defendant from assessing fees or costs for Plaintiffs' FOIA Request;

F.     Retain jurisdiction over this matter as appropriate;

G.     Award Plaintiffs their costs and reasonable attorneys' fees in this action as
       provided by 5 U.S.C. § 522(a)(4)(E); and

H.      Grant such other and further relief as this Court may deem just and proper.


Dated:  June 26, 2023                          Respectfully submitted,


                                               /s/ Samuel Everett Dewey
                                               SAMUEL EVERETT DEWEY
                                               (No. 999979)
                                               Chambers of Samuel Everett Dewey, LLC
                                               Telephone:  (703) 261-4194
                                               Email:  samueledewey@sedchambers.com

                                               ERIC NEAL CORNETT
                                               (No. 1660201)
                                               Law Office of Eric Neal Cornett
                                               Telephone:  (606) 275-0978
                                               Email: neal@cornettlegal.com

                                               DANIEL D. MAULER
                                               (No. 977757)
                                               The Heritage Foundation
                                               Telephone:  (202) 617-6975
                                               Email:  Dan.Mauler@heritage.org

                                               ROMAN JANKOWSKI
                                               (No. 975348)
                                               The Heritage Foundation
                                               Telephone:  (202) 489-2969
                                               Email:  Roman.Jankowski@heritage.org

                                               *Counsel for Plaintiffs*