**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| HERITAGE FOUNDATION & ) | |
| MIKE HOWELL ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 23-cv-1854 (DLF) |
| ) | |
| U.S. DEPARTMENT OF JUSTICE ) | |
| ) | |
| *Defendants*. ) | |
| ) | |
| _____ ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A**
**PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION AND SUMMARY ........................................................................ 1

LEGAL STANDARD ................................................................................................ 7

BACKGROUND ........................................................................................................ 9

ARGUMENT ............................................................................................................ 15

   I.   PRELIMINARY INJUNCTIONS COMPELLING PRODUCTION BY A DATE
       CERTAIN ARE PROPER IN APPROPRIATE FOIA CASES. ............................... 15

  II.  PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE
      MERITS. ......................................................................................................
              ........................................................................................... 16

     A.  FOIA Requires Production "as Soon as Practicable." ......................... 16

     B.  The Records Will Lose Considerable Salience If Not Produced in Time for Use
         in Hunter Biden's July 26, 2023 Plea Proceeding. ................................... 17

     C.  Plaintiffs Are Harmed Every Day They Cannot Use the Records to Inform the
         Public About On-Going Congressional Proceedings. ............................. 20

        1.  Every Day Plaintiffs Are Denied the Records, They Are Effectively Denied
            Their Right to Actual Expedited Processing. ..................................... 20

        2.  The Records Sought by This Motion Go to the Heart of Major and Rapidly
            Evolving Congressional Oversight Inquiries. ................................... 21

        3.  U.S. Attorney Weiss's Public Statements Do Not Alter This Analysis. ......... 27

     D.  Defendant Should Not be Heard to Claim the Responsive Records Are Exempt
         at this Stage. ........................................................................................ 29

**III. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.** ................................................................................. 31

**IV. THE EQUITIES FAVOR GRANTING A PRELIMINARY INJUNCTION.** ........... 34

**CONCLUSION** .................................................................................................................. 36

## TABLE OF AUTHORITIES

**Cases**

*Aguilera v. FBI*, 941 F.Supp. 144 (D.D.C. 1996) ........................................................................ 15

*Al-Fayed v. CIA*, 254 F.3d 300 (D.C. Cir. 2001) ......................................................................... 8

*\*Am. Immigr. Council v. DHS*, 470 F.Supp.3d 32 (D.D.C. 2020) .............................. 15, 16, 17, 33

*\*Am. Oversight v. Dep't of State*, 414 F.Supp.3d 182 (D.D.C. 2019) ............................. 15, 17, 29

*Ashland Oil v. FTC*, 548 F.2d 977 (D.C. Cir. 1977) .................................................................. 29

*Bragg v. Jordan*, __F.Supp.3d___, No. 23-cv-3032, 2023 WL 2999971 (S.D.N.Y. Apr. 19, 2023)
........................................................................................................................................... 29

*\*Brennan Ctr. v. Dep't of Com.*, 498 F.Supp.3d 87 (D.D.C. 2020) .................................... passim

*\*Ctr. for Pub. Integrity v. Dep't of Def.*, 411 F.Supp.3d 5 (D.D.C. 2019) .......................... passim

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ....................................... 7

*Edmonds v. FBI*, No. 02-cv-1294 (ESH), 2002 WL 32539613 (D.D.C. Dec. 3, 2002) .............. 35

*Elec. Frontier Found. v. ODNI*, 542 F.Supp.2d 1181 (N.D. Cal. 2008) ..................................... 15

*Elec. Frontier Found. v. ODNI*, No. 07-cv-5278 (SI), 2007 WL 4208311 (N.D. Cal. Nov. 27,
2007) ("EFF I") .............................................................................................................. 15, 16

*EPIC v. DOJ*, 15 F.Supp.3d 32 (D.D.C. 2014) .................................................................. 21, 30

*\*EPIC v. DOJ*, 416 F.Supp.2d 30 (D.D.C. 2006) ................................................................ passim

*Exxon Corp. v. FTC*, 589 F.2d 582 (D.C. Cir. 1978) ................................................................. 29

*Gerstein v. CIA*, No. 06-cv-4643 (MMC), 2006 WL 3462659 (N.D. Cal. Nov. 29, 2006) ..............
.................................................................................................................................. 15, 16, 33

*In re Morgan*, 506 F.3d 705 (9th Cir. 2007) .............................................................................. 18

*Prot. Dem. Project v. Dep't of Def.*, 263 F.Supp.3d 293 (D.D.C. 2017) ...................................... 21

iii

*Prot. Democracy Project v. DOJ*, 498 F.Supp.3d 132, 144 (D.D.C. 2020) ................................ 34

*Prot. Democracy v. U.S. Dep't of Def.*, 263 F.Supp.3d 293 (D.D.C. 2017) ................................ 8

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ................................................................ 7

*United States v. Bean*, 564 F.2d 700, (5th Cir. 1977) ............................................................. 18

*United States v. Bednarski*, 445 F.2d 364 (1st Cir. 1971) ...................................................... 18

*United States v. Carrigan*, 778 F.2d 1454 (10th Cir. 1985) .................................................... 18

*\*Wash. Post v. Dep't Homeland Sec.*, 459 F.Supp.2d 61 (D.D.C. 2006) .................. 15, 32, 34, 35

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...................................................... 7

**Statutes**

18 U.S.C. § 1001 .................................................................................................................. 2

43 Stat. 5 (1924) ................................................................................................................. 6

5 U.S.C. § 552(a)(6)(E)(iii) ............................................................................................... 8, 16

**Other Authorities**

*A Review of the President's Fiscal Year 2023 Funding Request for the U.S. Department of Justice: Hearing before the S. Comm. on Appropriations, Subcomm. on Justice, Science, and Related Agencies*, 117th Cong., CQ Trans. (Apr. 26, 2022) ......................................................... 9

Nathan Masters, *Crooked* (2023) ..................................................................................... 6

*Oversight of the Department of Justice: Hearing Before the Sen. Comm. on the Judiciary, 118th Cong.*, CQ Trans. (Mar. 1, 2023) ................................................................................... 10

*Oversight of the United States Department of Justice: Hearing Before the H. Comm. on the Judiciary*, 117th Cong. (Oct. 21, 2021) .......................................................................... 9

**Rules**

Fed. R. Crim. P. 11 ......................................................................................................... 17

Fed. R. Evid 801(d)(2) ..................................................................................................... 27

**Regulations**

28 C.F.R. § 16.5(e)(iv)............................................................................................................ 4, 16

\* Authorities upon which we principally rely are marked with an asterisk.

**INTRODUCTION AND SUMMARY**

This is *not* an ordinary FOIA case.

The son of the President of the United States was being investigated for serious crimes, many of which revolve around allegations of *at best* unsavory influence peddling to at least one hostile foreign power (the Chinese Communist Party).  The allegations involve not only many other members of the President's family, but the President *himself*.  Because the Attorney General of the United States, Merrick B. Garland, was appointed by the President, one would expect the appointment of a Special Counsel.  Other Administrations appointed Special Counsels in cases where the possible conflict of interest was much more attenuated.  And yet, the Biden Administration steadfastly refuses to do so.  The underlying case is an action under the Freedom of  Information Act ("FOIA"), 5 U.S.C. § 552, to compel the production of information concerning the authority of the U.S. Attorney for the District of Delaware, David C. Weiss, over the criminal investigation of the son of the President of the United States, Robert Hunter Biden.

The Administration's answer to date has been that U.S. Attorney Weiss—retained from the prior Administration—had supposedly complete authority over the case.  Attorney General Garland repeatedly testified under oath before Congress to that effect.  As the Attorney General told the press on June 23, 2023:  "Mr. Weiss had in fact more authority than a special counsel would have had.  He has and had complete authority, as I said, to bring a case anywhere he wants in his discretion."  Declaration of Samuel Everett Dewey in Support of Plaintiffs Motion for a Preliminary Injunction, Ex. 1 at *19 (June 28, 2023) ("Dewey Decl.").

