**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HERITAGE FOUNDATION, *et al.*,<br><br>            Plaintiffs,<br>    v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br><br>            Defendant. | Case No. 1:23-cv-1854-DLF |

**DEFENDANT'S COMBINED REPLY MEMORANDUM AND OPPOSITION TO
PLAINTIFFS' CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant the U.S. Department of Justice hereby submits this combined reply memorandum in support of its motion for partial summary judgment on search adequacy, ECF No. 33 ("Def. Mem.") and opposition to Plaintiff's cross motion for partial summary judgment, ECF Nos. 34, 35-1 ("Pls. Mem.").

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 5

I.   FOIA CUSTODIANS MAY PARTICIPATE IN A SEARCH EVEN WHERE THEY ARE
     ALLEGEDLY "CONFLICTED." .............................................................................. 5

     A. Every Relevant Case Has Come Out in Defendant's Favor. .................................. 5

     B. Plaintiffs Ignore the Benefits, and Thus the Reasonableness, of the Custodians'
        Involvement. ........................................................................................................ 8

II.  PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN TO REBUT THE PRESUMPTION OF GOOD
     FAITH. ................................................................................................................ 10

     A. Plaintiffs' "Case" Against Mr. Weiss Under 18 U.S.C. §§ 1001, 1015, Is
        Misguided and Ultimately Unavailing. ............................................................ 12

        1. Allegations against Mr. Weiss cannot be imputed to every employee of the
           Delaware U.S. Attorney's Office ............................................................... 13

        2. The allegations against Mr. Weiss fall short of the "clear evidence"
           necessary to rebut good faith. ................................................................... 19

     B. The Record Does Not Reveal "Substantial Misconduct" by the AUSA Identified
        by Plaintiffs. ....................................................................................................... 22

III. A "TAINT TEAM" IS NEITHER WARRANTED NOR REASONABLE. ......................... 23

IV.  THE DEPARTMENT CONDUCTED AN ADEQUATE SEARCH FOR NON-EMAIL RECORDS. ....... 24

     A. Hard-Copy Records. ........................................................................................... 25

     B. Non-Email Communications Systems. ................................................................ 26

CONCLUSION ........................................................................................................ 27

**INTRODUCTION**

Plaintiffs would like to convert this FOIA case into a forum to debate an ongoing criminal investigation and prosecution. But the only question before the Court is whether the Department of Justice conducted a search using means "reasonably calculated" to uncover any records responsive to Plaintiffs' Freedom of Information Act ("FOIA") request. *See Watkins L. & Advoc., PLLC v. U.S. Dep't of Just.*, 78 F.4th 436, 442 (D.C. Cir. 2023). There can be little doubt that it did.

The Department selected eight custodians who were likely to have responsive records and who were familiar with the underlying subject matter. Decl. of Kara Cain ¶¶ 12, 15 (Nov. 22, 2023), ECF No. 33-2 ("2d Cain Decl."). Among them was David Weiss, the U.S. Attorney for the District of Delaware and since-appointed Special Counsel. However, and ultimately fatal to Plaintiff's argument, Mr. Weiss did not search his own emails. *See* Cain Decl. ¶¶ 12–13, 16, 18, 22–27. Rather, his account was searched by the Delaware U.S. Attorney's Office's information-technology ("IT") personnel, *id.* ¶ 13, and the results were reviewed by First Assistant United States Attorney Shannon Hanson, *id.* ¶ 25. Plaintiffs argue principally that the search is tainted because of alleged misconduct. Yet neither Ms. Hanson nor the IT personnel have been accused of any misconduct. Thus, the allegations against Mr. Weiss would only be arguably relevant if they could be extrapolated against the other seven custodians. Plaintiffs devote less than two pages to that critical effort, Pls. Mem. 31–33, and they fall well short.

The details of the search are set forth in Ms. Cain's prior declaration. Using a time limit and search terms that Plaintiffs agree were reasonable, the Department searched all eight custodians' email archives. 2d Cain Decl. ¶¶ 19–22. The Department also searched for non-email records and turned the results over to the Executive Office for United States Attorneys ("EOUSA") for processing. *Id.* ¶¶ 35–36. Finally, the Department obtained assurances from all eight custodians

that they would not have kept responsive records on the non-email communications systems identified by Plaintiffs. *Id.* ¶¶ 37-38. Ultimately, more than 3,000 pages of potentially responsive records were identified and processed. *Id.* ¶ 41.

Nevertheless, Plaintiffs insist that the search was inadequate. Relying on incomplete references to transcripts of non-public congressional testimony, selective characterizations of that testimony in a congressional report, and their own armchair prosecutorial judgments, Plaintiffs allege that two of the custodians engaged in "misconduct" so extreme that none of them was permitted, as a matter of law, to participate in the search. As discussed further below, Plaintiffs' conclusions are based on their opinion that: (1) U.S. Attorney David Weiss committed misconduct in his correspondence with Congress, thus "tainting" all of the other custodians who worked with him; and (2) another prosecutor engaged in misconduct when making prosecutorial judgments in the underlying case, some of which date back to 2020. In the same breath, Plaintiffs admit that there would have been "nothing" wrong with EOUSA's "engaging with custodians" when "running the searches" because "[i]nvolving" custodians in that process "is discovery 101 in the modern world." Pls. Mem. 8–9 n.3. These arguments lack both legal and factual support.

Plaintiffs make several fundamental errors of law. First, Plaintiffs cite no case for the proposition that a "potentially conflicted custodian" (Pls. Mem. 11) cannot participate in a FOIA search. To the contrary, all three cases that Plaintiffs cite (*id.* at 8–12) held that such custodians *can* participate in such a search. That is, every case cited by Plaintiffs (and Defendant) holds that even an allegedly conflicted custodian may still participate in a FOIA search. Second, the caselaw makes clear that Plaintiffs' reliance on so-called "credible allegations" (*e.g.*, Pls. Mem. 8) do not suffice under the law to disqualify a custodian; rather, it is Plaintiffs' burden to adduce "clear evidence of bad faith." *Dalal v. U.S. Dep't of Just.*, 643 F. Supp. 3d 33, 54 n.6 (D.D.C. 2022) (quoting *Physicians for Human Rights v. U.S. Dep't of Def.*, 675 F. Supp. 2d 149, 158 (D.D.C.

2009)). Third, even accepting that any of the characterizations of alleged "misconduct" were true—which they are not—Plaintiffs muster no authority for the proposition that allegations against one custodian should be imputed to all of his subordinates, whether or not they have been accused of any misconduct in their own right. Instead, Plaintiffs must analogize to inapposite contexts, such as typical civil discovery (Pls. Mem. 11–12) or the recusal of criminal prosecutors (*id.* at 32–33). It is no exaggeration to say that Plaintiffs cannot cite legal precedent for any of these three arguments.

Plaintiffs' brief also comes up short factually. In this summary-judgment context, they rely on exactly *two* facts to support the theory that all eight custodians are tainted by allegations against Mr. Weiss: (1) that the custodians worked on the Hunter Biden investigation; and (2) that the custodians "were involved in [Mr.] Weiss's 2022 responses to Congress." Pls. Statement of Undisputed Material Facts 4, ECF No. 35-2. As explained below, neither suffices to tie every employee who worked for Mr. Weiss to allegations against him. But even if they did, those allegations fall well short of "clear evidence of bad faith." *Dalal*, 643 F. Supp. 3d at 54 n.6 (citation omitted). Plaintiffs draw exclusively from selective, incomplete, and contested characterizations from a congressional investigation. To wit, Plaintiffs rely principally on a December 2023 report by congressional staffers, which quotes selectively from certain witness interviews but does not attach the full transcripts.[1] There is at least one obvious example of a misleadingly truncated quote, and neither the Defendant nor the Court knows how many others there may be. *See infra* § II.A.2.

