```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   HERITAGE FOUNDATION, et al.,     .
                                      .  Case Number 23-cv-1854
 4             Plaintiffs,            .
                                      .
 5        vs.                         .
                                      .  Washington, D.C.
 6   U.S. DEPARTMENT OF JUSTICE,      .  August 11, 2023
                                      .  2:08 p.m.
 7             Defendant.             .
     - - - - - - - - - - - - - - - -

 8

 9                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                  UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:         SAMUEL DEWEY, ESQ.
                                Chambers of Samuel Everett Dewey,
13                                 LLC
                                2200 12th Court North
14                              Apt. 609
                                Arlington, Virginia 22201
15
                                DANIEL MAULER, ESQ.
16                              Heritage Action For America
                                214 Massachusetts Avenue Northeast
17                              Washington, D.C. 20002

18   For the Defendant:         JASON LYNCH, ESQ.
                                ELIZABETH SHAPIRO, ESQ.
19                              U.S. Department of Justice
                                Federal Programs Branch
20                              1100 L Street Northwest
                                Washington, D.C. 20005
21
     Official Court Reporter:   SARA A. WICK, RPR, CRR
22                              333 Constitution Avenue Northwest
                                Room 4704-B
23                              Washington, D.C. 20001
                                202-354-3284
24

25   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S

 2            (Call to order of the court.)

 3            COURTROOM DEPUTY:  Your Honor, we are in Civil Action

 4    23-1854, Heritage Foundation, et al., versus U.S. Department of

 5    Justice.

 6        If I can have counsel please approach the podium and state

 7    your names for the record, starting with counsel for the

 8    petitioner.

 9            MR. DEWEY:  Samuel Dewey, Your Honor, counsel for

10    Heritage and the other plaintiff, Mike Howell.

11            MR. MAULER:  Good afternoon, Your Honor.  Dan Mauler

12    on behalf of the plaintiffs.

13            THE COURT:  Good afternoon to both of you.

14            MR. LYNCH:  Good afternoon, Your Honor.  Jason Lynch,

15    trial attorney, Department of Justice, Federal Programs Branch,

16    for defendant.

17            MS. SHAPIRO:  Good morning, Your Honor.  Elizabeth

18    Shapiro on behalf of the Department of Justice.

19            THE COURT:  Good afternoon, everybody.

20        Let me hear first from the plaintiffs.  I reviewed the

21    status report.

22            MR. DEWEY:  Thank you very much, Your Honor.

23        As the plaintiffs see it, we're here on the question of

24    production rate, and our view is that an accelerated rate is

25    appropriate here, given the gravity of the matters underlying
```

1    the request, which Your Honor has acknowledged and that I think
2    the department acknowledges, that it is a request of exceptional
3    importance.  The subject is of exceptional importance.  And it
4    goes directly to a raging controversy.

5        And one of the key purposes of FOIA is to inform the public
6    on issues of controversy, and that means having access to the
7    information as close to contemporaneously as possible.  And in
8    our view, the department's submission would render FOIA really
9    only useful for a historian in that many, many months would go
10   by.  And as Your Honor knows, the political calendar, the modern
11   news cycle moves much more quickly.  The documents still retain
12   some salience, but they do lose salience each time something in
13   that process goes by.

14       And again, Your Honor, we would submit that there's a
15   structural first principle at play.  FOIA has to have some
16   utility in getting information out on these core central items.

17       And then second, Your Honor, we would point to the gravity
18   of the events and how quickly things are changing.  As Your
19   Honor may have seen, we now know that Mr. Weiss was appointed
20   special counsel about an hour ago, but we don't have the order.
21   So, as Your Honor knows, we don't know the scope of his mandate
22   yet.  That's yet another development.  The House Oversight
23   Committee issued a press release about 30 minutes ago vigorously
24   attacking that decision and saying there needs to be
25   transparency.

1      And just one other point on the transparency point, Your
2  Honor, I think a useful precedent from a first principles
3  perspective is the analysis and the opinions we cited in the
4  vaccine cases where Judge Pittman ordered in one instance 55,000
5  pages processed a month under the premise that there is a matter
6  of national controversy.  There is a large portion of the public
7  that does not believe the government, and that it only fuels
8  discord, dissension, and that lack of belief if the government
9  is unable to promptly produce the information.

10      Moving more specifically to the law, Your Honor, I didn't
11  take our friends to dispute that Your Honor has discretion to
12  impose an accelerated rate.  I took them to dispute the
13  appropriateness here.

14      And I would just say specifically, Your Honor, the 350-page
15  rate that they cite and that they have proffered here, it is my
16  understanding that it has been proffered recently as the
17  standard rate for the Executive Office of the United States
18  Attorney.  We've certainly seen it in other cases.

19      And I don't know the answer for sure, but I would expect,
20  Your Honor, that where I would bring a nonexpedited case and be
21  in front of Your Honor, I would probably get the same rate,
22  which again in our view stands the need for prompt disclosure in
23  a matter of great public importance on its head.

24      And I would also note there, Your Honor, the Department of
25  Justice is required to release certain statistical data.  We've

1    gone through that data, and there were a couple of things that

2    stood out.  Ms. Cain references, I think, roughly 25 FTEs, which

3    is lower than it's been in the past four years.  And by our

4    calculations, full production would take place in well over 200

5    days, which to my knowledge would be the longest expedited

6    response in the past four fiscal years for which data is

7    available.

8         Granted, Your Honor, there's an assymetry there.  We only

9    know what we know.  But we did try to look through the data to

10   see how this fits in.