1

But on June 22, 2023, the House Committee on Ways and Means released transcribed bipartisan staff interviews of two Internal Revenue Service ("IRS") whistleblowers, Gary Shapley ("Shapley") and the anonymized Whistleblower 2 ("WB 2") (collectively "Whistleblowers").  Compl. at ¶ 56.[1]  Those transcripts paint a picture of a different world.  *See* Transcribed Interview of Gary Shapley (May 26, 2023) (ECF Nos. 1-21); Transcribed Interview of WB 2 (June 1, 2023) (ECF No. 1-22).

Both Whistleblowers are career criminal investigators in an elite government unit.  Shapley is the highly decorated supervisor of that unit.  Compl. ¶¶ 58–59, 62.  Both Whistleblowers testified they had no political axe to grind.  *Id.* at ¶¶ 60, 63–64.  Indeed, WB 2 testified he is a Democrat and that he had even been attacked online for his role in the investigation because, as a gay man, many assumed he was a reliable "far left liberal" who would favor the Biden Administration.  *Id.* at ¶ 63.

The Whistleblowers offered more specific testimony:

- The Whistleblowers testified that U.S. Attorney Weiss stated he was not the deciding official as to whether charges are brought against Hunter Biden, contrary to the Attorney General's sworn testimony.

- Shapley testified that at an October 7, 2022 meeting, U.S. Attorney Weiss told those present:

  o That he sought to bring felony tax charges against Hunter Biden for the tax years 2014 and 2015 in the District of Columbia (which had sole venue), but the Biden-appointed U.S. Attorney for the District of Columbia, Matthew Graves, refused to proceed.

---

[1]  Transcribed Interviews with Congressional staff are not taken under oath, but Shapley and WB 2 were both cautioned they were subject to 18 U.S.C. § 1001, which criminalizes false statements to Congressional investigators.  Compl. ¶¶ 57, 61.

- o That he requested Special Counsel status from Main Justice, but the request was denied.  Instead, he was told to "follow the process."

- o That he sought to bring felony tax charges for the tax years 2017 and 2018 in the Central District of California (which had sole venue).

- o That if the Central District of California refused to bring the felony tax charges referred to them, he had no authority to bring those charges absent authorization from the Attorney General or the Deputy Attorney General.

- Shapley documented U.S. Attorney Weiss's statements at the October 7, 2022 meeting in a contemporaneous memorandum sent to, and confirmed as accurate by, his supervisor who was also present at the meeting.

- Shapley testified that the U.S. Attorney for the Central District of California refused to bring the felony tax charges.  *The New York Times* reported on June 27, 2023 that "this episode was confirmed independently to *The New York Times* by a person with knowledge of the situation."  Dewey Decl. Ex. 11 at 3.

The conflict between the Whistleblowers' testimony on pain of felony and the emphatic position delivered under oath by the Attorney General is direct and obvious.

This central issue—was U.S. Attorney Weiss denied the authority and discretion the Attorney General vowed he had—has dominated news coverage in every form of American media.  *See* Dewey Decl. Ex. 4–5 (collecting press coverage).  Even though Congress is not in session, this issue has already launched intense Congressional debate:

- Did U.S. Attorney Weiss have complete authority over the Hunter Biden investigation?

- Did U.S. Attorney Weiss have full authority and complete discretion over whether to charge Hunter Biden outside the District of Delaware?

- Did U.S. Attorney Weiss request Special Counsel authority?

- Did Main Justice refuse a request by U.S. Attorney Weiss for Special Counsel authority?

3

Plaintiffs' FOIA Request seeks records that go directly to these issues.  Plaintiffs' FOIA Request (ECF No. 1-5) ("Request").  The records should provide direct documentary evidence to resolve the conflict between the Attorney General's testimony on the one hand and the Whistleblowers' statements on the other.

The Department has conceded the importance of the Request, granting it expedited processing because it concerns "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." *See* ECF No. 1-14 at 1 (quoting 28 C.F.R. § 16.5(e)(iv)).  But despite this fact, Plaintiffs have not received a single page of records or byte of data even after *111* days following Plaintiffs' initial FOIA submission.  Moreover, the House Judiciary Committee made an almost identical request on February 28, 2023.  *See* App. B001 (ECF No. 1-5).[2]

Unfortunately, the only substantive update Plaintiffs have received on the progress of the FOIA Request came from Defense counsel *today*—and only on threat of this Motion.  The Department has reported that searches have been run and records transferred to the Executive Office for U.S. Attorneys ("EOUSA")—not U.S. Attorney Weiss's office—for review and processing.  Dewey Decl. at ¶ 13.  Plaintiffs are told that the searches generated a significant volume of records, but the Department has provided no specific details such as page numbers or data volume.  *Id.*[3]

---

[2]  Citations to the Appendices to Plaintiffs' FOIA Request are in the form "App.A __."
[3]  Plaintiffs told the Department on June 29, 2023 that EOUSA's role in *processing* the records is not a purely administrative role and that EOUSA's apparent authority over the Request is itself in considerable tension with the Attorney General's sworn testimony that U.S. Attorney Weiss

Plaintiffs now seek to compel the production by July 21, 2023, of a narrowed subset of the records sought by the Request.  Plaintiffs affirmatively offered an initial narrowing as part of the meet-and-confer process and have offered a further narrowing in an attempt to accommodate concerns raised by the Department.  *See* Dewey Decl. ¶ 13.

In cases concerning matters of exceptional national interest and importance where the "value" of records would be lost or diminished if not promptly produced, courts have entered preliminary injunctions compelling expedited production by a date certain.

Plaintiffs' Motion fits comfortably within this line of authority.  There is immense national interest in the disturbing conflict between the Attorney General and the Whistleblowers.  There also is immense political interest.  The records sought would provide clarity to essential questions so that Congress and the American people can judge the matter for themselves.

*First*, the records will lose utility if they are not produced in time for analysis and public dissemination prior to Hunter Biden's July 26, 2023 plea hearing and related Congressional investigations.

Hunter Biden has apparently negotiated a deal with the government where he will plead guilty to two misdemeanor tax charges and enter a pre-trial diversion agreement to resolve a felony firearms charge.  Contrast that with the Whistleblowers' testimony that U.S. Attorney Weiss was repeatedly blocked from bringing multiple felony tax charges.  Hunter Biden's plea hearing is currently set for July 26, 2023.  *See* Dkts., ECF 1-25.  The records Plaintiffs seek are

---

has ultimate authority over the Hunter Biden investigation.  Dewey Decl. ¶ 21.  Plaintiffs have requested the Department clarify this issue.  *Id*.

directly relevant to whether the court in Delaware should accept or reject the plea on the basis

that it may be the result of an irreparably tainted process in which efforts to bring multiple felony

charges were blocked by the Department.  Many, including a former Assistant Attorney General

of the Department's Tax Division, suggested the Delaware Court should consider rejecting the

plea.  Dewey Decl. Ex. 7.  Congress itself is conducting major cross-Committee investigations

into the matters implicated by the plea.  Congress has sought the same records as Plaintiffs.  And

they may well wish to make submissions to the Court in the District of Delaware to delay any

plea until they have had time to conduct their investigations, and if necessary, take remedial

legislative actions.  *See, e.g.*, Nathan Masters, *Crooked* 81–82 (2023) (detailing legislative

remedial actions in the aftermath of the Teapot Dome scandal).

There is finality to a plea.  This is not a case such as Teapot Dome where leases could be

rescinded years later after the misconduct of the Attorney General and other cabinet officials

came to light.  43 Stat. 5 (1924) (an Act of Congress to establish a special counsel in part to void

corruptly awarded federal oil leases years after they were entered into).  If Plaintiffs do not have

these records in time to analyze and publicize for use by the District Court in Delaware, the

Congress, and the broader public, the records lose their value.

*Second*, the House Committee on Oversight and Accountability, the House Committee on

the Judiciary, and the House Committee on Ways and Means are all conducting major

investigations on this same subject.  The Speaker of the House, Kevin McCarthy, is heavily

involved.  These types of major, coordinated, House investigations are rare, fast-moving, and

result in key events that occur with limited notice.  The Speaker has also stated that if the

Whistleblower allegations "are true," there will be an "impeachment inquiry" into the Attorney

General.  All key events in major Congressional investigations necessarily balance the need for

swift action against perfect information.  Every time the House acts and Plaintiffs are unable to

use the information sought by this Motion to educate and inform the public, Plaintiffs will suffer

grave irreparable injury as the records lose significant value.