In any event, to cast Mr. Weiss's letters to Congress as misleading, Plaintiffs engage in

---

[1] As an example of how the record presented to the Court is contested and potentially incomplete, another memorandum was released in September, which disputes many of the characterizations on which Plaintiffs rely. *See* Democratic Staff of the Committees on Judiciary and Oversight and Accountability, *IRS and FBI Witnesses Debunk Republicans' False Claims About Political Interference in Special Counsel Weiss's Investigation* (Sept. 27, 2023), *available at* https://punchbowl.news/wp-content/uploads/Dem-Memo.pdf.

pages of semantic argument, only to be caught removing critical language from the letters to make their point. This misdirection is reason enough to reject their argument. Although Defendant does not agree with Plaintiffs' strained reading of the letters, which are entirely consistent if read properly, it is sufficient to hold that the record on which they rely (and mischaracterize) falls far short of "clear evidence of bad faith." *Dalal*, 643 F. Supp. 3d at 54 n.6 (citation omitted).

Plaintiffs fare no better with respect to supposed examples of "probable misconduct" by one of the Assistant United States Attorneys ("AUSAs") working on the underlying matter. Pls. Mem. 33. Plaintiffs' allegations are, at bottom, merely disagreements (based on speculation) over decisions and judgments by prosecutors about isolated investigative steps in the course of an ongoing criminal matter. That is not evidence of misconduct. Investigatory decisions are vested in prosecutors' discretion, not least because they have a better view of the facts than any third-party plaintiff or reviewing court. Plaintiffs have no clear evidence that the allegations and characterizations they cite are even accurate or complete, let alone that anyone acted in bad faith.

"Once the agency has provided a reasonably detailed affidavit describing its search, the burden shifts to the FOIA requester to produce 'countervailing evidence' suggesting that a genuine dispute of material fact exists as to the adequacy of the search." *Project on Gov't Oversight, Inc. v. U.S. Dep't of the Treasury*, No. 21-CV-2797, 2022 WL 17719571, at *1 (D.D.C. Dec. 15, 2022) (Friedrich, J.) (quoting *Morley v. CIA*, 508 F.3d 1108, 1116 (D.C. Cir. 2007)). Here, to rebut the presumption of good faith afforded to Defendant, Plaintiffs' arguments require them to adduce "clear evidence" of bad faith. *Dalal*, 643 F. Supp. 3d at 54 n.6 (citation omitted). Plaintiffs have mustered no such countervailing evidence. Their motion should be denied, and the Court should grant Defendant's motion for partial summary judgment on the adequacy of its search.

**ARGUMENT**

This argument proceeds in two principal parts. In Section I, the Department dispels Plaintiffs' suggestion that a "potentially conflicted" (Pls. Mem. 11) custodian is *per se* ineligible to participate in a FOIA search. In Section II, the Department addresses the factual allegations by Plaintiffs in this case (*id.* at 12–41) and exposes just how short of "clear evidence" they fall.

## I.    FOIA CUSTODIANS MAY PARTICIPATE IN A SEARCH EVEN WHERE THEY ARE ALLEGEDLY "CONFLICTED."

Plaintiffs argue, as a matter of law, that no custodian may participate in a FOIA search "when they have been credibly accused of wrongdoing or are clearly bound up in or tainted by credible allegations of misconduct." Pls. Mem. 8.[2] Yet while ostensibly grounding this principle in "FOIA's test of reasonableness," *id.*, Plaintiffs cannot cite a single FOIA case to support their argument. To the contrary, while positing "almost no law on this point," Plaintiffs proceed to cite three cases that reach the opposite result. *See id.* at 9–10 (citing *Wadelton v. U.S. Dep't of State*, 106 F. Supp. 3d 139, 148 (D.D.C. 2015); *Bonilla v. U.S. Dep't of Just.*, 798 F. Supp. 2d 1325, 1330 (S.D. Fla. 2011); *Defs. of Wildlife v. U.S. Dep't of the Interior*, 314 F. Supp. 2d 1, 5, 9–10 (D.D.C. 2004). That is in addition to a fourth, cited by Defendant in its opening brief: *Akel v. U.S. Dep't of Just.*, 578 F. Supp. 3d 88 (D.D.C. 2021).

### A.    Every Relevant Case Has Come Out in Defendant's Favor.

Plaintiffs cannot distinguish the leading case, *Wadelton v. U.S. Department of State*. Pls. Mem. 9. There, the court held that "[p]ermitting government employees who created or maintained

---

[2] Plaintiffs' inability to articulate a clear standard should give the Court pause. Elsewhere in their brief, Plaintiffs go so far as to say "a credible allegation of misconduct or *implied misconduct*" is enough to reject an agency's search. Pls. Mem. 9 (emphasis added); *accord id.* at 12 (suggesting it is enough "that Plaintiffs have made a sufficient of [*sic*] implied misconduct"); *see also id.* at 12 (suggesting it is enough that misconduct be "imputed to a custodian"). Plaintiffs never ground any of these proffered tests—"accused of," "bound up in," "tainted by," "imputed to," or "implied misconduct"—in any FOIA precedent. The Court should hesitate to adopt any of these proposed standards.

the requested records to conduct the search for those records, even when the records are sought in order to uncover possible wrongdoing, is logical in light of the presumption of good faith accorded to government officials in the context of conducting FOIA searches."[3] 106 F. Supp. 3d at 149. Plaintiffs acknowledge that they cannot find any contrary precedent, and the court in *Wadelton* could not find any, either. *Cf.* Pls. Mem. 9; *Wadelton*, 106 F. Supp. 3d at 148 ("no court appears to have directly addressed the question").

Plaintiffs' only substantive critique of *Wadelton* is that it "failed to meaningfully consider the threshold question of reasonableness; instead it jumped directly to according a presumption of good faith." Pls. Mem. 10. Plaintiffs accuse the Department of the same legal error. *See id.* at 8. Neither accusation has merit. The *Wadelton* court framed its analysis as "whether the search for [responsive] records was adequate," noting that "[t]he adequacy of the search, in turn, is judged by a standard of *reasonableness*." 106 F. Supp. 3d at 145 (quoting *Steinberg v. U.S. Dep't of Just.*, 23 F. 3d 548, 551 (D.C. Cir. 1994) (emphasis added)). Defendant opened its brief in much the same way. *See* Def. Mem. 1 ("The only question before the Court, at this juncture, is whether the Department of Justice conducted a *reasonable* search for records responsive to Plaintiffs' request, using means *reasonably calculated* to uncover any such records." (citing *Watkins L.*, 78 F.4th at 442 (emphasis added).