11        On the question of resources, because I know my friends

12   have raised that, Your Honor, we would essentially stand on our

13   submissions in the reply brief on the preliminary injunction

14   motion as to resources.

15        But certainly, I understand my friend's point that Your

16   Honor should not direct specific allocation of resources in the

17   department.  We're not asking for this.  We see this as an Aiken

18   County-type situation.  The injunction or the order would only

19   run to say you have a statutory duty, you would not comply with

20   it.  It would not require the directing of any other resources.

21   It would not be directive in that sense.

22        Specifically on point, the Ninth Circuit has said that is

23   appropriate in the Fiduccia case, and it's not a redirecting,

24   it's a you must simply comply with statutory resources.

25        We referenced the Stevens case, Your Honor, which made the

point on resources that certainly it's appropriate in that Court's view for the Court to ask what is the relative resource allocation.

I had one of my colleagues go through the budget submissions, the recent budget submissions to see if there was any submission. There is a backlog, more money for processing FOIA. And the only thing that we could find was a submission for more money to hire more FTEs in U.S. Attorney offices to defend FOIA suits, not to go through the production and clear the backlog but, rather, to defend them.

So that's the only thing we have on that point, Your Honor.

As to ordering flexibility, we've made very clear our view, and we've tried to get as much information from my colleagues as we can on where we are in the production. For example, we've offered, as I've done -- we've done in other cases, Your Honor, to confer now on search terms, try to get agreement so there is no issue down the road. We're willing to engage in any process we can think of to accelerate the matter.

THE COURT: So let me ask you a question about that. My understanding is DOJ rejected your offer to try to narrow the search through search terms; correct?

MR. DEWEY: Your Honor, they said they didn't want to confer on search terms at this time. We have the data of the 2,500-some documents in the initial run, and they did another run. And my colleague can correct me. I believe they found

another 150 relevant records.  And I don't want to speak for them on that point, Your Honor.  They did run the searches.  And we appreciate them doing that.

Our offer had been not necessarily to narrow.  Maybe it would have narrowed.  But to confer, be it on narrowing or be it on -- we agree on the terms, so we're not going to have an issue back in front of Your Honor if Your Honor imposed an accelerated schedule as to well, we think the approach is inappropriate, summary judgment briefing.  We're trying to front-load and work out as much as we can.

THE COURT:  Right.  To lower the number of issues the Court may ultimately have to address.

MR. DEWEY:  Exactly.

THE COURT:  What about prioritizing by specification and request?  What does that mean exactly?

MR. DEWEY:  So Your Honor, our request had two parts. The first was for communications from Delaware to Main Justice regarding regulatory special counsel status or statutory special counsel status.  And the second was communications from the District of Delaware to other offices regarding bringing charges.

Our view is that the most critical of records, particularly in light of the developments of an hour ago, was specification 1.  That's always been our view.  And were there to be consideration of an order tranching them, we would prefer

specification 1.

I had dialogue with my colleagues, and my understanding from them was that it's not practicable to prioritize that way. But that would be our priority. We feel that while everything's important, the most important of the important are the documents on the request for special counsel status.

THE COURT: Okay. So you're telling me that your understanding is that EOUSA standard processing rate is 350?

MR. DEWEY: I've seen that in other cases, Your Honor. I'm at a disadvantage. As Your Honor has pointed out before, I only have the data I have. I've had my colleagues scrub the data. I have seen that in some other cases recently, that they've offered that. I know previously DOJ has and Your Honor's opinion referenced a 500-page rate.

THE COURT: At the FBI. But you've cited this authority that says when determining the rate at which a federal agency must respond to FOIA requests, courts often give deference to the agency's release policies.

And it runs to the agency rather than -- in your view, rather than the individual units?

MR. DEWEY: Two responses to that, Your Honor.

THE COURT: Or divisions, rather.

MR. DEWEY: Yeah. On the deference to the release policies, our position would be that that's in tension with Al Fayed and the D.C. Circuit's holding that in interpreting a

statutory provision of FOIA, which release would be, there is no
deference to the agency because it is a common federal statute.

Obviously, Your Honor has law on that, and if Your Honor is
against us on that, we accept that.

But even taking that, this is not a standard case.  This is
a case --

THE COURT:  No, I'm just trying to get a sense of, you
know, to what extent -- this Court, as you know, certainly
applied the 500 standard processing rate to the FBI.  I think
the defendants cite other cases in which the Court's applied
350.

I'm just curious what you, the plaintiffs, think that the
law requires in terms of looking at this at the division or the
agency perspective.  Because clearly, there are plenty of
attorneys all over the country who are detailed to EOUSA all the
time, and whether it's Main Justice or U.S. Attorney's Office
around the country, they're resources, and I don't want to
micromanage resources for the department.

But I'm just curious whether you believe there is a strong
legal principle that applies here that it is the agency as
opposed to the division.

MR. DEWEY:  Your Honor, I apologize for my inartful
response on that.  Yes, we clearly do.  I think the best
authority for that is the Ninth Circuit's opinion in Fiduccia,
which very clearly says FOIA -- I'm paraphrasing here, FOIA is a

1    tough statute on delay, Congress made it tougher, and therefore,

2    it may well be that the department needs to reallocate

3    resources.  I think that's the lead authority we would cite for

4    that point.

5        I think certainly the Stevens opinion also speaks to that

6    point.  That's the district court in, I believe, the Northern

7    District of Illinois which had the discussion of you have to

8    look to budget, you have to look to requests.