      At bottom, this Motion is about a public and political controversy so grave that it

threatens first principles foundational to our system of justice.  In such a situation, the American

people must have transparency.  And that transparency must come *now*—not later.

## LEGAL STANDARD

      **1.**      A plaintiff "seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public

interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  It is unclear whether the

D.C. Circuit still follows the "'sliding scale'" approach under which "if the movant makes an

unusually strong showing on one of the factors, then it does not necessarily have to make as

strong a showing on another factor" (*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288,

1291–92 (D.C. Cir. 2009)), or reads *Winter* as requiring a showing of both a likelihood of

success on the merits and irreparable harm.  *Compare Davis*, 571 F.3d at 1292 (reserving) *with*

*Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring) (*Winter* requires showing "*both* a likelihood

of success *and* a likelihood of irreparable harm, among other things"); *Sherley v. Sebelius*, 644

F.3d 388, 392–93 (D.C. Cir. 2011) (suggesting the *Davis* concurrence may be correct, but

ultimately reserving while noting a Circuit split on the issue).  Regardless, the issue is merely academic because Plaintiffs prevail under either standard.

2.      Review on a motion for a preliminary injunction to compel production by a date certain is *de novo*.  *See Al-Fayed v. CIA*, 254 F.3d 300, 306–08 (D.C. Cir. 2001) (Garland, J.) (Review of a statutory provision in FOIA is *de novo* because those terms are "defined by FOIA itself, and because the definition applies across the government, district courts may not defer to any individual agency's effort to elaborate upon that definition—whether through case-specific determinations or through regulations").

3.      Judicial review of an expedited processing *determination* is "based on the record before the agency at the time of the determination."  5 U.S.C. § 552(a)(6)(E)(iii).  Here, the Department has granted expedited processing to Plaintiffs' Request.  Thus, the only issue is whether Plaintiffs are *actually* receiving the expedition the Department has agreed they are entitled to.  Put differently, the question is whether the Department is processing quickly enough—*i.e.*, "as soon as practicable."  5 U.S.C. § 552(a)(6)(E)(iii).  That question is separate and apart from the determination of entitlement to expedition and accordingly is reviewable on the Motion record.  *Cf. Prot. Democracy v. U.S. Dep't of Def.*, 263 F.Supp.3d 293, 300 (D.D.C. 2017) (considering evidence outside of that submitted to the agency in support of expedited processing on irreparable harm analysis on motion for preliminary injunction to compel an agency to grant expedited processing).

## BACKGROUND

Plaintiffs have set forth the relevant background facts at length in their Complaint.  (ECF No. 1).  Critical here is the significant tension between the testimony and public statements of Attorney General Garland and the testimony of Shapley and WB 2 as well as Shapley's contemporaneous documentation:

**Statements of Attorney General Garland:**

- "So, I am not going to comment about this investigation, but as everyone knows there is an investigation going on in Delaware by the U.S. Attorney who was appointed by the previous Administration.  I can't comment on it any further than that."  *Oversight of the United States Department of Justice:  Hearing Before the H. Comm. on the Judiciary*, 117th Cong., 206 (Oct. 21, 2021) (ECF No. 1-8).

- "So the Hunter Biden investigation, as I said even in my own nomination confirmation hearing, is being run by and supervised by the United States Attorney for the District of Delaware."  *A Review of the President's Fiscal Year 2023 Funding Request for the U.S. Department of Justice:  Hearing before the S. Comm. on Appropriations, Subcomm. on Justice, Science, and Related Agencies*, 117th Cong., CQ Trans. at *16–18 (Apr. 26, 2022) (ECF No. 1-9).

- "He [U.S. Attorney Weiss] is supervising the investigation.  And I'm, you know, I'm not at liberty to talk about internal Justice Department deliberations, but he is in charge of that investigation.  There will not be interference of any political or improper kind."  *Id.* at *16.

- "Again, he [U.S. Attorney Weiss] is the supervisor of this investigation and, you know, the normal processes of the department occur.  But he is the supervisor of this investigation."  *Id.* at *16.

- "Because we put the investigation in the hands of a Trump appointee from the previous Administration who's the United States Attorney for the District of Delaware.  And because you have me as the Attorney General, who is committed to the independence of the Justice Department from any influence from the White House in criminal matters. *Id.* at *17.

- "Senator, following the longstanding rule of the Justice Department we don't discuss investigations or evidence that maybe—may or may not be relevant to investigations.

That's a matter for the United States Attorney's office that's investigating the case." *Id.* at \*18.

- "So, as the committee well knows from my confirmation hearing, I promise to leave—I promised to leave the matter of Hunter Biden in the hands of the US attorney for the District of Delaware, who was appointed in the previous administration.  So, any information like that should have gone or should—or should have gone to that US attorney's offices and the FBI squad that's working with him.  I have pledged not to interfere with that investigation, and I have carried through on my pledge." *Oversight of the Department of Justice:  Hearing Before the Sen. Comm. on the Judiciary, 118th Cong.*, CQ Trans. at \*30–33 (Mar. 1, 2023) (ECF No. 1-10).

- "The—the US attorney in Delaware has been advised that he has full authority to—to make those kind of referrals that you're talking about, or to bring cases in other jurisdictions if he feels it's necessary.  And I will assure that, if he does, he will be able to do that." *Id.* at \*31.

- "He [U.S. Attorney Weiss] would have to bring—if it's in another district, he would have to bring the case in another district.  But as I said, I promise to ensure that he's able to carry out his investigation and that he be able to run it.  And if he needs to bring it in another jurisdiction, he will have full authority to do that." *Id.* at \*31.

- "Well, it's a kind of a complicated question.  If it—under the regulations, that kind of act, he [U.S. Attorney Weiss] would have to bring to me under—to the Attorney General.  Under the regulations, those kind of charging decisions would have to be brought.  I would then have to, you know, authorize it and permit it to be brought in another jurisdiction.  And that is exactly what I promised to do here already, that if he needs to do—bring a case in another jurisdiction, he will have my full authority to do that." *Id.* at \*31–32.

- "So, I—I don't know the answer to that.  I do—and I don't want to get into the internal elements of decision making by the US attorney.  But he [U.S. Attorney Weiss] has been advised that he is not to be denied anything that he needs.  And if that were to happen, it should ascend through the department's ranks.  And I have not heard anything from that office to suggest that they're not able to do everything that the US attorney wants to do." *Id.* at \*32.

- "I can't comment about the investigation, other than to say that all the matters involving Mr. Hunter Biden are the purview of the US attorney in Delaware.  He's not restricted in his investigation in any way." *Id.* at \*138.

- "Yes, it's still the case that I stand by my testimony, and I refer you to the U.S. attorney for the District of Delaware who is in charge of this case and capable of making any decisions that he feels are appropriate."  Dewey Decl. Ex. 6 at *1.

- "As I said at the outset, Mr. Weiss, who was appointed by President Trump as the US attorney in Delaware and assigned this matter during the previous administration would be permitted to continue his investigation and to make a decision to prosecute anyway in which he wanted to and in any district in which he wanted to. Mr. Weiss has since sent a letter to the House Judiciary Committee confirming that he had that authority.  I don't know how it would be possible for anybody to block him from bringing a prosecution, given that he has this authority."  Dewey Decl. Ex. 1 at *17–18.

- "I say, [U.S. Attorney Weiss] was given complete authority to make all decisions on his own.  *Id*. at *18.

- "The only person with authority to make somebody a special counsel or refuse to make somebody a special counsel is the attorney general.  Mr. Weiss never made that request to me.  *Id*.

- "Mr. Weiss had in fact more authority than a special counsel would have had.  He had and has complete authority, as I said, to bring a case anywhere he wants in his discretion.  *Id*. at *19.