Neither the *Wadelton* court nor the Department has skipped past "the applicable rule of reason." Pls. Mem. 12. Reasonableness under FOIA is informed by its presumption of good faith. Thus, it is reasonable *under FOIA* to allow self-collection unless the plaintiff offers clear evidence

---

[3] It bears emphasis that the information Plaintiffs requested—documents pertaining to the "Special Counsel status" of a criminal investigation, and communications about the investigation between U.S. Attorney's Offices "with venue to bring charges"—does not even reflect "possible misconduct," *Wadelton*, 106 F. Supp. 3d at 149, and is not included among the various allegations Plaintiffs point to as possible misconduct. That is, Plaintiffs do not allege any misconduct regarding the "Special Counsel status" of the case or regarding communications between the Delaware U.S. Attorney's Office and other U.S. Attorneys' Offices with potential venue.

that the custodian(s) has acted in bad faith. The court in *Wadelton* upheld such an approach as "logical," *i.e.,* reasonable, "*in light of* the presumption of good faith accorded to government officials in the context of conducting FOIA searches." *See* 106 F. Supp. 3d at 149 (emphasis added). The presumption of good faith did not supplant the rule of reason; it merely informed that rule's application in the FOIA context.[4]

No precedent was required to reach such a sensible conclusion, but the *Wadelton* court did cite two prior cases: *Bonilla* and *Defenders of Wildlife*. *See Wadelton*, 106 F. Supp. 3d at 148. Plaintiffs fail to distinguish either case. Plaintiffs breeze past *Bonilla* on the grounds that it "involved no allegation of a conflict." Pls. Mem. 10. But the perceived conflict in that case was obvious: the FOIA search was conducted by "the Assistant United States Attorney currently assigned to [the FOIA] Plaintiff's criminal case." *Bonilla*, 798 F. Supp. 2d at 1330. And make no mistake: Mr. Bonilla had specifically alleged misconduct on his prosecutors' part. *See, e.g.*, Compl. ¶¶ 9-10, *Bonilla v. U.S. Dep't of Just.*, No. 1:10-cv-22168 (S.D. Fla. July 1, 2010) (alleging that the lead prosecutor "was given a 'special recommendation' for the job opening at Microsoft as a regard for Bonilla's prosecution," and that prosecutors had "used their official positions at DOJ to advance personal interests contrary to the duties they owe to the public"). Thus, just as in

---

[4] Defendants articulated the applicable standard in its prior brief, Def. Mem. 10. FOIA custodians "are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *Wilson v. U.S. Dep't of Just.*, 270 F. Supp. 3d 248, 255 (D.D.C. 2017) (quoting *SafeCard Servs., Inc. v. U.S. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (cleaned up)); *cf. Al-Hela v. Biden*, 66 F.4th 217, 236 (D.C. Cir. 2023) (en banc) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.") (quoting *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004)). Accordingly, once the agency has "shown that its search was reasonable, the burden is on the requester to rebut that evidence by a showing that the search was not conducted in good faith." *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996) (citing *Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1985)). "This [rebuttal] can be done either by contradicting the [agency's] account of the search procedure or by [presenting] evidence [showing] the [agency's] bad faith." *Id.* at 35–36 (citing *Miller*, 779 F.2d at 1384).

*Akel*, the *Bonilla* court upheld a search conducted by the very individuals that the FOIA plaintiff insisted had committed misconduct. And unlike this case, *Akel* and *Bonilla* both involved plaintiffs whose very liberty was at stake.

Plaintiffs misunderstand *Wadelton*'s reference to the third case: *Defenders of Wildlife*. Pls. Mem. 10. When the *Wadelton* court said "[w]ithout questioning," it was emphasizing—not conceding—that the *Defenders of Wildlife* opinion had affirmed the FOIA search "[w]ithout questioning" the accused custodians' participation. *See Wadelton*, 106 F. Supp. 3d at 148. That is the same point that Defendant drew from *Akel*: if an allegation of conflict were enough to disqualify a custodian from participating in a FOIA search, and that were a matter of blackletter law (as Plaintiffs keep suggesting), then one wonders why neither the *Akel* nor the *Defenders of Wildlife* courts balked at those custodians' participation.

With four cases against them and none in support, Plaintiffs finally retreat to a "first principles" argument based on out-of-circuit cases in non-FOIA contexts. *See* Pls. Mem. 11–12. They suggest that custodians have a "natural incentive to be less than transparent," or "may subconsciously err." *Id.* at 11. But by basing their argument on non-FOIA caselaw and their own broad conclusions about human behavior, Plaintiffs give away the game. Under FOIA, custodians are *presumed* to act in good faith absent clear evidence to the contrary. *Dalal*, 643 F. Supp. 3d at 54 n.6.

### B.    Plaintiffs Ignore the Benefits, and Thus the Reasonableness, of the Custodians' Involvement.

Plaintiffs oversimply the choice in this case as between (1) the custodians' searching their own emails; or (2) IT's searching those emails on the backend. Pls. Mem. 11–12. But the process of collecting potentially responsive records did not begin or end with the keyword search. *See* Cain Decl. ¶¶ 23–34. Plaintiffs' framing ignores the many benefits—and thus, the inherent reasonableness—of the custodians' participation both before and after the searches were run.

For example, neither EOUSA professionals nor the District of Delaware's IT staff would have been able to craft adequate search terms in this case, particularly with respect to Part 2 of Plaintiff's request (concerning communications with other U.S. Attorneys' Offices). Those officials wouldn't have known in which districts venue was appropriate, or with which personnel the District of Delaware had communicated. Neither EOUSA nor IT could have reviewed an ambiguous email, such as the hypothetical suggested in Defendant's motion, *see* Def. Mem. 9 ("Thanks for the call Tuesday and for your offer to support any charges we might bring"), and known whether it related to the Hunter Biden investigation. Thus, the irony is that Plaintiffs are objecting to a process that was designed to—and almost certainly did—get them more responsive records than their proposed alternative.

Plaintiffs expose the illogic of their position in a footnote, allowing that the custodians— though purportedly disqualified from participating in the search because of allegedly "egregious" misconduct (Pls. Mem. 2)—could still have "engag[ed] with" EOUSA during the search and review process. *See* Pls. Mem. 8 n.3. Despite their ostensible concerns over the custodians' integrity, Plaintiffs assert that "nothing prevent[ed] them from participating in the search. *Id.* at 8 n.3. This concession unravels Plaintiffs' core argument, which depends on their premise that these custodians are so untrustworthy as to render the search inadequate as a matter of law. It is also contradictory: If the Delaware custodians really were bad actors, willing to shield documents from a FOIA search, then they could have done so just as easily in Plaintiffs' scenario. *Id.* For example, Plaintiffs apparently do not object to the custodians' crafting search terms and then passing those to EOUSA. *Cf. id.* But if the District of Delaware custodians wanted to hide emails between themselves and a certain AUSA in another district, they could simply have withheld that name as a search term from EOUSA, which would have been none the wiser. The same goes for "construing am [*sic*] ambiguous email" (*id.*): the custodians could simply have told EOUSA that the email was

not responsive even though they knew that it was. To find hard-copy records, Plaintiffs' imagined "taint team" (Pls. Mem. 41) would still have had to ask custodians where they kept such records, and any of those custodians could simply have lied. So Plaintiffs' arguments, even if accepted, would do little to mitigate their concerns. In truth, Plaintiffs' concession only underscores that FOIA depends on some level of trust that public servants have obeyed the law. And it demonstrates why, absent clear evidence to the contrary, Courts presume as much.

Finally, Plaintiffs ignore the efficiencies gained by the custodians' participation in the search. If the IT staff had to craft the search terms, it might have taken several iterations before they settled on an adequate set. If Ms. Cain had to call a District of Delaware custodian whenever EOUSA came across an ambiguous email, that would have slowed down the processing time. Plaintiffs elide that they sought (and received) expedited processing of their requests. Thus, Plaintiffs' approach is doubly ironic: it would have resulted in fewer responsive records *and* at a slower pace. The flipside of that coin is that Defendant's search was doubly reasonable.