9        And I think there is law in this district, Your Honor, that

10   the defendant is the agency.  And we would submit it would be

11   odd as a matter of first principles that any order Your Honor

12   issues runs against the department.  And the proper defendant is

13   the department, and it would be quite odd to only consider in

14   isolation the resources of one element of that department,

15   because Your Honor is quite correct, resources can be

16   reallocated.

17       And again, I'm not saying and we do not submit Your Honor

18   should micromanage.  We see this as more of a Aiken County, the

19   injunction merely says you have to comply with your statutory

20   duties and that's it.  But it certainly is relevant that there

21   have been cases that I'm aware of, Your Honor, where the

22   department has redeployed upwards of 50 attorneys at the drop of

23   a hat because it had a priority of production.

24            THE COURT:  Right.

25            MR. DEWEY:  Again, Your Honor, not submitting any of

that as dispositive.  We think it all goes to the calculus of FOIA's not just for historians.  This is a matter of importance, as Your Honor has already noted.  And again, I would come back to what Judge Pittman said in the Texas vaccine cases, that this -- a large portion of the country does not believe the department is telling the truth on this question, and we would submit respectfully that that state of affairs is only perpetuated by a delay in production.

Putting the documents out, you know, whatever they say, they are the documents that may very well prove the attorney general's side of the point and leave Mr. Comer, Chairman Comer and Chairman Jordan with egg on their face.  We don't know.  But we would submit in that situation the proper statutory and Article III consideration is transparency is good, regardless of how it cuts.

THE COURT:  Well, transparency was certainly a part of that, but also, it did relate to a huge public health emergency.  So I don't know that that's the standard that necessary applies here.

As I see it, your request that they produce all of the records, which exceeds 2,500, that's, what, close to a rate of like 800 a week or something.  That's a rate of over 32,000 a month.  That's a pretty fast clip as compared to, let's say, I accept the 500 as the baseline.  It seems that the department's suggestion is -- the Court's having a hard time seeing how that

1    can possibly be as soon as practicable for certain.  On the

2    other hand, your request seems out of line as well.

3        So any more response to that?  It does seem like the answer

4    is somewhere in between the two.

5            MR. DEWEY:  That may very well be, Your Honor.  I

6    would just submit that 2,500, there are certainly other cases

7    than the Texas case, and I didn't mean to suggest an equivalency

8    to public health.  I merely meant to articulate the principle.

9            THE COURT:  No, I understand.  And they concede this

10   is of extreme public importance.  So I hear you on that point.

11           MR. DEWEY:  On page 9 and 10 of the joint status

12   report, Your Honor, there are other cases ordering a rate that

13   are relevant here.  For example, in Seavey -- and that was

14   actually a case dealing with a historical request.  There were

15   just a lot of records.  The Court ordered 28 a month in

16   Clemente, which involved allegations --

17           THE COURT:  I know.  But I had that with Colbert, and

18   I didn't do it.

19       Are these all cases involving the expedited request that

20   you've cited here?

21           MR. DEWEY:  I believe most of them were expedited,

22   Your Honor.  There is authority in this district that the

23   expedited status is simply one of the factors you would look to,

24   that the importance and exigency is overwhelming.  And I can see

25   the burden on the requester's resources as well.  We're not

1    trying to discount that point, Your Honor.  We're just

2    submitting that the 2,500 is very much within -- within the

3    range of cases, you know.

4         For example, we cite the ACLU case, which involved issues

5    of detainee treatment, and the rate there started at 17 to 20

6    and was later brought down to, I believe, 10,000 in response to

7    a supplemental filing by the department.

8         So obviously, I understand if Your Honor is against us on

9    our specific ask, but we do think that there are cases in other

10   varied situations of importance that have gone above this rate,

11   actually above the rate that we're asking for.

12        So that would be our response on that point, Your Honor.

13             THE COURT:  And I did deny it at that time, but I

14   certainly did it without prejudice, and I do think over time it

15   becomes more salient, as recent events have suggested here.  So

16   I'm -- I don't want you to think I'm insensitive to the need,

17   the public need for these documents.

18        All right.  I will perhaps hear from you again, Mr. Dewey,

19   but let me turn to Mr. Lynch or Ms. Shapiro.

20             MR. DEWEY:  Certainly, Your Honor.  Thank you.

21             THE COURT:  All right, Mr. Lynch.  I just don't see

22   how the department can defend the 350 by August 23rd, given what

23   we've talked about here in terms of standard rates and standard

24   cases.

25             MR. LYNCH:  Well, just to be clear, Your Honor, on

that, we proposed making our first interim response by the 25th, which would be two weeks from today.  So we're essentially cutting our first month in half to reflect the time that we've already spent processing, which gets me to the first point that I want to make, which is, I think the fundamental problem in plaintiff's argument is that they're focusing exclusively on the number of pages per month, which is only one metric if you're going to decide whether something is being sufficiently expedited.

The other metric which I would submit is equally or more important here is when you start that pace.  So we could propose to do a thousand pages a month, but if we said that's not going to start until next June, I doubt plaintiffs would accept that as an expedited processing.

THE COURT:  But you've already pulled the records.

MR. LYNCH:  That's exactly right, Your Honor.

THE COURT:  But we are where we are now.  So why does the rate prospectively need to be so slow?  You've got the records.  This isn't a situation where you're spending months trying to find them.  There's a relatively small universe.  You have them.  I mean, that's great.  You did that quickly.  But it doesn't mean that that gives you extra time to actually do the review.  It's as soon as practicable, and you've got the stack of documents that for FOIA requests is not that great.