## Whistleblower Statements:

- WB 2 testified that the U.S. Attorney for the District of Columbia, Matthew Graves, personally rejected U.S. Attorney Weiss's March 2022 attempt to charge Hunter Biden for tax years 2014 and 2015 in the District of Columbia.  "But he basically said that now that the U.S. Attorney looked at the case, they don't want to move forward with it.  And essentially what he told me is that not only are they not going to join the case and give us assistance—so give us another AUSA, give us someone to help there—they also told our prosecutors that they don't think we have—that we can—or they don't think that we have the charges—or not the ability, but the evidence for the charges to charge in D.C.  So not only was it a, no, we're not going to help you, but it was a, you shouldn't bring the charges here, essentially."  WB 2 Trans. at 36; *accord*, WB 2 Trans. at 35; Shapley Trans. at 24 ("Just a couple days later, Mark Daly called the case agent back and told him that the President Biden appointee to the United States Attorney for the District of Columbia, Matthew Graves, personally reviewed the report and did not support it."); *accord id.* at 65.

- "The next meeting was in person on October 7th, 2022, and it took place in the Delaware U.S. Attorney's Office.  This meeting included only senior-level managers from IRS CI,

11

FBI, and the Delaware U.S. Attorney's Office.  This ended up being my red-line meeting in our investigation for me.  United States Attorney Weiss was present for the meeting. He surprised us by telling us on the charges, quote:  I'm not the deciding official on whether charges are filed, unquote.  He then shocked us with the earth-shattering news that the Biden-appointed D.C. U.S. Attorney Matthew Graves would not allow him to charge in his district.  To add to the surprise, U.S. Attorney Weiss stated that he subsequently asked for special counsel authority from Main DOJ at that time and was denied that authority.  Instead, he was told to follow the process, which was known to send U.S. Attorney Weiss through another President Biden-appointed U.S. Attorney. This was troubling, because he stated that, if California does not support charging, he has no authority to charge in California.  Because it had been denied, he informed us the government would not be bringing charges against Hunter Biden for the 2014–2015 tax years, for which the statute of limitations were set to expire in one month.  All of our years of effort getting to the bottom of the massive amounts of foreign money Hunter Biden received from Burisma and others during that period would be for nothing.  Weiss also told us that if the new United States Attorney for the Central District of California declined to support charging for the 2016 through 2019 years, he would have to request special counsel authority again from the Deputy Attorney General and/or the Attorney General.  I couldn't understand why the IRS wasn't told in the summer of 2022 that D.C. had already declined charges.  Everyone in that meeting seemed shellshocked, and I felt misled by the Delaware United States Attorney's Office.  At this point, I expressed to United States Attorney Weiss several concerns with how this case had been handled from the beginning.  The meeting was very contentious and ended quite awkwardly.  It would be the last in-person meeting I had with United States Attorney Weiss." *Id.* at 28–29.

- Shapley's memorandum recording U.S. Attorney Weiss's statements during the October 7, 2022 meeting:

**From:** Shapley Gary A Jr <                    >
**Sent:** Friday, October 07, 2022 6:09 PM
**To:** Batdorf Michael T <                    >
**Cc:** Waldon Darrell J <                    >
**Subject:** Sportsman Meeting Update

Mike,

Darrell asked me to shoot an update from todays meeting.  Darrell – feel free to comment if I miss something.

1. Discussion about the agent leak – requested the sphere stay as small as possible
   a. DOJ IG will be notified
   b. FBI – HQ is notified and they refer it to their Counter Intelligence squad in a field office for investigation
   c. IRS-CI – <mark>We need to make a referral to TIGTA</mark> – What do you need from me on this action item?
2. <u>Weiss stated that he is not the deciding person on whether charges are filed</u>
   a. I believe this to be a huge problem – inconsistent with DOJ public position and Merrick Garland testimony
   b. Process for decision:
      i. Needs DOJ Tax approval first – stated that DOJ Tax will give "discretion" (We explained what that means and why that is problematic)
      ii. No venue in Delaware has been known since at least June 2021
      iii. Went to D.C. USAO in early summer to request to charge there – Biden appointed USA said they could not charge in his district
         1. USA Weiss requested Special counsel authority when it was sent to D.C and Main DOJ denied his request and told him to follow the process



EXHIBIT
10

iv. Mid-September they sent the case to the central district of California – coinciding with the confirmation of the new biden appointed USA – decision is still pending
v. If CA does not support charging USA Weiss has no authority to charge in CA –
   1. He would have to request permission to bring charges in CA from the Deputy Attorney General/Attorney General (unclear on which he said)
vi. With DOJ Tax only giving "discretion" they are not bound to bring the charges in CA and <u>**this case could end up without any charges**</u>
3. They are not going to charge 2014/2015 tax years
   a. I stated, for the record, that I did not concur with that decision and put on the record that IRS will have a lot of risk associated with this decision because there is still a large amount of unreported income in that year from Burisma that we have no mechanism to recover.
   b. Their reason not to charge it does not overcome the scheme and affirmative acts – in my opinion
4. FBI SAC asked the room if anyone thought the case had been politicized – we can discuss this is you prefer
5. No major investigative actions remain
6. Both us and the FBI brought up some general issues to include:
   a. Communication issues
   b. Update issues
   c. **These issues were surprisingly contentious**

Always available to discuss.  Have a great weekend!

Text  Description automatically generated

- Confirmation by Special Agent in Charge Darrell J. Waldon, Shapley's supervisor that Shapley's memorandum was accurate:



- Shapley testified that "[i]n January of this year, I learned United States Attorney Estrada had declined to bring the charges in the Central District of California." Shapley Trans. at 31; *accord id.* at 152. WB 2 testified consistently. *See* WB 2 Trans. at 158–59. Shapley did not know if U.S. Attorney Weiss sought Special Counsel authority after U.S. Attorney Estrada declined to bring charges. Shapley Trans. at 102.

---

[5] *See* Shapely Trans. at 149 (discussing preparation of memorandum and confirmation).

14

## ARGUMENT

### I.    PRELIMINARY INJUNCTIONS COMPELLING PRODUCTION BY A DATE CERTAIN ARE PROPER IN APPROPRIATE FOIA CASES.

Admittedly, a motion for a preliminary injunction does not typically arise in the garden-variety FOIA case.  But again, this is *not* a normal FOIA case.  Motions for preliminary injunctions *are* appropriately brought in FOIA cases where the requestor seeks expedited processing by a date certain.  Numerous courts—including in this District—have entered preliminary injunctions to compel expedited processing by a date certain:

- *Brennan Ctr. v. Dep't of Com.*, 498 F.Supp.3d 87 (D.D.C. 2020) (Kelly, J.);
- *Am. Immigr. Council v. DHS*, 470 F.Supp.3d 32 (D.D.C. 2020) (Hogan, J.);
- *Am. Oversight v. Dep't of State*, 414 F.Supp.3d 182 (D.D.C. 2019) (Cooper, J.);
- *Ctr. for Pub. Integrity v. Dep't of Def.*, 411 F.Supp.3d 5 (D.D.C. 2019) (Kollar-Kotelly, J.);
- *Elec. Frontier Found. v. ODNI*, 542 F.Supp.2d 1181 (N.D. Cal. 2008) ("EFF II");
- *Elec. Frontier Found. v. ODNI*, No. 07-cv-5278 (SI), 2007 WL 4208311 (N.D. Cal. Nov. 27, 2007) ("EFF I");
- *Gerstein v. CIA*, No. 06-cv-4643 (MMC), 2006 WL 3462659 (N.D. Cal. Nov. 29, 2006)
- *EPIC v. DOJ*, 416 F.Supp.2d 30 (D.D.C. 2006) (Kennedy, J.) ("EPIC II")
- *Wash. Post v. Dep't Homeland Sec.*, 459 F.Supp.2d 61 (D.D.C. 2006) (Urbina, J.) ; and
- *Aguilera v. FBI*, 941 F.Supp. 144 (D.D.C. 1996) (Sullivan, J.).

Per the first principles set forth in the statute, this preliminary-injunction process makes sense—a plaintiff with a statutory entitlement to expedited processing has a statutory right to expedition, *i.e.*, to have its request processed *more quickly*.  If a Defendant fails to expedite a request in the face of an impending event, or a rapidly transpiring legislative action likely replete with any number of significant events scheduled on short notice, a requestor will be irreparably harmed.  Documents essential to such proceedings lose much of their significance after those

15

proceedings—or key events therein—have passed.  Preserving the right to *actual* expedition can only be vindicated by preliminary relief.