## II. PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN TO REBUT THE PRESUMPTION OF GOOD FAITH.

Before turning to the substance of Plaintiffs' arguments on this score, Defendant offers three preliminary points.

First, the Department's response is necessarily limited by its longstanding policies of not commenting on pending investigations. These policies protect the integrity of the Department's investigations and law-enforcement work. Here, for example, Mr. Weiss "decline[d] the Committee's request for documents and information at this time to protect confidential law enforcement information from disclosure." *See generally* Ltr. from David Weiss to The Hon. Jim Jordan at 2 (June 7, 2023), ECF No. 1-18 (the "June 7, 2023 Letter"). The Department adheres to these principles even where deviating from them would free the Department to refute allegations. *See, e.g.*, Letter from Deputy Attorney General Rod Rosenstein to Hon. Charles Grassley at 6–7

(June 27, 2018) ("It may seem tempting to depart from Department policies and traditions in an effort to deflect short-term criticism, but such deviations ultimately may cause a loss of public confidence in the even-handed administration of justice."), *available at* https://www.justice.gov/media/962176/dl?inline. Accordingly, the arguments below largely address Plaintiffs' allegations on their own terms. But that should not be taken as an admission that any custodian has committed any misconduct; Plaintiffs' allegations simply fail on their own terms.

Second, it is Plaintiffs' burden to overcome the presumption of good faith, *Eddington v. United States Department of Defense*, 35 F.4th 833, 836, 839 (D.C. Cir. 2022), and they are wrong that leveling (what they deem to be) "credible allegations" is enough to do so. *See* Pls. Mem. 12.[5] Despite repeating that mantra throughout their brief, Plaintiffs never cite any case to support the proposition. That is no surprise, considering the ample precedent holding that the presumption of good faith "can only be rebutted with *clear evidence* of bad faith." *Dalal*, 643 F. Supp. 3d at 54 n.6 (quoting *Physicians for Human Rights*, 675 F. Supp. 2d at 158 (emphasis added)).

Third, most of the evidence offered by Plaintiffs is objectionable on an evidentiary level and should not be considered by the Court in this posture. Plaintiffs rely principally on a December 5, 2023 report authored by the staffs of three House committees. *See* Pls. Mem. Ex. 2, ECF No. 36-3 (the "Staff Report"). But the Staff Report paraphrases, characterizes, or (at best) selectively quotes numerous transcripts of witness interviews that are not appended to the report or available to Defendant or the Court.[6]

---

[5] The correct standard is set forth above. *See supra* n.4.

[6] At summary judgment, a court can consider evidence so long as it is "capable of being converted into admissible evidence" at trial. *Klayman v. Judicial Watch*, 6 F. 4th 1301, 1316 (D.C. Cir. 2021). For example, an un-authenticated document that could be authenticated at trial, or a hearsay statement that might later be admitted as a business record under Federal Rule of Evidence 803(6),

In this case, there is little question that Plaintiffs' one-sided quotes are unfair. For example, part of Mr. Weiss' testimony is materially truncated, leaving the misimpression that he conceded having been denied special-attorney designation under 28 U.S.C. § 515.[7] *See* Staff Report at 45. The truth is that, according to more complete excerpts of the testimony available publicly (including to Plaintiffs), Mr. Weiss disputed at length that his request for § 515 designation was a "denial." But the Court would never know that from Plaintiffs' exhibits, which do not include the full transcript. Only by reviewing media coverage apparently based on review of the full transcript, cited below, can the Court get a more complete picture. And by the same token, the Court can only guess how many other statements in the full transcripts would undermine Plaintiffs' arguments.[8] The upshot is that Plaintiffs are relying on certain portions of witness statements without making the balance of those statements available. That is fundamentally unfair.

### A.    Plaintiffs' "Case" Against Mr. Weiss Under 18 U.S.C. §§ 1001, 1015, Is Misguided and Ultimately Unavailing.

Plaintiffs' memorandum takes a bizarre detour in Section II, in which Plaintiffs pretend to bring criminal charges against Mr. Weiss under 18 U.S.C. §§ 1001 and 1015. *See* Pls. Mem. 12–31. But that exercise, which is contrary to fact and unsupported, is wholly irrelevant: cases on the

---

could still be considered by a court at summary judgment. But a fraction of a transcript cannot be converted into admissible evidence later; it is objectionable precisely because it is incomplete.

Here, for example, the Court does not have the full transcript of Mr. Weiss's November 7, 2023 interview by the House Judiciary Committee. *See* Staff Report at 8 & n.37 (citing Transcribed Interview of David Weiss (Nov. 7, 2023)). Nor does the Department have a copy of that transcript (or others); transcripts of interviews by congressional committees are typically maintained at the Capitol, and their dissemination is controlled by the relevant committee(s).

[7] Designation under 28 U.S.C. § 515 does not make one a "statutory Special Counsel." Pls. Mem. 18. Instead, persons designated under that section—*e.g.*, Special Assistant United States Attorneys ("SAUSAs")—are referred to as "special attorneys." *Compare* 28 U.S.C. § 515 *with* 28 C.F.R. Part 600. The term "Special Counsel status," especially when capitalized as a term of art, can only refer to appointment under 28 C.F.R. Part 600.

[8] As noted above, according to other excerpts of testimony released publicly, witnesses have contested characterizations of misconduct or political interference. *See supra* n.1.

elements of criminal statutes have no bearing on this FOIA case.[9] For that and other reasons, Defendant will not participate in Plaintiffs' 19-page show trial. The only question in this FOIA case is whether Plaintiffs have offered "clear evidence" of misconduct, such that the Court can no longer presume that the seven custodians who participated in the Department's search acted in good faith. *See Dalal*, 643 F. Supp. 3d at 54 n.6 (quoting *Physicians for Human Rights*, 675 F. Supp. 2d at 158). For the following reasons, Plaintiffs have not adduced such evidence.

### 1. Allegations against Mr. Weiss cannot be imputed to every employee of the Delaware U.S. Attorney's Office.

The Department demonstrates below (*infra* § III.A.2.) that Mr. Weiss is not, in fact, credibly accused of any misconduct. But the Court need not address that argument, because Mr. Weiss did not participate in the search or review of his emails. *See* 2d Cain Decl. ¶¶ 12–13, 16, 18, 22–27. As explained above, his account was searched by the Delaware U.S. Attorney's Office's IT personnel, *id.* ¶ 13, and the results were reviewed by Ms. Hanson, *id.* ¶ 25. Neither Ms. Hanson nor the IT personnel have been accused of any misconduct. Thus, the allegations against Mr. Weiss would only be relevant if they could be extrapolated against the other seven custodians. Plaintiffs devote less than two pages to that critical effort, Pls. Mem. 31–33, and they fall well short.