MR. LYNCH:  We absolutely have the stack of documents,

Your Honor.  My only point was that in response to Mr. Dewey's suggestion that they're not being expedited at all, of course, they have been expedited.  He referenced, you know, if he had been here in a nonexpedited posture.  We likely would not have even run searches by this point.  So we're way ahead of where --

THE COURT:  Fair enough.  But you need to keep moving. You can't rest on your laurels at this point.

MR. LYNCH:  The statutory touchtone, as you noted, is as soon as practicable, not as soon as possible but as soon as practicable, which we think we've offered based on the facts in Ms. Cain's declaration and balancing the need not just to continue working on other requests, we can't drop everything and work on just plaintiffs' request, but also other expedited requests.

THE COURT:  You can, I think, put this in front of regular requests, can you not?

MR. LYNCH:  They have been.  That's why we've run the searches.

THE COURT:  So we're talking about 14 in front of them on a first in/first out.  Are those 14 still in the process, or have some of those fallen away in the time since I've ruled on the PI?

MR. LYNCH:  No, my understanding, Your Honor, is there are at least still 14 other expedited requests.

THE COURT:  Well, there can't be more that are in

1  front of them, can there?

2      MR. LYNCH:  Not that would have been received before

3  the plaintiffs', that's correct.  Yes, Your Honor.

4      I think what Ms. Cain is proposing is a pace that will

5  allow us to continue working on all expedited requests, because

6  they all by definition have shown a compelling need.

7      THE COURT:  And these are all at EOUSA, not the

8  department as a whole?

9      MR. LYNCH:  That's correct, just the EOUSA component,

10 Your Honor, yes.

11     THE COURT:  As for each of those requests, are you

12 applying this 350 rate for each of those expedited requests?

13     MR. LYNCH:  I do not know what the rates are in the

14 other expedited requests.

15     THE COURT:  Well, I would be interested in that.  It

16 seems that, you know -- I don't want to interfere with other

17 cases, but if you're doing 2,000 or something a month in one,

18 it's -- it makes the Court question why the rate here.  This

19 is -- what is the standard EOUSA rate?  350?  And why isn't this

20 any faster than that?  I don't get that.

21     MR. LYNCH:  I am not aware that EOUSA has a standard

22 rate, Your Honor.  As to why it's that number, I think each FOIA

23 processing component assesses its resources and its workload and

24 comes up with a number that it -- I mean, this is all

25 necessarily predictive, too.  We could get additional cases in

litigation.  We could get additional cases that are granted

expedited processing.  And I doubt we're going to be able to

tell those courts, I'm sorry, we can't do anything on your

request because we're already processing the Heritage

Foundation's request.

So they have to sort of account for possibility and

contingency down the road.  But they do their best to come up

with a rate that they think will allow them to continue

processing all expedited requests.

And as we noted in our position in the joint status report,

part of that is resource and resource allocation.  So when they

cite this Court's decision in Colbert and the declaration on

which Your Honor relied, that was FBI specific.

THE COURT:  And a much greater group.  I get all that.

MR. LYNCH:  Yes, Your Honor.  So when you ask why is

it only 350, I think primarily that's a reflection of the

relative resources of, say, EOUSA and FBI.

THE COURT:  But do you disagree with them that the

resources are at the agency level rather than at the division or

component level?

MR. LYNCH:  We do, Your Honor.  That's just not how

FOIA requests are processed.

THE COURT:  Is that in practice or under the law?

MR. LYNCH:  Well, the regulations specify a

decentralized FOIA processing scheme.  And so requests -- you're

1    actually supposed to submit a request to the processing

2    component.  You can go through what's called the Mailroom

3    Referral Unit, and it will find its way to the right component.

4    But the regulations are absolutely clear that requests are

5    processed by component.

6         And if I could, returning to the statutory touchstone of

7    practicability, I think it makes eminent sense to assess a

8    prospective rate per month that's based on the component's

9    resources.

10        To suggest --

11             THE COURT:  Maybe, maybe not.  If you've got a bunch

12   of FOIA -- especially FOIA lawyers sitting over at DOJ that are

13   understaffed right now, I don't know, but let's hypothetically

14   say that were the case, why -- it's not much more expensive at

15   all for them to walk five blocks to EOUSA.  I don't know where

16   you are now, but you used to be apart from Main Justice.

17        It's not necessarily the case that you can't move resources

18   around.  And in fact, you do.  You take resources from the U.S.

19   Attorney's Office all the time to come to EOUSA.  You do

20   details.

21        So I don't think it's just looking at EOUSA today without

22   considering whether there are untapped resources around the

23   department that can be focused on FOIA for a little while or

24   FOIA for EOUSA rather than FOIA for FBI.

25             MR. LYNCH:  Well, Your Honor, I can tell you from my

1    experience, it is very much a hypothetical that there are any

2    FOIA lawyers sitting around with nothing to do in the Department

3    of Justice.

4        THE COURT:  No, but expedited requests, if EOUSA is

5    especially heavy now on that relative to others.  It's

6    something, it seems in the Court's view, that the department as

7    a whole should consider, especially when you have issues of

8    national importance, as you've conceded this is.

9        I'm not going to look at it in this case simply as EOUSA,

10   unless you show me a D.C. Circuit case that says I must.