## II.     PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.     FOIA Requires Production "as Soon as Practicable."

The Department has already granted the Request expedited processing because in the Department's view, the Request concerns "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence."  *See* ECF No. 1-14 at 1 (quoting 28 C.F.R. § 16.5(e)(iv)).  When expedited processing has been granted, "an agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph." 5 U.S.C. § 552(a)(6)(E)(iii).  Courts have rejected government submissions that expedited processing is merely an agency ordering mechanism and does not require *actual* expedition.  *See EFF I*, 2007 WL 4208311 *4; *EPIC II*, 416 F.Supp.2d at 37–38.  Rather, courts have repeatedly held that they have ample authority to enforce the "as soon as practicable" provision and that what matters under that provision is not the administrative classification of the request, but whether the agency is *actually* processing the request "as soon as practicable."  *See EFF I*, 2007 WL 4208311 *4 ("Here, defendant has already determined that plaintiffs' request is entitled to expedited processing.  Thus, the only question remaining is whether defendant is actually processing the request 'as soon as practicable.'"); *EPIC II*, 416 F.Supp.2d at 41 (question is whether the agency has "*actually* expedit[ed] its processing."); *see also*, *Brennan Ctr.*, 498 F.Supp.3d at 100–101; *Am. Immigr. Council*, 470 F.Supp.3d at 36–37; *Gerstein*, 2006 WL 3462659, at *3.  Courts also

16

have inherent power to control timing in FOIA responses.  *See Am. Oversight*, 414 F.Supp.3d at 186.

In applying this test, courts have been less than clear on the precise contours of the statutory phrase "as soon as practicable."  But that is of no moment here because of the extreme gravity and urgency of this case.  Whatever the outer limits of that phrase, its core meaning clearly encompasses cases like this one where production by a date certain is essential to avoid the records becoming stale and being "of little value" to "inform the public of ongoing proceedings of national importance."  *Brennan Ctr.*, 498 F.Supp.3d at 99 (internal citations omitted) (collecting authorities).  "[U]nder those circumstances, a plaintiff may demonstrate a likelihood that it is entitled to have processing completed quickly enough so that 'the value of the information would not be lessened or lost.'"  *Brennan Ctr.*, 498 F.Supp.2d at 99 (quoting *Ctr. for Public Integrity*, 411 F. Supp. 3d at 12); *see also*, *Am. Immigr. Council*, 470 F.Supp.3d at 37. ("Plaintiffs' request concerns a serious and time-sensitive matter, and it is entitled to an order requiring Defendants to process and produce responsive documents on a more expeditious timeline than that proposed by Defendants."); *Am. Oversight*, 414 F.Supp.3d at 186–87.

### B.     The Records Will Lose Considerable Salience If Not Produced in Time for Use in Hunter Biden's July 26, 2023 Plea Proceeding.

Hunter Biden is scheduled to appear before the U.S. District Court for Delaware on July 26, 2023 for a combined initial appearance and plea hearing.  Fed. R. Crim. P. 11 ("Rule 11") covers plea agreements generally. It is believed that the plea agreement entered into by U.S. Attorney Weiss and Mr. Biden's attorney was made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A) or 11(c)(1)(C).

Critically here, in analyzing whether to accept a plea agreement, courts have broad discretion to consider the interests of justice, *i.e.*, the public interest.  *See In re Morgan*, 506 F.3d 705, 712 (9th Cir. 2007) ("a district court properly exercises its discretion when it rejects a plea agreement calling for a sentence the court believes is too lenient or otherwise not in the public interest in light of the factual circumstances specific to the case."); *United States v. Carrigan*, 778 F.2d 1454, 1462 (10th Cir. 1985) ("Rule 11 also contemplates the rejection of a negotiated plea when the district court believes that bargain is too lenient, or otherwise not in the public interest."); *United States v. Bean*, 564 F.2d 700, 704 (5th Cir. 1977) ("[i]f the court did not have discretion to refuse a plea bargain because the agreement is against the public interest in giving the defendant unduly favorable terms [Rule 11(c)(2)(A) allowing deferral of acceptance to sentencing] would be largely unnecessary."); *United States v. Bednarski*, 445 F.2d 364, 366 (1st Cir. 1971) ("a conviction affects more than the court and the defendant; the public is involved.").

These considerations of public interest surely reach a situation where there is extensive public controversy as to whether the plea was the result of the normal judicial process or was infected by an irreparably tainted process.  A court would have ample authority to reject a seemingly lenient plea agreement to misdemeanor charges in a case where the Attorney General stated the prosecutor was entirely independent, but in reality, the prosecutors were repeatedly blocked by the Administration from pursuing felony charges.  Indeed, Eileen J. O'Conner, the Assistant Attorney General of the Department's Tax Division from 2001–2007 wrote an editorial in *The Wall Street Journal* on June 27, 2023, calling for the U.S. District Court for Delaware to

"consider" rejecting the plea agreement.  *See* Dewey Decl. Ex. 7.  The Records sought go *directly* to that issue.

Release of the records would also add needed transparency to the process and stave off public mistrust and cynicism.  *Cf.* Dewey Decl. Ex. 4 at 040, 064, 066-67, 073, 079, 174, 198-199, 225; Dewey Decl. Ex. 5 at 039–40, 081-82, 085, 095, 125-26, 132, 172, 176, 185, 207, 212-220, 284, 324, 344, 367, 374, 393, 494, 501, 505, 526 (widely reported accusations Hunter Biden received a "sweetheart deal"); *accord* Dewey Decl. Ex. 8  Justice must not merely be done—but must be seen to be done.

Records released by July 21, 2023 is vital to allow Plaintiffs to analyze those records and make them public.  By making the records public along with accompanying analysis, Plaintiffs will be able to allow the court in Delaware to examine the records directly or allow interested parties to prepare briefing placing those records before the court.  Critically, it would also allow Congress to examine the records, and if necessary utilize those records to request that the Department or the Delaware Court delay the plea hearing.

Plaintiffs' ability to inform public and Congressional participation in the legal process is just as important as informing public participation in the legislative process.  *Cf. e.g.*, *Brennan Ctr.*, 498 F.Supp.3d at 101 ("Thus, the harm would be beyond remediation because under current law the census and the reapportionment process—and the opportunity for the public to be informed about them while they are ongoing—would be over."); *Ctr. for Pub. Integrity*, 411 F.Supp.3d at 13 ("in order to ensure informed public participation in the proceedings, the public needs access to relevant information").  Surely that measure of transparency—release of records

19

that may well resolve the tension between the testimony of the Attorney General and that of the

Whistleblowers—is warranted before the finality of accepting a plea.

### C. Plaintiffs Are Harmed Every Day They Cannot Use the Records to Inform the Public About On-Going Congressional Proceedings.

The records sought by this Motion go directly to the heart of major House investigations

that are fast moving and evolving. Significant events occurred this very afternoon. Speaker

McCarthy has made clear that U.S. Attorney Weiss must comply with a July 6, 2023 deadline

from the Judiciary Committee concerning questions about his authority. House Ways and Means

Committee Chairman Jason Smith, House Oversight and Accountability Committee Chairman

James Comer, and House Committee on the Judiciary Committee Chairman Jim Jordan have also

raised the specter of impeachment proceedings against the Attorney General.

### 1. Every Day Plaintiffs Are Denied the Records, They Are Effectively Denied Their Right to Actual Expedited Processing.

The House's rapidly developing investigations significantly enhance Plaintiffs' need and

entitlement to the requested records. And courts routinely recognize such enhancement. Here,

like in *Center for Public Integrity*:

> Plaintiff explained that the subject matter of the requested information . . . is of immediate concern to the American public due to the ongoing congressional hearings. [Congress has requested almost verbatim the information sought by Plaintiffs' FOIA Request]. Given that the congressional hearings and any potential congressional action are "imminent," the Court finds that Plaintiff adequately demonstrated that the value of the information would be lessened or lost absent expedited processing.