---

[9] The exercise also proves that Plaintiffs are out of their depth. For example, they bungle a critical element of a § 1001 case—that a defendant act knowingly and willfully, *see id.* § 1001(a)—by instead arguing that Mr. Weiss acted knowingly and "willingly." Pls. Mem. 23. "Willfully" and "willingly" mean different things, especially in criminal law. *See United States v. Project on Gov't Oversight*, 616 F.3d 544, 552 n.10 (D.C. Cir. 2010) ("[I]n order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.") (quoting *Bryan v. United States*, 524 U.S. 184, 191 (1998) (cleaned up)). The fact that Mr. Weiss "signed his name to the [2023] letters to Congress" (Pls. Mem. 23) may suffice for willingness, but not for willfulness. And because Plaintiffs omit a critical element of the supposed crime, Plaintiffs' fictional case against Mr. Weiss would never "get to a jury" (Pls. Mem. 13) because any court would have to enter a judgment of acquittal. *See* Fed. R. Crim. P. 29(a).

### a) Plaintiffs offer no precedent for this theory.

It speaks volumes that Plaintiffs cannot find any FOIA case in which a court has denied the presumption of good faith to custodians who have never been accused of anything. Plaintiffs argue instead that "in FOIA cases it suffices to demonstrate bad faith generally, it need not be shown at each discrete aspect of the search." Pls. Mem. 32. That would be a marked departure from the prevalent "clear evidence" standard. And contrary to Plaintiff's suggestion, it is neither "unique" nor "bizarre" (Pls. Mem. 32) for FOIA requestors to believe that the subjects of their requests have committed some kind of misconduct. Indeed, as shown by the cases in Section I above, it is fairly common. And yet, despite thousands of FOIA cases in the federal reporters, Plaintiffs can find none to support their imputation theory.

Neither of the two cases cited by Plaintiffs is any help. *See* Pls. Mem. 32. In *Competitive Enterprise Institute*, the court found that representations by the agency to the plaintiffs before and during the litigation had "proven to be inaccurate time and again." 185 F. Supp. 3d 26, 29 (D.D.C. 2016). The case had nothing to do with alleged *antecedent* misconduct by anyone who later participated in the search. Nor did the opinion deal with imputation of such misconduct by one custodian to others. The case is irrelevant for present purposes. So is *CREW*, *see* Pls. Mem. 32, which likewise dealt with the government's response to the FOIA request and not any underlying alleged misconduct or conflict of interest. No. 05-cv-2078-EGS, 2006 WL 1518964, at *3 (D.D.C. June 1, 2006) ("Plaintiff has sufficiently raised a question as to whether the government has processed its FOIA requests in a reasonable and expeditious manner, thereby complying with the government's FOIA obligations."). Here, Plaintiffs have no objection to the choice of custodians, the search terms used, or the timeliness of the response. Unlike in *CEI* or *CREW*, Plaintiffs argue that the custodians' participation in the underlying conduct disqualifies them from participating in the subsequent FOIA search. Neither of Plaintiffs' cases addressed that question. And the four cases above that implicate that question—*Wadelton*, *Bonilla*, *Defenders of Wildlife*, and *Akel*—all

came out in Defendant's favor.

Unable to find FOIA caselaw in support, Plaintiffs offer yet another inapt analogy: "the criminal context." Pls. Mem. 32. For starters, a motion to recuse prosecutors is governed by a different legal standard, *see, e.g.*, *United States v. Minkkinen*, No. 2:22-cr-00163, 2023 WL 3587757, at *4 (S.D.W. Va. May 22, 2023), so the reasoning in Plaintiffs' two cases (Pls. Mem. 32–33) is inherently skewed.

Moreover, the concerns vindicated by prosecutors' recusal are not presented in the FOIA context. In *Minkkinen*, for example, the U.S. Attorney had represented the defendant company, on precisely the same criminal matter his office later prosecuted, before he took that office. *Id.* *3. The Department of Justice agreed that his office should be recused but argued that the supervisory AUSA who brought the case (and his support staff) should be able to stay on under the direction of a different United States attorney. *Id.* The court rejected that "carve-out," *id.* at **5–6, but not because of any "egregious or incurable misconduct." Pls. Mem. 32. Rather, the likelihood that the U.S. Attorney would be called as a witness created an unavoidable perception of a conflict of interest, should one of his employees serve as lead prosecutor. *Minkkinen*, 2023 WL 3587757, at *6. There is no such concern in FOIA cases, which "typically and appropriately are decided on motions for summary judgment," *Barry v. Haaland*, No. 19-cv-3380, 2021 WL 1177798, at *6 (D.D.C. Mar. 29, 2021) (Friedrich, J.) (quoting *Defs. Of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)), and "on the basis of agency affidavits," *id.* (quoting *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (cleaned up)), against a background "presumption of good faith." *Bader Family Found. V. U.S. Dep't of Educ.*, 630 F. Supp. 3d 36, 40 (D.D.C. 2022) (Friedrich, J.) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).

Still further afield is Plaintiffs' other case, *United States v. Dyess*, 231 F. Supp. 2d 493

15

(S.D.W. Va. 2002), on which *Minkkinen* principally relied. That case involved a truly "disturbing factual scenario." *Id.* at 495. A detective and task force officer had formed a "personal/sexual relationship" with a witness, whom the detective encouraged to lie to the Court and about whom the detective concealed a polygraph report. *Id.* at 494. The witness had also given $80,000 in drug money to the detective and his partner. *Id.* All of this was disclosed by the government voluntarily, because the government agreed that the misconduct was exculpatory under *Brady*. *See id.* Any attempt to analogize those facts to this case is fanciful at best.

In sum, Plaintiffs have offered no precedent for their theory that allegations against one FOIA custodian (who did not even participate in the search) disqualifies all of his subordinates (even those who have never been accused of any misconduct) from participating in a FOIA search.

### b)    Plaintiffs offer no facts in support of their theory.

Even if Plaintiffs' theory were legally viable, it would remain factually weak. Plaintiffs rely on two facts for the proposition that the seven other custodians "all sang from the same hymnal" (Pls. Mem. 31) as Mr. Weiss: (1) that those custodians worked on the Hunter Biden matter; and (2) that they "clearly assisted Weiss in his responses to Congress in 2022." Pls. Mem. 31–32. Neither of those provides the Court any basis to accept Plaintiffs' theory that all seven custodians would (hypothetically) join Mr. Weiss in shielding records from disclosure under FOIA. Indeed, because Mr. Weiss did not search his own emails, Plaintiffs' argument that other custodians' collections must be "tainted" fails in no small measure because those custodians would have known that their emails would overlap substantially with Mr. Weiss's.

Plaintiffs believe that the Hunter Biden investigation was conducted improperly in six discrete respects. *See* Pls. Mem. 33–41. But not only do Plaintiffs fail to establish that any of those complaints amounts to "clear evidence" of bad faith or misconduct (addressed below), they never even allege misconduct by any custodian except Mr. Weiss and one AUSA. *Id.* At the same time,

Plaintiffs exaggerate the "numerous key steps" in which, according to Internal Revenue Service Supervisory Special Agent Gary Shapley, Ms. Hanson and Mr. Weede participated in the investigation. *See* Pls. Mem. 32 (citing "Shapely [*sic*] Trans. At 178–79"). In reality, Mr. Shapley only recalled Ms. Hanson's and Mr. Weede's presence at one meeting, held on October 7, 2022; he did not even *mention* them in any other context.[10] And as Defendant pointed out, "Mr. Shapley did not even know Ms. Hanson's or Mr. Weede's titles, let alone accuse them of any misconduct." *See* Def. Mem. 14.