11       MR. LYNCH:  I don't know that I have a D.C. Circuit

12   case that says you must, Your Honor, but I can line up any

13   number of cases, including from this Court.  The Colbert case I

14   just mentioned, Your Honor didn't ask sorry, FBI --

15       THE COURT:  It wasn't expedited, number 1.  And it

16   wasn't of huge national importance.  It's 25 -- I don't know how

17   old it is, but who the hijacker was.  Nobody's focused on it

18   like this issue.  So I don't think that that's a fair

19   comparison.

20       Yes, generally, I do defer to what the various agencies say

21   they can handle, and I'm just curious whether there's some

22   history, practice of DOJ looking more broadly than at the

23   components in certain important FOIA cases, and if not, why not.

24   It just seems like you can move resources around.

25       MR. LYNCH:  My understanding is that the history and

1    practice are exactly the opposite.  I can go back and file

2    something supplemental on this point, if the Court would like.

3    But my understanding is whether it's EOUSA or Crim or OIP or any

4    other FOIA processing component, courts accept declarations from

5    those components that say how quickly they can move, and maybe

6    they up that a little bit or maybe they accept it.  But the

7    judgment is always made within the confines of the processing

8    component.

9        My guess is that reflects the practicability standard;

10   right?  Is it possible to move attorneys around within the

11   department?  Probably, yes.  I mean, they're going to go where

12   they're told by leadership to go.  But is that practicable?  I

13   don't think so, to bring attorneys from Antitrust or U.S.

14   Attorney's offices around the country, you know.  To reallocate

15   them to fulfill a FOIA request, I don't think, is practicable.

16       And of course, it has a baked-in assumption that there is

17   excess capacity in those other components.  Again, I can tell

18   you from my experience there's nowhere right now that has an

19   excess of FOIA processing resources.

20            THE COURT:  So you say prospectively this 350 rate is

21   what EOUSA is proposing every month, is that fair to say, or is

22   this just this month and next month it could be more?  What is

23   your representation to the Court and the parties about how you

24   will proceed after August 23rd?

25            MR. LYNCH:  Yes.  Thank you for letting me clarify

1    that, Your Honor.

2        So as I mentioned a moment ago, our proposal is to make an

3    interim response two weeks from now.  So the very first month,

4    we're essentially cutting in half.  We will do that in two

5    weeks.  That will process at least 350 pages.

6        As to whether that will remain the rate, I don't want to

7    promise anything here.  We're at a very preliminary stage.  It's

8    possible that, you know, scores of pages could be eliminated off

9    the top because they're either not responsive, there was a

10    search term that netted, you know, a bunch of nonresponsive

11    documents, or the time window was off or something like that.

12    There could be a number of duplicates.

13        So there could be ways in which that 350 is accelerated,

14    but I am not promising that it can be.  I'm just saying that at

15    the very outset of the case where we are here talking about the

16    initial processing and production order, it's always possible

17    that that could be exceeded down the road, but I'm not --

18            THE COURT:  But this is the baseline that you're sort

19    of guaranteeing, if you will, prospectively?

20            MR. LYNCH:  The 350 every month starting two weeks

21    from now.  So, yes, 350 in half a month to begin with --

22            THE COURT:  But why from half a month, from today?

23    Why not from the date the PI was filed?

24            MR. LYNCH:  It's admittedly sort of a rough

25    adjustment.  It's based on the fact that -- what Ms. Cain said

1    was we estimate we can process 350 pages a month once the Court

2    enters an order.

3              THE COURT:  Once the what?

4              MR. LYNCH:  I'm sorry.  Once the Court enters a

5    processing and production order.

6              THE COURT:  So you just wait until there's an order?

7              MR. LYNCH:  No, we haven't been waiting, Your Honor.

8    So we've run the searches.  We've started a preliminary review.

9    We don't see ourselves as under a 350-page-per-month order until

10   the Court enters one.

11       So what we've done in this first month is say look, we've

12   already done some work, we've collected the results, we have

13   done a preliminary review on just over 500 pages.  So the ball

14   is rolling.  And so we didn't think it was appropriate to say

15   well, we're going to take a full month for our first interim

16   response.  So we said we're willing to do this in half a month,

17   the first response.

18             THE COURT:  And why are you rejecting the plaintiffs'

19   offer to engage on search terms, so that when this finally is

20   teed up for the Court's review we are not fighting over whether

21   the search was adequate?

22             MR. LYNCH:  I'm happy to discuss search terms with

23   Mr. Dewey to avoid litigating them down the road when the

24   processing is complete.  So we absolutely are going to try to

25   narrow every issue before we bring it to the Court, to be clear

1    about that.

2              THE COURT:  Okay.  The government seems to suggest

3    that because there are issues relating to work product,

4    et cetera, as well as, you know, law enforcement related

5    materials, that somehow this makes this request different in

6    nature in terms of the level of review that's required.

7        Did I misread that?  Or is it just the multiple components

8    that are involved?

9              MR. LYNCH:  It's the likelihood of having to refer

10   documents to other components for review, so namely the U.S.

11   Attorney's Office in Delaware or other components within DOJ

12   whose equities would be reflected in those records.

13             THE COURT:  But isn't that the case in -- it's so rare

14   that there's an EOUSA FOIA case that's just confined to EOUSA as

15   opposed to --

16             MR. LYNCH:  I'm not sure that's true, Your Honor.  I

17   think EOUSA gets a lot of cases where it's just a criminal

18   defendant who was prosecuted in the Eastern District of Virginia

19   files a FOIA request for everything related to his case.  A case

20   like that, you would just be dealing with that U.S. Attorney's

21   Office in terms of equity and review.

22       Obviously, this case by its nature seeks communications in

23   and around the department about an investigation and prosecution

24   that had many other components involved.  So --

25             THE COURT:  So each of those components needs to weigh

1    in?