411 F.Supp.3d at 12. C*f. Ctr. for Pub. Integrity*, 411 F.Supp.3d at 13 (holding as to irreparable

harm "in order to ensure informed public participation in the proceedings, the public needs

access to relevant information"); *Prot. Dem. Project v. Dep't of Def.*, 263 F.Supp.3d 293, 302

(D.D.C. 2017) (lack of likelihood of success on merits where there was no reason to expect

future events by date certain or "any definite time window" of weeks or months); *EPIC v. DOJ*,

15 F.Supp.3d 32, 46 (D.D.C. 2014) (EPIC III) (lack of likelihood of success on the merits where

there was no indication of pendant action on pending bills).

House Speakers rarely demand full compliance with a Judiciary Committee document

request in the same breath as they raise a potential impeachment inquiry into the conduct of the

Attorney General of the United States.  That such matters move quickly is demonstrated by the

rapid evolution of the first impeachment of President Donald J. Trump from whistleblower

disclosure to Impeachment in a matter of months.

> **2.     The Records Sought by This Motion Go to the Heart of Major and
> Rapidly Evolving Congressional Oversight Inquiries.**

1.     On February 28, 2023, Chairman Jordan initiated an investigation into the matters

at issue here, writing to Attorney General Garland:

> The Committee on the Judiciary is conducting oversight over the operations and
> activities of the Department of Justice.  The Department's investigation of Hunter
> Biden, son of President Biden, raises the appearance of a conflict of interest that
> would necessitate special counsel protections and authorities.  However, to date,
> you have declined to appoint a special counsel in this matter, despite appointing
> special counsels in other investigations.  Your refusal to appoint a special counsel
> here is conspicuous in this context.

App. B001 (ECF No. 1-5).  That letter sought almost the exact set of records sought by the

Request.  *Id.*

2.     On April 19, 2023, a whistleblower (now revealed to be Shapley) sent a protected

disclosure to the Chairs and Ranking Members of the Senate Finance and Judiciary Committees,

the House Committees on Ways and Means and Judiciary, and Senator Charles Grassley as Co-

Chair of the Whistleblower Protection Caucus via his attorney, triggering the Committee on

Ways and Means on-going investigation into the matter.  It was immediately widely reported the

disclosure concerned the Hunter Biden Investigation.  *See* Compl. ¶ 47.  On May 15, 2023,

Shapley's attorneys transmitted another letter to the same officials informing the Committees

that he and his entire team had been removed from the investigation.  *Id.* at ¶¶ 49–51 (ECF No.

1-16) ("May 15 Letter").

 The May 15 Letter in turn triggered a separate but related investigation by the House

Judiciary Committee into whistleblower retaliation by the Department.  On May 25, 2023, House

Judiciary Committee Chairman Jim Jordan wrote to Attorney General Garland requesting

documents and communications related to the allegations in the May 15 Letter regarding the

removal of the IRS investigative team from an ongoing Hunter Biden Investigation, all

documents and communications between or among DOJ and IRS referring or relating to any

investigations involving both parties, and all documents and communications between DOJ and

the U.S. Attorney's Office for the District of Delaware referring or relating to the removal of an

IRS investigative team from an ongoing investigation on or around May 15, 2023.  Letter from

the Hon. Jim Jordan to the Hon. Merrick Garland (May 25, 2023) (ECF No. 1-17).

 On June 7, 2023, U.S. Attorney Weiss—*not* Attorney General Garland—sent Chairman

Jordan a response, writing "[y]our May 25th letter to Attorney General Garland was forwarded

to me, with a request that I respond on behalf of the Department."  Letter from David C. Weiss to

Chairman Jordan (June 7, 2023) (ECF No. 1-18) ("June 7 Letter").  U.S. Attorney Weiss refused

to respond to Chairman Jordan's questions on the grounds that Chairman Jordan's request related to an on-going investigation. *Id.* at 1–2.

On June 22, 2023, Chairman Jordan responded to U.S. Attorney Weiss reiterating his prior request. Letter from the Hon. Jim Jordan to the Hon. David C. Weiss (June 22, 2023) (ECF No. 1-19) (June 22 Letter). Chairman Jordan rejected U.S. Attorney Weiss's claims of confidentiality, explaining at length that information about alleged whistleblower retaliation through staffing decisions has nothing to do with the actual merits of any on-going case. *Id.* at 1. The June 22 Letter also sought additional information "in light of the unusual nature of [U.S. Attorney Weiss's] response on behalf of Attorney General Garland." *Id*. at 2–3. Specifically, Chairman Jordan requested information related to the June 7 Letter, including a list of individuals who drafted or assisted in drafting the response, the name of the party who forwarded the letter, and whether U.S. Attorney Weiss had any discussions with Attorney General Garland or any other individual at DOJ about the May 25 Letter. *Id.* These requests unambiguously sought to plumb the relative authority of the Attorney General and U.S. Attorney Weiss over the Hunter Biden Investigation. Chairman Jordan sought a response by 5:00 p.m. on July 6, 2023. *Id.* at 3.

**3.** Speaker McCarthy has made clear that the July 6, 2023 deadline outlined in Chairman Jordan's June 22, 2023 letter is firm. He has also publicly stated the House will do what it takes to get to the bottom of the matter. He also made plain that if the Whistleblowers' allegations are true, the House of Representatives will initiate an impeachment inquiry.

- On June 25, 2023, Speaker McCarthy tweeted:

23





- On June 26, 2023, the Speaker appeared on national television to reiterate his demand for answers and the possibility of impeachment.  Dewey Decl. Ex. 4 at 182–3.

- Speaker McCarthy reiterated the next steps in the House investigation in a June 27, 2023 tweet:

24

- On June 28, 2023, Speaker McCarthy appeared with Chairman Jordan on national television and hammered home the House's intent to obtain answers.  Dewey Decl. Ex. 9 at 9.

- Speaker McCarthy followed up his June 28, 2023 statement with the following tweet:



**3.**     Chairman Jordan has made clear how the Judiciary Committee intends to determine whether the Whistleblowers' statements are proven true.  This too will undoubtedly lead to further concrete and time-sensitive investigative steps.

- On June 26, 2023, Chairman Jordan reiterated these points on national television.  Dewey Decl. Ex. 4 at 154.  In that same interview, he added, "Merrick Garland said he took a hands-off approach to the investigation.  That sure looks like it wasn't accurate as well." *Id*.

- On June 25, 2023, on national media, Chairman Jordan articulated that the Judiciary Committee is concerned about issues that are at the heart of Plaintiff's FOIA Request: Dewey Decl. Ex. 4 at 037.

- On national media on June 28, 2023, Chairman Jordan again reiterated his commitment to obtaining answers.  Dewey Decl. Ex. 9 at 7, 9

**4.** Chairman Comer has also identified additional investigative steps his Committee is taking in light of the Shapley testimony.

- In a June 24, 2023 news interview, Chairman Comer elaborated on these points. Dewey Decl. Ex 4 at 267–68.

**5.** On June 28, 2023, the Chairmen of the Committees on Oversight and Accountability, Judiciary, and Ways and Means issued a joint statement "on their commitment to pursue a thorough inquiry into misconduct at the Department of Justice and the Internal Revenue Service (IRS) with respect to the Hunter Biden investigation." Dewey Decl. Ex. 3.

**6.** On the afternoon of June 29, 2023, Chairman Smith, Chairman Comer and Chairman Jordan jointly announced they were demanding that the Department, IRS, and the U.S. Secret Service "make over a dozen employees available for transcribed interviews who possess information concerning allegations of politicization and misconduct at their agencies with respect to the investigation of Hunter Biden." Dewey Decl. Ex. 10 at 1. In particular, the Chairmen demanded a transcribed interview with U.S. Attorney Weiss. *Id.* at 3. The Chairmen demanded that the DOJ and IRS "begin scheduling these transcribed interviews as soon as possible, but no later than 5:00 p.m. on July 13, 2023" *Id.* at 4, 7. The Chairman also stated, "[p]lease be aware that the Committees will resort to compulsory process to obtain the required testimony." *Id.*

### 3.      U.S. Attorney Weiss's Public Statements Do Not Alter This Analysis.

Anticipating an argument the government is likely to raise, it is no answer to say that

there is no real dispute because U.S. Attorney Weiss supposedly resolved the matter in the June 7

Letter.  In that letter, U.S. Attorney Weiss wrote, in reference to the Hunter Biden Investigation:

- "I want to make clear that, as the Attorney General has stated, I have been granted ultimate authority over this matter, including responsibility for deciding where, when, and whether to file charges and for making decisions necessary to preserve the integrity of the prosecution, consistent with federal law, the Principles of Federal Prosecution, and Departmental regulations."  June 7 Letter at 1.