Plaintiffs also suggest that the other three named custodians "assisted Weiss in his responses to Congress in 2022." Pls. Mem. 32. True to form, Plaintiffs never specify what "assist[ance]" they're referring to or why such assistance was improper—instead citing wholesale the >300 pages of records that the Department has produced. *See id.* Nor do Plaintiffs allege that there was anything improper regarding responses to Congress in 2022—just that email correspondence about congressional letters occurred. Even there, Plaintiffs are wrong: Mr. Weiss tendered no congressional responses in 2022. *See* Def. Resp. to Pls. Statement of Material Facts ("RSMF") ¶ 1.

By Defendant's count, there are four distinct email chains in the released materials involving congressional responses in 2022. None of them evidences any misconduct by the custodians. The most fulsome example is a string of internal and external emails prompted by a May 9, 2022 letter from Senators Grassley and Johnson. *See generally* Cornett Decl. Ex 1 (FOIA

---

[10] Mr. Shapley's May 26, 2023 interview transcript is publicly available. *See* https://waysandmeans.house.gov/wpcontent/uploads/2023/06/Whistleblower-1-Transcript_Redacted.pdf. As noted above, in addressing the content of the materials on which Plaintiffs rely, the Department does not endorse or concede their accuracy.

The Court will search in vain to find any other mention of Ms. Hanson or Mr. Weede. Defendant had already performed this searching, which is why it has maintained for months that Plaintiffs lack any specific allegations against Ms. Hanson or Mr. Weede. *See* Def. Mem. 12–14.

Production), ECF No. 36-1, at 21-23, 27-32, 62-66, 87-109, and 112-18.[11] This string comprises fewer than 40 discrete emails, many of which are merely blank forwards or "FYI"s.[12] Many others are perfunctory correspondence either acknowledging receipt or asking for updates.[13] There are precious few emails reflecting any substantive discussion of the congressional responses. Mr. Weede did not send any such emails. Ms. Wolf did not send any such emails. And the few sent by Ms. Hanson reflect nothing unusual, let alone improper. For example, Ms. Hanson expresses her understanding that "[p]er DOJ policy, only OLA can respond on behalf of the Department to a request from the legislative branch." *Id.* at 141; *see* Justice Manual § 1-8.200, Communications with Congress ("The Assistant Attorney General (AAG) for the Office of Legislative Affairs (OLA) is responsible for communications between Congress and the Department . . . . Communications between the Department and Congress . . . will be managed or coordinated by OLA . . . ."), *available at* https://www.justice.gov/jm/jm-1-8000-congressional-relations#1-8.200. Nothing in Ms. Hanson's (or anyone else's) "assist[ance]" to Mr. Weiss (Pls. Mem. 32) comes close to "clear evidence of bad faith." *Dalal*, 643 F. Supp. 3d at 54 n.6 (citation omitted).

Plaintiffs bear the burden to overcome the presumption of good faith. In this case, that

---

[11] A second string of emails was prompted by a July 7, 2022 letter from Senators Grassley and Johnson. *See id.* at 33, 110-11. These seven discrete emails evidence no misconduct; the Delaware USAO employees merely reference prior guidance related to the May 9, 2022 letter. *See id.* at 110.

A third string of emails was prompted by an email from the Department's Office of Legislative Affairs attaching the July 7, 2022 letter. *See id.* at 79, 154. Ms. Hanson merely forwarded the letter to Messrs. Weiss and Weede and to Ms. Wolf; there is no substantive discussion whatsoever.

A fourth string of emails was prompted by an October 26, 2022 letter from Senators Grassley and Johnson. *See id.* at 294. Here again, the correspondence is merely forwarded on; there is no evidence of any wrongdoing. *See id.*

[12] *See id.* at 27 (blank), 94 (blank), 161 (blank); *id.* at 33 ("FYI"), 62 ("FYI"), 93-94 ("FYI").

[13] *See, e.g.*, *id.* at 23 ("received"), 22 ("Received."), 103 ("Copy that!"); *id.* at 27 ("The letter is addressed to Mr. Weiss. Is he going to respond?"), *id.* ("I can't promise a timeline but thanks for checking in as the Department continues to work on responding."); 29 ("Thanks for checking in. We are working on a response and hope to get it out shortly.").

means adducing clear evidence that Mr. Weiss's alleged wrongdoing, which the Department denies, should be imputed to every other employee at the Delaware USAO. Because Plaintiffs have failed to do so, and because Mr. Weiss did not participate in the search of his emails, the Court need not even address the allegations against him.

> **2.    The allegations against Mr. Weiss fall short of the "clear evidence" necessary to rebut good faith.**

Even if the Court were to address the alleged wrongdoing by Mr. Weiss, it would find Plaintiffs' allegations lacking. Plaintiffs argue that correspondence from Mr. Weiss to Congress was inaccurate—and so egregiously so that it amounts to clear violations of two federal criminal statutes. Pls. Mem. 12–31. Plaintiffs devote these 19 pages to an exposition of the elements of those statutes and to a highly semantic analysis of the contents of the letters. To Plaintiffs, each of these letters is only susceptible to one meaning—theirs—and must be read to contradict each other. *See, e.g.*, Pls. Mem. 23 (noting Mr. Weiss's explanation of his letters but arguing "'Ultimate authority' must be given *some* meaning" different from his explanation). But of course, even the letters themselves offer a different interpretation, with Mr. Weiss affirming the June 7, 2023 letter while "expand[ing] on what this means." June 30, 2023 Letter, ECF No. 14-2.

Plaintiffs' argument also largely ignores an express caveat in Mr. Weiss's description of his authority: that it was subject to "federal law, the Principles of Federal Prosecution, and Departmental regulations." June 7, 2023 Letter at 1. Mr. Weiss need not have included that clause; it is true of every prosecutor in the Department—including Special Counsels. *See, e.g.*, 28 C.F.R. § 600.7(a) ("A Special Counsel shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice. He or she shall consult with appropriate offices within the Department for guidance with respect to established practices, policies and procedures of the Department."); *see also id.* § 600.7(b) (describing supervision of a special counsel). Nevertheless, having excised the clause, Plaintiffs turn and argue that the truncated language can only be read as

"false and misleading." Pls. Mem. 15. Plaintiffs' strained analysis cannot constitute "clear evidence" of misconduct that invalidates the search run in this FOIA case.

Plaintiffs also rely on a glaring example of selective quotation from Mr. Weiss's November 7, 2023 testimony. On page 22 of their memorandum, Plaintiffs block-quote from page 45 of the Staff Report, which in turn quotes Mr. Weiss as follows:

> Q. But [515 authority] wasn't granted, right?
>
> A. Yes. We have been over this. It wasn't granted. They said, follow the process. I followed the process. And in completing the process—
>
> Q. But, Mr. Weiss, when you ask for something and they don't give it to you, what is that?
>
> A. I asked for something, and in that conversation they didn't give it to me[.]

Pls. Mem. 22 (quoting Staff Report at 45). Plaintiffs cite this as evidence that Mr. Weiss had been denied special-attorney status under § 515, and thus that his June 7 claim to "ultimate authority" was misconduct. But if the bracketed period ("[.]") appears contrived, it is. The Staff Report cuts off Mr. Weiss's statement; he continued to say, according to one news outlet that claims to have reviewed a full transcript of the exchange:

> I'm not—you want me to say it's a denial, *but it's not*. Not when I know that, weeks later, I was specifically told, "You can proceed."
>
> From my mind, it's a sequencing event. . . . *It's not a denial in any way, shape or form*.