2            MR. LYNCH:  Not on every record but on any record that

3    has -- if there's a -- I'm just making this up --

4            THE COURT:  An e-mail between San Francisco and

5    Delaware, then both offices.

6            MR. LYNCH:  Correct, Your Honor, yes.

7            THE COURT:  Okay.  And the specification issue, that's

8    not something that's practicable?

9            MR. LYNCH:  It's not just practicable, Your Honor;

10   it's just not doable.  We don't have the records broken out as

11   between specification 1 or 2.  We said that in a footnote in our

12   brief -- sorry, in our portion of the JSR.  It's not that we're

13   unwilling to do it or it would take too much time.  It's just

14   literally impossible because the records were not sent over as

15   here's the bucket of specification 1 and here's the bucket of

16   specification 2.

17           THE COURT:  Okay.  So at EOUSA's rate, what are we

18   looking for in order to complete this?  Are we talking about

19   eight months before we even start briefing?  What's the math?

20   Have you worked this out?

21           MR. LYNCH:  Well, assuming that -- it's always

22   dangerous to ask me to do math, Your Honor.  But at 350 a month,

23   and again recognizing that the first would be half a month, yes,

24   I think seven or eight months.  That assumes again --

25           THE COURT:  You've got a little more than that,

though.  So we're talking roughly eight months, seven to eight months?

MR. LYNCH:  Barring some ability to, as I say, lop off swaths of records as duplicative or as not responsive, assuming it stays at 350, yes, I believe so.

THE COURT:  Okay.  So we're not looking to have even a brief filed at the very earliest until some time in May; right?

MR. LYNCH:  I think if that pace holds, that would be correct.  It would depend, of course, on what the parties are able to meet and confer on and narrow the scope of any necessary dispositive motion.

THE COURT:  So the Court's -- sometimes you all have longer briefing schedules in these cases, but let's say it's a standard briefing schedule.  That has the Court not even being able to address this until June.

MR. LYNCH:  Well, address the propriety of any withholdings or search adequacy, that's correct, but of course, any responsive records would have been produced in that time.

THE COURT:  I'm guessing there's going to be a lot of redactions here.

MR. LYNCH:  I don't know that, Your Honor.  Obviously, we've argued that the request on its face seeks what would seem to be law enforcement and privileged records.

And I should mention actually, it occurred to me, that's another basis on which we might end up exceeding the

350-page-a-month pace.  Again, I'm not representing anything or promising anything on this today.  But if we end up making, you know, categorical exemption applications to, you know, these records, then that could result in a faster response time.

Again, we're still just beginning to review them.  Your Honor asked how that pace might be exceeded.  That's another way.

THE COURT:  But today, standard FOIA cases filed, EOUSA is involved, not expedited, you do a status report.  What are you telling a court here in D.C.?

MR. LYNCH:  I'm afraid I don't know that, Your Honor. I'm happy to go back to EOUSA and --

THE COURT:  How do you not know that answer?

MR. LYNCH:  Let me be clear.  My understanding is there's not sort of a form template.  I think they look -- in every case, they look at what is on their plate at that moment and decide what they can do.

So just to use a hypothetical here, if all 14 other expedited requests had been voluntarily withdrawn, you know -- one of them is actually from the Heritage Foundation.  So if they had withdrawn their request the week before we proposed the rate, my understanding is that would likely have affected the rate.

But they take it at a snapshot in time.  Again, it's necessarily subjective and predictive.  But they decide this is

1    what we think we can do.  I don't think it's just 350, 350, 350.

2    That's my understanding.

3            THE COURT:  But it's set that week, and it's not

4    revised as those cases drop away?

5            MR. LYNCH:  No.  I think that's one of the sort of

6    inherent difficulties of FOIA litigation, is that you sort of

7    have to make a judgment at the outset as to what you think you

8    will be able to process, and my experience is that you can't go

9    back and say, you know, Judge Friedrich, we've had 14 more

10   expedited requests come in, we need to lower this from 350.  So

11   you have to kind of decide at the outset what you think you will

12   be able to, you know, maintain.

13       But I will certainly -- I'm certainly happy to go back to

14   EOUSA and confirm that, but my understanding is there's not, as

15   there is at RIDS, at the FBI processing section, you know --

16   they have a formal policy is my understanding.  500 pages is

17   right there in black and white.  I don't believe EOUSA has a

18   corollary to that.

19           THE COURT:  Okay.  All right.  Anything else you would

20   like to say?

21           MR. LYNCH:  The last thought I would just leave with

22   the Court is that in their preliminary injunction, the

23   plaintiffs asked EOUSA to process some 2,500 pages in 22 days.

24   That was the ask in their PI.  Now through their proposal,

25   they're asking for roughly 2,650 pages to be produced in 27

1    days.

2        My point being, they're effectively asking here for exactly

3    the same relief that the Court denied in the PI.  So it would

4    seem anomalous to us, to say the least, to grant what the Court

5    denied at the PI stage to them now through a processing and

6    production order, especially since -- and this is all late-

7    breaking news that Mr. Dewey referred to.