- In February 2021, I was asked to remain as United States Attorney for the District of Delaware to continue my oversight of the matter. Since that time, I have fulfilled my responsibilities, consistent with Department practices and procedures, and will continue to do so.  Throughout my tenure as U.S. Attorney my decisions have been made—and with respect to the matter must be made—without reference to political considerations." *Id.* at 3.

As an initial matter, the fact that U.S. Attorney Weiss's statements *could* be read to agree

with Attorney General Garland and disagree with the Whistleblowers does nothing to resolve the

matter because U.S. Attorney Weiss's statements are inconsistent with the Whistleblowers'

direct testimony as to his *own* prior statements.  Recall that Shapley's testimony and

contemporaneous memorandum (and confirmed by another witness at the October 7, 2022

meeting) rested entirely on U.S. Attorney Weiss's own statements, made in his official capacity,

and at an official meeting within his Office.  Accordingly, nothing about the conflict and tension

between the statements of the Attorney General and the Whistleblowers' testimony is resolved

by the June 7 Letter; it is actually hardened.  *Cf.* Fed. R. Evid 801(d)(2) (statement by party

opponent is not hearsay).  Moreover, U.S. Attorney Weiss made his statement without any

supporting documentation (unlike Shapley).  And if U.S. Attorney Weiss's statements are

27

accurate, the corroborating documentation is entirely within U.S. Attorney Weiss's control and ability to release (if Weiss's authority is truly as broad as Attorney General Garland claims). *See* Dewey Decl. Ex 1 at *20 ("I would support Mr. Weiss explaining or testifying on these matters when he deems it appropriate."). If U.S. Attorney Weiss is correct and the whistleblowers are wrong, then the documents should show this in objective fact; the keys to putting the entire controversy to bed are in U.S. Attorney Weiss's hands. If anything, U.S. Attorney Weiss's statements muddy the water and propound the conflict, crying out for the objectivity of documentary evidence.

Even on their own terms, the statements contain sufficient ambiguity:

- "[I] have been granted." When was the authority granted? Was it January 20, 2021 or sometime in 2023 in response to political concerns ***and after the statute of limitations had run*** on tax year 2014 and 2015 felony counts. If the latter, then the Whistleblower statements are correct, and Attorney General Garland appears to have grossly misled Congress, if not worse.

- "[U]ltimate authority over this matter." In reference to what? The District of Delaware, the Department, or the Executive Branch? Without specificity (such as that provided by the Special Counsel regulations), the statement is inherently ambiguous.

- The modifier "consistent with . . . Departmental regulations." Does that include Department policies and procedures which require internal authorizations to prosecute in another District?

Moreover, there is strong support for Plaintiffs' view that the June 7 Letter settles nothing. Speaker McCarthy, Chairman Jordan, Chairman Comer, and Chairman Smith all agree the questions raised by the Whistleblowers' testimony are very real, very grave, and very live.

It is no answer to this fact to say Speaker McCarthy or the Committee Chairmen are political actors. So too are U.S. Attorney Weiss and the Attorney General. And the House, no

28

less than any other branch of government, is entitled to the presumption of regularity in its actions and the dignity departmentalism accords to a coordinate branch of government.  *See Exxon Corp. v. FTC*, 589 F.2d 582, 589 (D.C. Cir. 1978); *Ashland Oil v. FTC*, 548 F.2d 977, 979 (D.C. Cir. 1977), *cf. Bragg v. Jordan*, __F.Supp.3d___, No. 23-cv-3032, 2023 WL 2999971, *12 (S.D.N.Y. Apr. 19, 2023) (in a conflict between District Attorney Alvin Bragg and Chairman Jordan, the fact that both parties are acting politically does not alter analysis.).

> **D.      Defendant Should Not be Heard to Claim the Responsive Records Are Exempt at this Stage.**

U.S. Attorney Weiss's June 7, 2023 letter refused to produce information to Chairman Jordan on the grounds of an "open matter" and to "protect confidential law enforcement information." June 7 Letter at 1, 2.  To be sure, some courts have concluded that whether the records are likely subject to withholding is relevant to whether to grant a preliminary injunction. *See, e.g.*, *Am. Oversight*, 414 F.Supp.3d at 187; *Ctr. Public Integrity*, 411 F.Supp.3d at 13; *EPIC II*, 15 F.Supp.3d at 46.  But those cases have set a high threshold for invoking this consideration, requiring a showing that most (if not all of the records) are exempt.  *Compare Am. Oversight*, 414 F.Supp.3d at 187 ("State rightly points out that American Oversight will not be irreparably harmed by further delay if the documents it seeks can be lawfully withheld from disclosure under FOIA's exemptions.  Certain categories of the requested documents may well meet that description.  Others, however, would not appear to be subject to any FOIA exemptions.  This is especially true for communications between Department officials and Mr. Giuliani, who is not a government employee.  Accordingly, the Court finds that the harm of delay beyond the anticipated timeline of the impeachment inquiry would be irreparable, especially with respect to

29

those categories of requested records that are unlikely to be subject to FOIA exemptions."); *Ctr. for Pub. Integrity*, 411 F.Supp.3d at 13 ("While some of the requested information may very well be exempt from disclosure, Plaintiff's Motion requests only non-exempt information.  And, at this point in the litigation, knowing nothing about the content of the responsive documents, the Court is not prepared to find that all of the requested information is exempt from FOIA"), *with EPIC III*, 15 F.Supp.3d at 46 ("most if not all" of an entire category of records sought by Plaintiff were "classified").

Defendant cannot make such a showing here.

As an initial matter, whatever the state of play on June 7, 2023, the playing field seems to have changed.  When Attorney General Garland was extensively questioned on the key issues presented by Plaintiffs' FOIA Request, he stated "I would support Mr. Weiss explaining or testifying on these matters when he deems it appropriate."  Dewey Decl. Ex. 1 at *20.  The Attorney General's statement aligns with that of Hunter Biden's attorney that, with the plea agreement made public on June 20, 2023, "it is my understanding that the five-year investigation into Hunter is resolved." *Id.* at Ex. 8 at 2.

To be sure, the press release from U.S. Attorney Weiss Office is in tension with these statements:  "David C. Weiss, U.S. Attorney for the District of Delaware, made the announcement.  The investigation is ongoing."  Dewey Decl. Ex. 2 at 2.  But it is entirely unclear from this statement *what* investigation is on-going—that into Hunter Biden, or into other individuals unknown?  If the Hunter Biden matter is closed, then there is no on-going investigation that justify withhold records about ultimate authority to charge him.

30

As to the issues raised by the June 7 Letter, the inquiry here does not concern the substance or the conduct of the case.  Rather it concerns authority and power *over* the case.  Put differently, most of the records sought categorically do not in any way involve the putatively sensitive details of the investigation or case.

Moreover, there is nothing deliberative about making a key *decision*—whether it be appointing a Special Counsel, granting unusual authority to a U.S. Attorney, or whether to allow charges or investigation in a Judicial District.

Even if responsive records produced *are* in heavily redacted form, they may have immense relevance to the matters at issue.  Shapley and WB 2 testified at length that U.S. Attorney Graves refused to allow charges in the District of Columbia in March of 2022.  *See* Compl at ¶¶ 68–72.  A flurry of emails in March of 2022 (responsive to Specification 1 of the Request) with virtually all information redacted is still powerful circumstantial evidence corroborating Shapley and WB 2's accounts.  So too would a flurry of emails shortly thereafter between U.S. Attorney Weiss and the Attorney General or Deputy Attorney General concerning Special Counsel status.