Brooke Singman, *Weiss says he 'wasn't granted' special attorney authority in Hunter Biden probe despite request: transcript; Weiss said he did not feel he was denied the authority, though, and said it was a 'sequencing event'*, Fox News (Nov. 9, 2023), https://www.foxnews.com/politics/weiss-says-he-wasnt-granted-special-attorney-authority-in-

hunter-biden-probe-transcript (emphasis added).[14]

In the end, Plaintiffs grudgingly acknowledge that Mr. Weiss explained at his November 7, 2023 interview exactly how his statements were all consistent and accurate. *See* Pls. Mem. 23 (quoting Staff Report at 55). Yet they maintain that their own interpretation of his letters—informed by speculation and contested/incomplete testimony about the facts—satisfies their burden in this FOIA case. The Court need not resolve Plaintiffs' semantic arguments in order to grant Defendant's motion. It suffices to hold that Plaintiffs have not carried their burden to muster

---

[14] This article was based on "a transcript of [Mr. Weiss'] testimony reviewed by Fox News Digital." *Id.*

Plaintiffs also cite Mr. Shapley's characterization of comments by Mr. Weiss at an October 7, 2022 meeting as evidence that the June 7 letter was so inaccurate as to constitute misconduct. But Mr. Shapley's May 23, 2023 interview is not the sole account of that meeting. Indeed, Mr. Weiss's correspondence postdates it. *See* July 10, 2023 Letter, ECF No. 14-3. Furthermore, Plaintiffs avoid (or rely on sources that do not include) testimony by others who reportedly contradicted Plaintiffs' secondhand characterizations. A number of media outlets have reported on testimony based on access to the transcripts, and the Court may take judicial notice of information published in news articles "for the fact that they contained certain information," *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113 (D.D.C. 2015). The following articles are representative:

- *See* Luke Broadwater, *F.B.I. Agent Undercuts Claims of Political Interference in Hunter Biden Inquiry*, N.Y. Times (Sep. 12, 2023) (an FBI witness testified that Mr. Weiss said he had "never been denied the authority to bring charges in any jurisdiction."), https://www.nytimes.com/2023/09/12/us/politics/hunter-biden-thomas-sobocinski-testimony.html;

- Annie Grayer & Marshall Cohen, *Top DOJ Prosecutor in DC Refutes Claim That He Blocked Hunter Biden Tax Charges In His District*, CNN (Oct. 13, 2023) (U.S. Attorney "refuted claims from two Internal Revenue Service whistleblowers [Messrs. Shapley and Ziegler] that he [Mr. Graves] blocked federal investigators from charging Hunter Biden with tax crimes in DC."), https://www.cnn.com/2023/10/13/politics/matthew-graves-hunter-biden-testimony/index.html;

- Erica Brown, *U.S. Attorney for Central California Told Congress David Weiss Had Full Authority to Charge Hunter Biden In the State*, CBS News (Oct. 27, 2023) (U.S. Attorney testified his office "offer[ed] administrative resources and office space to Weiss' staff" and "that Mr. Weiss had been doing the investigation for several years, was leading the investigation, and would bring charges if he believed they were appropriate"), https://www.cbsnews.com/news/u-s-attorney-california-david-weiss-full-authority-charge-hunter-biden/.

"clear evidence of bad faith," *Dalal*, 643 F. Supp. 3d at 54 n.6 (quoting *Physicians for Human Rights*, 675 F. Supp. 2d at 158), and certainly not enough to disqualify everyone who works for Mr. Weiss at every level.

### B.    The Record Does Not Reveal "Substantial Misconduct" by the AUSA Identified by Plaintiffs.

Other than their arguments about Mr. Weiss's letters and their "taint" theory, Plaintiffs only marshal allegations regarding the conduct of *one* custodian who participated in the search: an AUSA assigned to the underlying investigation. *See* Pls. Mem. 33–41.

While Plaintiffs offer six discrete anecdotes about the investigation, they all amount to the same fundamental grievance: Based on characterizations by others—many of which have been contested or contradicted—Plaintiffs disagree with steps taken in an ongoing investigation and prosecutions. Even wading into that dispute would place the Court, through a FOIA case, in the position of second-guessing matters of prosecutorial discretion, which are not judicially reviewable. *See United States v. Fokker Servs. B.V.*, 818 F.3d 733, 742 (D.C. Cir. 2016) (citing *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967)); *Ning Ye v. Holder*, 624 F. Supp. 2d 121, 123 (D.D.C. 2009) (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). In other words, the Court could only find "clear evidence of bad faith" if it held that a prosecutor should have done what Plaintiffs would have preferred. The Court should hesitate before assuming that role. In any event, none of Plaintiffs' six examples amounts to clear evidence of bad faith.

Plaintiffs' first allegation of misconduct, for example, is "'unusual' communication issues" with then-U.S. Attorney Scott Brady who—according to the Staff Report—was assigned by former Attorney General Barr "to vet information related to Ukraine coming into the Justice Department." Staff Report at 16 & n.77. But even on its own terms, Plaintiffs' recounting hardly evidences misconduct. Indeed, Plaintiffs do not even state what misconduct they are alleging. They describe events apparently intended to speak for themselves. That falls short of Plaintiffs' burden. Indeed,

the partial testimony they cite actually disclaims knowledge. *See, e.g.*, Pls. Mem. 35 (asked whether Mr. Brady was ever "made aware of [the AUSA's] processing and decisions regarding this briefing, and why she didn't want the briefing," Mr. Brady testified, "I was not.") (quoting Staff Report at 25).

Throughout their argument, Plaintiffs fail to articulate any legal or ethical standard that was violated. With respect to a draft search warrant (Pls. Mem. 35–36) or communications with defense counsel (*id.* at 37), Plaintiffs never explain *why* these actions (or inactions) amount to "probable misconduct" (*id.* at 33) as opposed to mere disagreements between investigators and prosecutors. Nor do Plaintiffs cite any law, regulation, policy, or principle of federal prosecution that would have required prosecutors to conduct specific interviews at a particular time (*id.* at 39), to pursue a particular lead (*id.* at 40), or to prioritize obtaining a particular type of evidence (*id.* at 40–41). In many cases, they do not even add any analysis, argument, or conclusions of their own. Instead, Plaintiffs largely block-quote from the Staff Report and hope that suffices. It does not. Without any legal baseline from which to assess a normative deviation—let alone a deviation in bad faith—the Court cannot conclude that Plaintiffs have met their burden.

The law and Department policy limit what can be said to address the allegations relating to the course of an ongoing criminal investigation. But even on a cursory inspection, Plaintiff's ominous-sounding allegations fall short. At most, the anecdotes reflect commonplace disagreements between investigators and prosecutors over isolated judgments, priorities, and investigative steps. The Court should not adopt the characterizations of these events as clear evidence of misconduct.

## III.    A "Taint Team" Is Neither Warranted Nor Reasonable.

Because the Department conducted a reasonable search, and Plaintiffs have failed to muster clear evidence to the contrary, no "taint team" (Pls. Mem. 41) need be employed. Defendant would

only add that, contrary to Plaintiffs' suggestion, such an approach would not be "a relatively simple matter technologically." *Id.* Plaintiffs may have in mind the sort of e-discovery software that allows for easy de-duplication of documents. EOUSA's FOIA software does not have that capability. *See* Ex. 1, Jan. 11, 2024 Declaration of Kara Cain ("3d Cain Decl.") ¶ 4. Thus, if any of the Department's searches were re-run, EOUSA would likely have to review every page of the results. *See id.* That would result in an enormous duplication of work, as most of the records would have been reviewed already. And for reasons stated in Section I above, review "directly by EOUSA" (Pls. Mem. 41) would only yield fewer responsive documents on a slower timetable. Plaintiffs' "taint team" suggestion is both unwarranted and unreasonable.