8        But he mentioned that Mr. Weiss has now been appointed as

9    special counsel.  He didn't mention, I don't know if he's aware,

10    but the government has also moved to dismiss the tax charges

11    against Mr. Biden in Delaware.  That was, of course, the entire

12    premise for seeking -- I'm sorry, a major premise for seeking

13    the records on a hyper- expedited basis at the PI.

14        So it seems that the foundations for seeking that pace to

15    begin with have abated.  So it would be, again, rather

16    anomalous, we think, for the Court to endorse their proposed

17    pace here at this juncture.

18        I'm sorry.  One last point, Your Honor.

19        As to the data and budget submissions and other things

20    Mr. Dewey referred to, I don't know what he's referring to, and

21    I don't think the Court does either, because those have not been

22    put before the Court.

23        So I don't have any response to that.  I can't really

24    respond.  I don't believe I've seen it.

25        And barring any other questions from the Court --

1          THE COURT:  You just mentioned that the, I don't know,

2     footnotes 5 through 8, you were going to respond.  Is there

3     anything else you want to say in response to those late-added

4     footnotes?

5          MR. LYNCH:  This is what I would begin by addressing,

6     Your Honor, is the basic accusation in those footnotes is we're

7     just paying lip service to expedited processing.  The initial

8     point I was trying to make is just by virtue of the requests

9     having been tasked back in March and by virtue of the fact that

10    they've been placed ahead of 2,000 other FOIA requesters, you

11    can't just look at the pace of pages per month.  You have to

12    consider that, too.  Yes, we're proposing 350 pages per month.

13    But that's 350 pages that they wouldn't have gotten for I don't

14    know how long.

15         THE COURT:  I know.  But as I said before, I don't

16    think that this enables you just to slow down once you did the

17    production, you got the documents.  I think you've got to move

18    and produce it as soon as practicable.

19         MR. LYNCH:  We totally agree it needs to be as soon as

20    practicable.  EOUSA, I think, has proposed what they think is as

21    soon as practicable.

22    Thank you, Your Honor.

23         THE COURT:  Thank you.

24    Mr. Dewey?  Wait.  Let him add one more point.

25         MR. DEWEY:  I apologize.

1              MR. LYNCH:  Thank you for the indulgence, Your Honor.

2         My colleague, Ms. Shapiro, reminded me, you know, we

3    haven't been able to break down their request by specification,

4    but we have prioritized the two custodians that plaintiffs

5    wanted us to prioritize.  So Mr. Weiss and Ms. Wolf, they are

6    being processed first.  And given the number of potentially

7    responsive records from those two custodians, they would both be

8    included in our first interim response two weeks from now.

9              THE COURT:  Okay.  Thank you.

10             MR. LYNCH:  Thank you, Your Honor.

11             THE COURT:  All right.  Mr. Dewey, anything you would

12   like to add?

13             MR. DEWEY:  A couple of things briefly, Your Honor.

14        As to the data I was alluding to, that's the department's

15   data.  I'm happy to file it.  It was from their standard FOIA

16   report.  And I'm more than happy to put that in front of the

17   court, if that would be helpful.

18        The second point I would make is that effectively seeking

19   the same relief, we don't see it that way because more time has

20   transpired.  So I wanted to make sure to make that factual

21   point.

22        And then on the third factual point, we don't think the

23   appointment of Mr. Weiss and the motion at all takes away the

24   urgency of the matter.  We think it deepens the controversy.

25        Why now?  We don't know the scope of the order.  The

1    dismissal is predicated on charges being refiled in another

2    district.  Will they be refiled as misdemeanor?  As felony?

3    Will FARA charges be filed?

4         That all is a live controversy, and there is a live motion

5    to dismiss on that issue in front of the Delaware court.  So I

6    don't think the exigency of the prosecution and its intersection

7    with the political would go away.

8         And Your Honor, on that point, I'm happy to -- if Your

9    Honor would like, and I have a copy for my friend, if I can

10    approach, I would reference Mr. Comer's statement.

11         THE COURT:  It's okay.  I take you at your word.  It's

12    of national importance.

13         MR. DEWEY:  On the structural points my friend was

14    making, we really do submit there's a fundamental structural

15    issue at stake here in this case and the competing positions.

16    As we see it, FOIA is a statutory mandate, and the department

17    must comply with its statutory mandates.  And this Court has

18    power to enter an order that simply says comply with your

19    mandate, I don't care how you do it.

20         We're not talking, and I don't think my friends have

21    suggested, that there is an impracticability point at issue

22    here.  And surely, practicability should take into account, we

23    would submit, the gravity of the matter.

24         We've cited -- admittedly, it's from the Ninth Circuit --

25    the Fiduccia case which we think is on this point.  But again,

1    and I say this respectfully and I understand their position that

2    they have to balance resources, in our view, there is a bit of a

3    resource shell game if the rate is the same for every request

4    and if component resources are, you know, hydraulically walled

5    off.  That is not the case in any other department function, as

6    Your Honor has pointed out, and if we were wrong and they have

7    asked for more resources, then we are not aware of that fact.

8    But again, the only thing we could find, Your Honor, is give us

9    more money to defend the cases, not to process.

10        And I would just make the point, in other situations, the

11    department does not take this view, when they're dealing with a

12    discretionary function.  Office of Legislative Affairs responds

13    to Congress.  They are frequently accused of responding slowly.

14    But take when the department wants something, be it legislation

15    or in a famous example, I think over 50 attorneys were pulled

16    off the line and went through the staff secretary's e-mails in

17    several weeks.

18        And I'm not saying there's an equivalency here.  But I'm

19    saying, when the department wants something done, even in a

20    discretionary case, they can get it done.