Finally, as the court in *Center for Public Integrity* observed, at the end of the day the court knows "nothing about the content of the responsive documents" (411 F.Supp.3d at 13) and here there are no detailed and specific declarations from key decisionmakers on any of the foregoing points—or much of anything given the Department's apparent slow-walking of a Request it *concedes* is important and must be expedited.

## III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A

**PRELIMINARY INJUNCTION.**

Plaintiffs have shown irreparable harm for the same reason they have demonstrated

likelihood of success on the merits.

The information sought by this Motion goes to the heart of on-going House investigations

and raging political controversy.  It also goes directly to the issue of whether the District Court in

Delaware should reject Hunter Biden's plea on July 26, 2023.  Therefore, Plaintiffs are

irreparably harmed by delayed production of that information for precisely the reasons set forth

in *Center for Public Integrity*:

> If the requested information is released after the impeachment proceedings
> conclude, the information may still be of historical value.  However, for Plaintiff,
> the primary value of the information lies in its ability to inform the public of
> ongoing proceedings of national importance; and, in these circumstances, "stale
> information is of little value."  *Payne Enterprises, Inc. v. United States*, 837 F.2d
> 486, 494 (D.C. Cir. 1988).  As such, Plaintiff has shown that a delay in the release
> of the requested information would cause irreparable harm.

411 F.Supp.2d at 12.  Numerous other courts have entered preliminary injunctions compelling

production on a date certain under precisely this same rationale—the information relates to a

matter of immense public importance that will lose its value if not timely made public.  *See, e.g.*,

*Brennan Ctr.*, 498 F.Supp.3d at 101 (production of information concerning census process in

time for use in apportionment proceedings); *Wash. Post*, 459 F.Supp.2d at 75 ("Because the

urgency with which the plaintiff makes its FOIA request is predicated on a matter of current

national debate, due to the impending election, a likelihood for irreparable harm exists if the

plaintiff's FOIA request does not receive expedited treatment."); *EFF II*, 2007 WL 4208311 at

*6–7 (irreparable harm where information was sought for use in pending Congressional debates

over legislation relating to electronic surveillance); *EPIC II*, 416 F.Supp.2d at 41 ("Beyond

losing its right to expedited processing, EPIC will also be precluded, absent a preliminary

injunction, from obtaining in a timely fashion information vital to the current and ongoing debate

surrounding the legality of the Administration's warrantless surveillance program. . . .  That can

only occur if DOJ processes its FOIA requests in a timely fashion and releases the information

sought."); *Gerstein*, 2006 WL 3462659 at *4 ("Gerstein has demonstrated a likelihood of

irreparable injury if an injunction is not granted, because, as Gerstein argues, (*see* Motion at

4:14–18), '[t]he ongoing debate about how to respond to classified leaks and how aggressively to

investigate them cannot be restarted or wound back.'").

As to the need for the records sought by this motion for Hunter Biden's plea hearing on

July 26, there is no question about a date certain presenting a precise need.  As to the broader

issue of oversight, the lack of a precise end date does not in any way diminish the harm to

Plaintiffs.  As explained, *supra* at II C, those proceedings while on-going occur in a political

timeframe and are both fast paced and involve multiple important and relevant events.  That the

records are needed for meaningful participation in that rapidly developing, but necessarily

temporally limited, process is sufficient to show irreparable harm.  *See, e.g.*, *Am. Immigr.

Council*, 470 F.Supp.3d at 38 ("Defendants attempt to downplay the urgency of Plaintiff's

request, asserting that Plaintiff 'cannot point to any concrete deadline by which it needs the

records' because '[t]he COVID-19 pandemic continues.'  Opp'n at 16.  But the fact that the

COVID-19 pandemic is an ongoing public health crisis only bolsters Plaintiff's claim of

irreparable harm."); *Public Integrity*, 411 F.Supp.3d at 13 ("The Court finds that the lack of a

precise end-date for the impeachment proceedings is not detrimental to Plaintiff's claim of irreparable harm. The impeachment proceedings are ongoing. And, in order to ensure informed public participation in the proceedings, the public needs access to relevant information. As such, irreparable harm is already occurring each day the impeachment proceedings move forward without an informed public able to access relevant information.").

## IV.    THE EQUITIES FAVOR GRANTING A PRELIMINARY INJUNCTION.

Where the government is a party, the equities and the public interest merge.  *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Brennan Ctr.*, 498 F.Supp.3d at 103.

The public interest expects faithful enforcement of FOIA and Department Regulations. *See, e.g.*, *Wash. Post*, 459 F.Supp.2d at 76 ("If anything, the public's interest in this case is best assessed through the statutory provisions passed by the public's elected representatives."); *EPIC II*, 416 F.Supp.2d at 42 ("The public interest prong is met because 'there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate.'" (internal citation omitted)).  There is also a public interest that is "best 'served by the expedited release of the requested documents because it furthers FOIA's core purpose of 'shed[ding] light on an agency's performance of its statutory duties.'"  *Prot. Democracy Project v. DOJ*, 498 F.Supp.3d 132, 144 (D.D.C. 2020) (quoting *EPIC II*, 416 F.Supp.2d at 42 (alteration in original) (citation omitted)).  This is especially so when the topic of the request—as here—has received "great public and media attention."  *See, e.g.*, *EPIC II*, 416 F.Supp.2d at 42.

Accordingly, in the context of a motion for a preliminary injunction seeking to compel expedited processing of a FOIA request, the public interest largely merges with the merits.  *See,*

*e.g.*, *Brennan Ctr.*, 498 F.Supp.3d at 103 (finding that expedition is warranted leads directly to conclusion that the public interest favors a preliminary injunction).

As to harm, to be sure, the expedition of Plaintiffs' FOIA request will place some burden on limited DOJ resources and will disfavor other requestors by placing Plaintiffs' FOIA Request ahead of theirs.  But the entire point of expedited processing under FOIA is a judgement by both Congress and the agency that these harms and burdens are outweighed by the need to process certain requests on an expedited basis to ensure transparency into salient and time-sensitive issues of the day.  *See, e.g.*, *Edmonds v. FBI*, No. 02-cv-1294 (ESH), 2002 WL 32539613, *4 (D.D.C. Dec. 3, 2002) ("While defendant could justifiably argue that the Court's application of the relevant regulation will result in an even greater burden on its already strained resources and will disadvantage other FOIA requesters, the Court is constrained to enforce the regulation as written.").  Part of the statutory entitlement *is* priority.  And *actual* priority and expedition at that.  *See, e.g.*, *Wash. Post*, 459 F.Supp.2d at 76 ("pursuant to the statutory provision mandating expedited treatment, the public's interest in expedited processing of the plaintiff's request outweighs any general interest that it has in first-in-first-out processing of FOIA requests.").

Moreover, much of any burden on DOJ or other parties is the result of DOJ's action in this case.  The keys are entirely in DOJ's hands.  They have delayed action on the Request.  And they have created the extreme tension between the statements of the Attorney General and Whistleblowers.

**CONCLUSION**

This Court should enter a preliminary injunction compelling production of the documents

sought by Plaintiffs Motion by July 21, 2023.

Dated: June 29, 2023                    Respectfully submitted,

                                        /s/ Samuel Everett Dewey
                                        SAMUEL EVERETT DEWEY
                                        (No. 999979)
                                        Chambers of Samuel Everett Dewey, LLC
                                        Telephone:  (703) 261-4194
                                        Email:  samueledewey@sedchambers.com

                                        ERIC NEAL CORNETT
                                        (No. 1660201)
                                        Law Office of Eric Neal Cornett
                                        Telephone:  (606) 275-0978
                                        Email: neal@cornettlegal.com

                                        DANIEL D. MAULER
                                        (No. 977757)
                                        The Heritage Foundation
                                        Telephone:  (202) 617-6975
                                        Email:  Dan.Mauler@heritage.org

                                        ROMAN JANKOWSKI
                                        (No. 975348)
                                        The Heritage Foundation
                                        Telephone:  (202) 489-2969
                                        Email:  Roman.Jankowski@heritage.org

                                        *Counsel for Plaintiffs*