## IV. THE DEPARTMENT CONDUCTED AN ADEQUATE SEARCH FOR NON-EMAIL RECORDS.

An agency need not "search every record system" or "demonstrate that all responsive documents were found and that no other relevant documents could possibly exist." *Watkins L.*, 78 F.4th at 442 (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (citation omitted)). Rather, "[a]n agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Id.* (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (cleaned up)); *see also Shapiro v. U.S. Dep't of Just.*, 40 F.4th 609, 613 (D.C. Cir. 2022) ("In a FOIA case, a district court is not tasked with uncovering 'whether there might exist any other documents possibly responsive to the request,' but instead, asks only whether 'the *search* for [the requested] documents was *adequate*.'" (quoting *In re Clinton*, 973 F.3d 106, 116 (D.C. Cir. 2020) (emphasis in original)).

Under this framework, the Court should reject Plaintiffs' arguments as to hard-copy records and non-email communications systems.

A.    **Hard-Copy Records.**

All eight custodians were provided a copy of Plaintiffs' FOIA request. 2d Cain Decl. ¶ 13.

All eight custodians were told to search for any hard-copy records, including handwritten notes,

that would have been responsive to Plaintiffs' request. *Id.* ¶ 35. All eight custodians were told to

err on the side of caution, to the extent they had any doubts about potential responsiveness. *Id.*

¶ 14. And while this would not be necessary to uphold the search, it did yield hard-copy records.

*Id.* ¶ 36. On these facts, the agency's search was more than reasonable.

Plaintiffs' only arguments are that the 2d Cain Declaration does not sufficiently describe

the "instructions given" to the custodians or say "whether a central hard-copy record existed." Pls.

Mem. 42. The first argument fails because it is not clear what additional instruction could be given.

The custodians were told to search for "*any* hard-copy records." 2d Cain Decl. ¶ 35 (emphasis

added). And they were told that, among those records, "handwritten notes" specifically should be

searched. *Id.* FOIA does not require any more detailed instruction than that, and Plaintiffs cite no

case to the contrary.

In the sole case offered by Plaintiffs, the search declaration had only contained nine words

on hard-copy records: ". . . the scope of the search also included paper files." 2d Decl. of Jamal

El-Hindi ¶ 14, *Lewis v. U.S. Dep't of the Treasury*, No. 1:17-cv-943-CKK (D.D.C. Oct. 6, 2017),

ECF No. 20–1. As described above, the Court has far more detail here. And unlike in *Lewis*, the

Court has "the overall results" of the agency's search. *See* Mem. Op. & Order 4, *Lewis v. U.S.

Dep't of the Treasury*, No. 1:17-cv-943-DLF (D.D.C. July 2, 2018) ("*Lewis* Mem. Op."), ECF No.

23. Finally, the primary ground for invalidating the *Lewis* search was the agency's failure to

identify search terms used in searching for electronic records. *Id.* at 3. Those are described at length

here. *See* 2d Cain Decl. ¶¶ 23–34 ("Search Terms Used").

The second argument fails because, whatever Plaintiffs might mean by "a central hard-

copy record," Pls. Mem. 42, it would have been subsumed by the command to each custodian to

search for "*any* hard-copy records." *Id.* (emphasis added). Merely supposing that some centralized file might exist, and that it might not have been searched, is insufficient under FOIA. Nor must an agency include in every declaration whether such a file exists. Rather, per the standard applied by this Court in *Lewis*, an agency's search declaration only fails if it contains no "information about the search strategies of the [agency] components charged with responding" *and* no "indication of what each [agency component's] search specifically yielded." *Lewis* Mem. Op. 2 (quoting *Reps. Comm. for Freedom of Press v. Fed. Bureau of Investigation*, 877 F.3d 399, 403 (D.C. Cir. 2017)). The declaration in this case contains both.

### B.    Non-Email Communications Systems.

Plaintiffs' FOIA request identified three broad categories and 12 specific examples of communications systems other than email. *See* 2d Cain Decl. ¶ 37. Again, all eight custodians were provided with this request. *Id.* ¶ 13. But they were also asked specifically whether they would have kept records of the sort identified by Plaintiffs' request on any of those systems. *Id.* ¶ 37. Because all eight confirmed that they did not use any of those systems to communicate about the subjects of Plaintiffs' request, the agency did not search any such systems. *Id.* ¶ 38. That was an eminently reasonable approach. Nevertheless, Plaintiffs dispute this aspect of the search on three grounds.

First, they fault the Cain declaration for suggesting that custodians were asked about *general* use of the enumerated systems while offering "silence" on the answer. Pls. Mem. 43. That argument misreads Ms. Cain's declaration. Taken together, paragraphs 37 and 38 clearly convey that the custodians were asked whether they would have kept any *responsive* records on the enumerated systems.[15] The answer was "no."

---

[15] Plaintiffs' contrary reading would make little sense. Everyone in the modern era uses "inter-office and intra-office communications," just as everyone uses "MMS or SMS text messages." 2d Cain Decl. ¶ 37. There would have been no need to ask whether custodians used such systems *generally*. The point is that, absent any reason to think the system(s) would contain responsive records, an agency is not required by FOIA to search them. *Watkins L.*, 78 F.4th at 442.

Second, Plaintiffs suggest that custodians might simply have *forgotten* using such systems, and that it should be no "technological challenge" to search them anyway. Pls. Mem. 44. Here again, Plaintiffs turn FOIA on its head. The adequacy of an agency's search "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Shapiro*, 40 F.4th at 613 (quoting *Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 74 (D.C. Cir. 2018)) (citation omitted)). And the level of "technological challenge" is irrelevant under FOIA; the question is whether the agency employed means "reasonably calculated" to uncover responsive records. *Watkins L.*, 78 F.4th at 442. In other words, FOIA does not require an agency to search any system just because it would be easy.

Plaintiffs' only FOIA case, *Center for Biological Diversity* (Pls. Mem. 44), is distinguishable. There, the agency had assured the court that "no [instant messages], text messages, social media posts, Facebook or Twitter messages, or any other kind of chats were used by Office of Pesticide Programs ('OPP')] staff to communicate on the drafting and review of [responsive] documents." Decl. of Earl G. Ingram ¶ 15, *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, No. 1:16-cv-175-BAH (D.D.C. Nov. 23, 2016), ECF No. 16-2. But that assurance did not from the OPP custodians themselves. Instead, the assurance came from members of a separate component, the Environmental Fate and Effects Division, who had been declared "subject matter experts" to help coordinate the search. *Id.* ¶¶ 14, 15. That is a far cry from the present case, in which the custodians themselves confirmed that the systems would not have contained responsive records. *See* 2d Cain Decl. ¶¶ 31–32.

## CONCLUSION

For the foregoing reasons, Plaintiffs should grant Defendant's motion for partial summary judgment and deny Plaintiffs' cross motion for partial summary judgment.

Dated:  January 12, 2024                              Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

/s/ *Jason C. Lynch*
JASON C. LYNCH (D.C. Bar No. 1016319)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 514-1359
Email: Jason.Lynch@usdoj.gov

*Counsel for Defendant*