21        And it would, in our submission, break the structure of

22    FOIA to accept their submission that you cannot consider total

23    resources, since we are talking about a statutory mandate here.

24            THE COURT:  All right.  Understood.  But there are

25    some very important, it seems, FOIA requests -- one of them is

yours; I'm not sure what one that is -- that came in in front of you.

      But your point is, with respect to all of them, they need to speed all of them up?

            MR. DEWEY:  Yes, Your Honor.  And I think there is a question of, you know, not only could you get more resources in, you know, could you accelerate within even EOUSA the production of the expedited requests.  And those requests have been granted expedition.  We don't -- I don't know the grounds.  I don't know the specifics of the other requests.  A lot of them appeared -- some of the ones described in the declaration appear to be retrospective as opposed to prospective.

      We're not disputing that they met the criteria.  What we're saying is that, you know, if they are being processed at 350 a month, too, they're in the same boat where there is a bit -- again, I'm not saying it's in bad faith or anything, but there is a bit of a resource shell game.

      And were a similar case to be in front of Your Honor and I were to be representing that client, I might be making the same argument, that those 14 are in the same boat and that you need to actually expedite the important requests so that it's not just a tool for historians.  And there are a lot of ways to do that:  Move resources from other tracks, ask for more funding, et cetera.

            THE COURT:  Understood.

1          Anything else, Mr. Lynch?  I will give you one last

2    opportunity.

3          MR. LYNCH:  Nothing further from defendant, Your

4    Honor.

5          THE COURT:  Thank you.

6      At this time I'm not going to order a specific production

7    schedule, but what I am going to do is direct the two sides to

8    sit down again.  I think that the department's proposal is not

9    processing the requests, based on what I know, such that it will

10   be produced as soon as practicable.  They haven't convinced me

11   that's the case.

12         To the extent the parties are unable to reach an agreement,

13   I will revisit this issue.  And I will ask that you submit a

14   joint status report on August 21st.  And if you're not in

15   agreement at that time, Mr. Lynch, I would like answers to the

16   kinds of questions I've been asking about, you know, EOUSA's

17   rate in standard cases, what's going on in the other expedited

18   cases.  And I'm not looking for nonpublic information to be

19   shared, but in general, I need a better sense of what's going

20   on.  And, you know, why can't attorneys, certainly FOIA

21   attorneys, but if not FOIA attorneys other folks, be moved from

22   another component?  What does the overall resource allocation

23   look like in the Department of Justice?

24         And I'm not going to micromanage that, but it would be

25   helpful for me to have a better sense than I have right now on

1    what the resources actually are, and it's hard to know.

2            MR. LYNCH:  I understand, Your Honor.  Thank you.

3            THE COURT:  And as I said in the order denying the

4    preliminary injunction, the importance of the plaintiffs'

5    request becomes greater over time, as I think the events of

6    today might be illustrating, and I did deny the PI without

7    prejudice and to be refiled at some point.

8            So I'm not necessarily saying I'm inviting that now.  I am

9    not saying that.  But to the extent you all can't reach a

10   reasonable agreement -- and just to be clear, on the plaintiffs'

11   side, I don't think producing everything by the 30th is

12   reasonable.  I think that's a very fast clip.  And I appreciate

13   the time sensitivity of this matter, but I think that that's

14   also too fast.

15           And so I think you all ought to be able to reach something

16   in between, and I can assure you that barring a PI, TRO,

17   et cetera, at the time when this is ready to be teed up, I will

18   resolve this motion in a timely fashion.

19           So it would be helpful for me, if you can't agree, to have

20   the parties' respective positions on how this would play out and

21   when briefs would be ready to be filed and resolved by the

22   Court.

23           And I do think at the appropriate time it's important for

24   you all to confer so that the Court's not deciding issues that

25   you all could have resolved on your own with a little bit more

work before you started filing briefs.  So I absolutely

encourage that.  And I understand DOJ's receptive to that, just

at the appropriate time.  So I'm glad to hear that.

    And if there's a need to hold a hearing, let me just go

ahead and tentatively set one.  So I'm asking you to provide a

joint status report by the 21st, and if you can't reach an

agreement, I'm asking you to do like you did this time and

provide your respective positions.

    If the Court thinks that there's a need to hold a hearing,

I'm happy to do this in person.  I'm happy to do it over Zoom or

telephone, whatever.  I don't think it's necessarily required to

be here in court.  But I would like to do that on the 23rd some

time, and I'm fairly open that day.

    So keep that in mind as you're -- is that workable for you

all with your summer schedules, if necessary?  I'm not saying

that there will be a need to.  I may just enter an order based

on what you provide.  But if I do have follow-up questions,

would you be available on the 23rd?

        MR. LYNCH:  I believe we're available on the 23rd,

yes, Your Honor.

        MR. DEWEY:  Yes, Your Honor.

        THE COURT:  Either way, I want a status report saying

you've reached an agreement or you haven't, and then I will go

from there and have Mr. Hopkins be in touch with you.  All

right?

1    Thank you.

2    (Proceedings adjourned at 2:58 p.m.)

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5

6    CERTIFICATE OF OFFICIAL COURT REPORTER

7

8    I, Sara A. Wick, certify that the foregoing is a

9    correct transcript from the record of proceedings in the

10    above-entitled matter.

11

12

13    /s/ Sara A. Wick                    October 29, 2023

14    SIGNATURE OF COURT REPORTER         DATE

15

16

17

18

19

20

21

22

23

24

25