**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

)
HERITAGE FOUNDATION &               )
MIKE HOWELL                         )
                                    )
            _Plaintiffs_,           )
                                    )
v.                                  )            Case No. 23-cv-1854 (DLF)
                                    )
U.S. DEPARTMENT OF JUSTICE          )
                                    )
            _Defendants_.           )
                                    )
_____)

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 2

I.   SELF-SEARCHES AND INITIAL SELF-REVIEW ARE NOT PERMISSIBLE WHERE
THERE IS SUBSTANTIAL EVIDENCE THE CUSTODIANS ENGAGED IN
MISCONDUCT, OR ARE TAINTED BY SUCH MISCONDUCT, RELATED TO THE
REQUEST................................................................................................................. 2

II.  PLAINTIFFS HAVE REBUTTED THE PRESUMPTION OF GOOD FAITH. ............. 7

    A.  Standard. .......................................................................................................... 8

    B.  Defendant's Procedural Objection Lacks Merit. ........................................... 9

    C.  Weiss Acted in Extreme Bad Faith.............................................................. 12

    D.  There is Credible Evidence AUSA Lesley Wolf Acted In Bad Faith........................ 17

        1.  FD-1023. .................................................................................................. 17

        2.  Keeping the Biden Name Out of the Investigation.............................. 18

        3.  The Storage Unit Search Warrant. ........................................................ 18

        4.  Interviews with Hunter Biden's Adult Children. .................................. 19

        5.  Campaign Finance Investigation........................................................... 20

        6.  CEFC Energy Investigation. .................................................................. 20

III. WEISS'S CONFLICTS ARE IMPUTED TO THE HUNTER BIDEN CASE TEAM ON
THIS RECORD. ..................................................................................................... 20

IV. DEFENDANT'S SEARCH OF NON-EMAIL RECORDS IS INFIRM. ....................... 23

i

A.  Hard Copy Records........................................................................................... 23

B.  Other Record Sources. ...................................................................................... 24

CONCLUSION............................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Az. v. DHS*, No. 15-cv-247 (PHX) (JJT), 2017 WL 3478658 (Aug. 14, 2017)............. 5

*AFL-CIO v. Chao*, 496 F.Supp.2d 76 (D.D.C. 2007) ...................................................... 5

*Akel v. DOJ*, 578 F.Supp.3d 88 (D.D.C. 2021)............................................................... 3

*Ala. Assoc. of Realtors v. DHS*, 539 F.Supp.3d 29 (D.D.C. 2021)................................. 15

*Am. Oversight v. Dep't of State*, 414 F.Supp.3d 182 (D.D.C. 2019)............................... 2

*\*Am. Oversight v. U.S. Gen. Servs. Admin.*, 486 F.Supp.3d 306 (D.D.C 2020) .......................... 25

*Ashland Oil v. FTC*, 548 F.2d 977 (D.C. Cir. 1977).................................................... 10

*\*Bader Fam. Found. v. U.S. Dep't of Educ.*, 630 F.Supp.3d 36 (D.D.C. 2022) ..................... 5, 25

*Bautista-Rosario v. Mnuchin,* 568 F.Supp.3d 1 (D.D.C. 2021)....................................... 6

*Budik v. Dep't of Army*, 742 F.Supp.2d 20 (D.D.C. 2010) ........................................... 8

*Cole v. Copan*, 485 F.Supp.3d 243 (D.D.C. 2020) ....................................................... 8

*\*Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 185 F.Supp.3d 26 (D.D.C. 2016) ..... 22

*Cooper Indus. v. Avail Servs., Inc.*, 543 U.S. 157 (2004)............................................. 4

*\*Cousins v. Hathaway*, No. 12-cv-1058 (CRC), 2015 WL 13659633 (D.D.C. July 9, 2015) 11, 12

*\*CREW v. DOJ*, 05-cv-2078, 2006 WL 1518964 (D.D.C. June 1, 2006) .................................... 22

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, No. 17-cv-1208, 2021 WL 918204
    (D.D.C. Mar. 9, 2021)............................................................................... 25

*\*Ctr. for Biological Diversity v. EPA*, 279 F.Supp.3d 121 (D.D.C. 2017)................................. 25

*\*Ctr. for Biological Diversity v. EPA*, 369 F.Supp.3d 1 (D.D.C. 2019)................................... 25

*Ctr. for Pub. Integrity v. Dep't of Def.*, 411 F.Supp.3d 5 (D.D.C. 2019) ........................ 2

*Dalal v. DOJ*, 643 F.Supp.3d 33 (D.D.C. 2022)........................................................ 8

*\*Defs. of Wildlife v. U.S. Dept' of Agriculture*, 311 F.Supp.2d 44 (D.D.C. 2004)............... 24, 25

*Defs. of Wildlife v. U.S. Dep't of the Interior*, 314 F.Supp.2d 1 (D.D.C. 2004)........................... 3

*Dep't of Comm. v. New York*, 139 S.Ct. 2551 (2019).................................................... 7

*Exxon Corp. v. FTC*, 589 F.2d 582 (D.C. Cir. 1978)................................................... 10

*Harrison v. EOUSA*, No. 16-cv-1310 (JLS) (BGS), 2017 WL 1180183 (S.D. Cal. Mar. 30, 2023) ....................................................................................................................... 24

*Hiken v. Dep't of Def.*, 521 F.Supp.2d 1047 (N.D. Cal. 2007)...................................... 8

*\*Hoffman v. USCIS*, No. 20-cv-6427, 2023 WL 4237096 (E.D. Penn. June 28, 2023) .............. 24

*\*Jones v. FBI*, 41 F.3d 238 (6th Cir. 1994) ............................................................ 22

*Judicial Watch v. DOJ*, No. 19-cv-879 (CJN), 2022 WL 898825 (D.D.C. Mar. 28, 2022) ........... 6

*Klayman v. Judicial Watch, Inc.*, 6 F.4th 1301 (D.C. Cir. 2021) ................................... 10

*\*Lewis v. U.S. Dep't of the Treasury*, No. 1:17-cv-943-DLF (D.D.C. July 2, 2018)................... 24

*Long v. ICE*, 279 F.Supp.3d 226 (D.D.C. 2017)...................................................... 9

*Miller v. U.S. Dep't of State*, 779 F.2d 1378 (8th Cir. 1985)........................................ 5

*Moore v. Aspin*, 916 F.Supp. 2 (D.D.C. 1996) ....................................................... 5

*\*Nat. Day Laborer Organizing Network v. ICE*, 877 F.Supp.2d 87 (S.D.N.Y. 2012) ................. 6

*Shteynlyuger v. CMS*, No. 20-cv-2982 (RDM), 2023 WL 6389139 (Sept. 30, 2023)................. 25

*Span v. DOJ*, 696 F.Supp.2d 113 (D.D.C. 2010)..................................................... 8

*United States v. Armstrong*, 517 U.S. 456 (1996) .................................................. 8

*United States v. Concord Mgmt. & Consulting LLC*, 317 F.Supp.3d 598 (D.D.C. 2018)........... 15

*United States v. Dyess*, 231 F.Supp.2d 493 (S.D.W.Va. 2002) ................................... 22

*United States v. Ehmer*, 87 F.4th 1073 (9th Cir. 2023) .................................................. 11

*United States v. Miller*, 605 F.Supp.3d 63 (D.D.C. 2022)............................................... 4

*United States v. Minkkinen* No. 22-cr-163 (ICB), 2023 WL 3587757 (S.D.W.Va. May 22, 2023) ................................................................................................................... 22

*United States v. Stone*, 394 F.Supp.3d 1 (D.D.C. 2019)................................................. 15

*Wadelton v. U.S. Dep't of State*, 106 F.Supp.3d 139 (D.D.C. 2015)............................... 3

*Wash. Post. Co. v. DHS*, 865 F.2d 320 (D.C. Cir. 1989).................................................. 9

*Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:10-cv-1182 (RCL), 2019 WL 1746326 (D.D.C. Apr. 19, 2019)................................................................................................... 11

## Statutes

18 U.S.C. § 1001 ...................................................................................................... 12, 13

18 U.S.C. § 1505 ...................................................................................................... 12, 13

28 U.S.C. § 515 ............................................................................................................. 16

## Other Authorities

*A. Scalia and B. Garner, *Reading Law* (2012) ............................................................. 15

H. Res 918.................................................................................................................... 2

## Rules

Fed. R. of Evid. 106 .................................................................................................. 10, 11

Fed. R. of Evid. 403 .................................................................................................... 11

## Regulations

28 C.F.R. § 600.7(a)..................................................................................................... 15

28 C.F.R. § 600.7(b) .................................................................................................... 15

* Authorities upon which we principally rely are marked with an asterisk.

## INTRODUCTION

As Plaintiffs explained in their Motion for Partial Summary Judgement (ECF No. 35) ("Plaintiffs' Motion" or "Plts. Mot."), Defendant's Motion for Partial Summary Judgment (ECF No. 33) ("Defendant's Motion" or "Def. Mot.") should be denied and Plaintiffs' Motion granted. Defendants Combined Reply Memorandum and Opposition (ECF No. 38) ("Defendant's Opposition" or "Def. Opp.") does nothing to change this fact. Defendant's Opposition misstates Plaintiffs' submissions, needlessly argues points Plaintiffs concede, fails to address inconvenient facts, and, at its core, simply does not acknowledge the *sui generis* nature of this case.

Start with why this issue is being litigated at all. In Defendant's telling "Plaintiffs would like to convert this FOIA case into a forum to conspicuously debate an ongoing criminal investigation and prosecution." Def. Opp. at 1. But it is *Defendant* who triggered the instant dispute by insisting on allowing conflicted custodians to not only self-search but to perform an initial self-review.

Continue to both Defendant's aversion to this Court's unambiguous statement, that "[t]he plaintiffs have brought a FOIA request that all parties involved agree carries exceptional importance" (ECF No. 18, at 10), and Defendant's effort to portray this case—including critically its facts—as run-of-the-mill. *Compare, e.g.*, Def. Opp. at 14 ("And contrary to Plaintiff's suggestion, it is neither 'unique' nor 'bizarre' (Pls. Mem. 32) for FOIA requestors to believe that the subjects of their requests have committed some kind of misconduct. Indeed, as shown by the cases in Section I above, it is fairly common."), *with* Plts. Mot. at 32 ("Again, the *facts* are as unique as they are bizarre" (emphasis added)). The only other FOIA cases Plaintiffs are aware of that turned on facts which formed a component of a House impeachment inquiry into the President of the United States and were covered many times a day by all facets of

national news, reflect both the unique and urgent nature of the underlying requests. *See Am. Oversight v. Dep't of State*, 414 F.Supp.3d 182 (D.D.C. 2019); *Ctr. for Pub. Integrity v. Dep't of Def.*, 411 F.Supp.3d 5 (D.D.C. 2019).

Defendant's failure to objectively acknowledge the unique facts (undisputed to Plaintiffs' knowledge) as to the importance of the underlying Request, and insistence on pressing the issue, also explains why there is almost no precedent in this area. It is nearly unheard of for a civil litigant to elect to litigate the credibility of a self-search and initial self-review by high-ranking custodians credibly accused of misconduct in detail and with a wealth of supporting testimony and documentation not only in the instant litigation, but also by three House Committees as part of an impeachment inquiry authorized and ratified by the full House of Representatives. *See* H. Res 918. Why? Because that approach involves *immense* potential downside that can be easily mitigated (with little real cost) by simply voluntarily re-running a reasonable search. (A voluntary action establishes no precedent). The Court has acknowledged this point. *See* Transcript at 32:15–18 (Oct. 30, 2023) (ECF No. 41) ("And I'm sympathetic to that as well. Like if there's—if it's close at all, why not run it and get them out of it and run it a second time, because I would think the government really doesn't want to have a ruling on this."). That is why Plaintiffs (quite properly) argue from first principles.

All this Court need do to resolve this issue in Plaintiffs' favor is rule that it is unreasonable for custodians credibly accused of misconduct, or tainted by such misconduct, to self-search and initially self-review. It should do so.

## ARGUMENT

## I.    SELF-SEARCHES AND INITIAL SELF-REVIEW ARE NOT PERMISSIBLE WHERE THERE IS SUBSTANTIAL EVIDENCE THE CUSTODIANS ENGAGED IN MISCONDUCT, OR ARE TAINTED BY SUCH MISCONDUCT, RELATED TO THE REQUEST.

As Plaintiffs' Motion explained, it is unreasonable to allow a custodian to both self-search and initially self-review records when there is substantial evidence the custodian engaged in misconduct, or is tainted by such misconduct, related to the underlying request.  Plts. Mot. at 7–12.[1]  As Plaintiffs explained, "there is little law on point", but the application of FOIA's test of reasonableness and FOIA's first principles lead to this result.[2]  Defendant's contrary submissions do not alter this analysis.

     1.     Defendant largely ignores that the challenged conduct here involves not only a self-search, but an initial self-review.  *Compare* Plts. Mot. at 3, 5, 8, *with* Def. Opp. at 5–10.  To be clear, this Court need only address *that* specific question.

     2.     Defendant's leading argument against Plaintiffs' submissions is that "every relevant case has come out in Defendant's favor".  Def. Opp. at 5; *see also id.* at 2.  This submission is misleading and falls on its own terms.

     *First*.  Even by Defendant's own (disputed) count there are but four district court cases on point.  Def. Opp. at 5 (citing *Akel v. DOJ*, 578 F.Supp.3d 88 (D.D.C. 2021); *Wadelton v. U.S. Dep't of State*, 106 F.Supp.3d 139, 148 (D.D.C. 2015); *Bonilla v. DOJ*, 798 F.Supp.2d 1325, 1330 (S.D. Fla. 2011); *Defs. of Wildlife v. U.S. Dep't of the Interior*, 314 F.Supp.2d 1, 5, 9–10 (D.D.C. 2004).  That is hardly a controlling or dispositive body of law and certainly does not lead to the inference that Plaintiffs' position *must* be in error.  *Cf. United States v. Miller*, 605

---

[1]  Defendant submits that Plaintiffs "fail to articulate a clear standard."  Def. Opp. at 5 n.2.  Not so.  Defendant's evidence of this supposed failure is simply the use of synonyms to reflect the standard stated in the *section heading*.  *Id.* at 7.  Plaintiffs have been clear.

[2]  Defendant at one point argues to the contrary claiming that "Plaintiffs keep suggesting" that it is a matter of "blackletter law" that an "allegation of conflict . . . disqualif[ies] a custodian from participating in a FOIA search."  *See* Def. Opp. at 8.  But Defendant's own brief refutes this allegation.  Def.  Opp. at 6 ("Pls. Mem. 9; *Wadelton*, 106 F.Supp.3d at 148 ('no court appears to have directly addressed the question')").

F.Supp.3d 63, 66 n.1 (D.D.C. 2022), *rev'd sub nom. United States v. Fischer*, 64 F.4th 329 (D.C. Cir.), *cert. granted*, No. 23-5572, 2023 WL 8605748 (U.S. Dec. 13, 2023) (denying government's motion for reconsideration based on conflicts with the decisions of other Judges in the District).

And there is good reason for this dearth of caselaw. Again, it is exceedingly rare for litigation counsel to voluntarily put at issue the question of whether their custodians engaged in misconduct when they have been *credibly* so accused.[3]

*Second*. The only case actually on point is *Wadelton*. Indeed, *Wadelton itself* acknowledges this fact in language quoted by *Defendant*. Def. Opp. at 6 ("*Wadelton*, 106 F. Supp. 3d at 148 ('no court appears to have directly addressed the question')").

Defendant submits that *Bonilla* is on point because the plaintiff there alleged what amounted to a conflict of interest in his complaint. Def. Opp. at 7. True, but what matters here is that the plaintiff there never argued a conflict precluded a self-search and initial self-review.

Turning to *Defender's of Wildlife* and *Akel*, Defendant admits both cases are not directly on point (but conspicuously does not square this admission with its earlier math). Def Opp. at 8. Rather, in Defendant's telling, those cases support its position because "if an allegation of conflict were enough to disqualify a custodian from participating in a FOIA search, and that were a matter of blackletter law (as Plaintiffs keep suggesting), then one wonders why neither the *Akel* nor the *Defenders of Wildlife* courts balked at those custodians' participation." *Id.* But it is hornbook law that such a bald negative inference is impermissible as Plaintiffs previously noted. *See* Plts. Mot. at 10; *see also, e.g.*, *Cooper Indus. v. Avail Servs., Inc.*, 543 U.S. 157, 170 (2004)

---

[3] Although Defendant does not explicitly say it, Defendant implies Plaintiffs' rule would apply to unsupported "jailhouse" accusations of a conflict. Not so. A credible allegation is only one backed by substantial evidence.

("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)); *AFL-CIO v. Chao*, 496 F.Supp.2d 76, 88 (D.D.C. 2007) (similar).

*Third*. As Plaintiffs have explained, Judge Chutkin erred in *Wadelton* because she did not consider the reasonableness of a self-search, declined to draw any lessons from the logic of civil discovery cases, and immediately proceeded to invoke the presumption of good faith. Plts. Mot. at 9–10.

Defendant's only riposte is to say that Judge Chutkin did consider reasonableness, because "[r]easonableness under FOIA is informed by its presumption of good faith." Def. Opp. at 6. But that is to collapse separate but related inquiries. The presumption of good faith only comes into play if the court concludes that on the undisputed facts—according the agency declaration good faith—the search is reasonable. *See, e.g.*, *Moore v. Aspin*, 916 F.Supp. 2, 35 (D.D.C. 1996) ("Once the agency has shown that its search was reasonable, the burden is on the requester to rebut that evidence by a showing that the search was not conducted in good faith."); *accord Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1985). Searches are routinely rejected on this ground, that the undisputed facts show the search unreasonable. That disposition has nothing to do with the plaintiff showing bad faith. *See, e.g.*, *Bader Fam. Found. v. U.S. Dep't of Educ.*, 630 F.Supp.3d 36, 41–42 (D.D.C. 2022) (ordering new search because search terms identified in agency declaration were not reasonably calculated to produce an adequate search). Accordingly, without reaching the question of bad faith, courts have held that certain searches are unreasonable because of an issue with who performed the search. *See, e.g.*, *ACLU of Az. v. DHS*, No. 15-cv-247 (PHX) (JJT), 2017 WL 3478658, at *6 (Aug. 14, 2017) (those

running searches must have the "requisite skillset or knowledge base to conduct a compliant search"); *Nat. Day Laborer Organizing Network v. ICE*, 877 F.Supp.2d 87, 108–10 (S.D.N.Y. 2012) (similar).  Judge Chutkin erred in *Wadelton*.

*Fourth*.  Plaintiffs' Motion explained in detail that first principles support its proposed rule:  It is not reasonable to allow a custodian to both self-search and conduct the initial self-review of records when there is substantial evidence the custodian engaged in misconduct, or is tainted by such misconduct, related to the request.  *See* Plts. Mot. at 11–12.  Defendant does not wrestle with Plaintiffs' submission, but rather seeks to undermine it on collateral grounds.  None of these attacks find purchase.

1.      Defendant does not engage with Plaintiffs' submission (and supporting FOIA cases) that logic and lessons from civil discovery are applicable to FOIA.  Plts. Mot. at 11.  Defendant simply attacks Plaintiffs' reliance on "non FOIA caselaw" ignoring the fact that Plaintiffs cited FOIA caselaw on this point.  *Id.*  The Court could consider that point waived.  *See, e.g.*, *Judicial Watch v. DOJ*, No. 19-cv-879 (CJN), 2022 WL 898825, at *8 (D.D.C. Mar. 28, 2022); *Bautista-Rosario v. Mnuchin,* 568 F.Supp.3d 1, 9–10 (D.D.C. 2021).

2.      Defendant next attacks Plaintiffs' submissions as being "based on out-of-circuit cases in non-FOIA contexts."  Def. Opp. at 8.  But Plaintiffs relied upon FOIA cases in advancing this submission (including *Bader* from this Court).  *See* Plts. Mot. at 11–12.

3.      Defendant targets Plaintiffs' "own broad conclusions about human behavior" surrounding self-search and initial self-review.  Def. Opp. at 8.  But Plaintiffs simply recount well known precepts from civil discovery law—that is not armchair psychology.  As to Defendant's argument that Plaintiffs' submissions run into the presumption of good faith because custodians are presumed to act in good faith (Def. Opp. at 8), that is beside the point; a custodian

may act in good faith and still subconsciously bias a search; and a search and review by an interested custodian may still undermine public confidence.  *See* Plts. Mot. at 8.  Again, the proper test is a question of reasonableness on the known facts.

**4.**     Defendant submits that because Plaintiffs concede the custodians can be involved in some capacity in search and review, Plaintiffs concede the core argument.  *See* Def. Opp. at 9–10.  Not so.  Anyone who has run a document production knows there is a world of difference between a process with self-searches and initial self-review and a process run by an attorney who consults with custodians but manages the process and is positioned to cross-check information in order to ensure accuracy.  (For example, in seeking the names of AUSAs in other districts the attorney running document review could speak to the Districts whom all involved knew had venue—D.D.C. and N.D. Cal.  *Cf.* Def. Opp. at 9.)   To be sure, the process may not be perfect, but it is far better and hence reasonable.  The Court need not blind itself to experience in reaching this conclusion.  *See Dep't of Comm. v. New York*, 139 S.Ct. 2551, 2575 (2019) (courts are "'not required to exhibit a naiveté from which ordinary citizens are free.'"  (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).

**5.**     Finally, Defendant submits that Plaintiffs' rule would slow down review and hence would be unreasonable.  *See* Def. Opp. at 10.  But that is the wrong test.  The point is to produce a reasonable, *i.e.*, *accurate* search.  Time does not come into play in that analysis.  To do something properly often takes more time.  As to the actual time of production, that is largely in Defendant's control as Plaintiffs have repeatedly submitted.[4]

## II.     PLAINTIFFS HAVE REBUTTED THE PRESUMPTION OF GOOD FAITH.

---

[4] Thus, Defendant's statement that Plaintiffs "elide that they sought (and received) expedited processing)" is wrong.  Def. Opp. at 10.  Plaintiffs have always submitted the Department must bring sufficient resources to bear to do the job both quickly *and* properly.  (And to be accurate, Defendant produced at the rate it did only because of the Court's order).

A.      Standard.

Plaintiffs have always accepted Defendant's position that the custodians have a presumption of good faith; the dispute is when that presumption comes into play.  *E.g.* Def. Opp. at 7 n.4 ("FOIA custodians 'are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" (quoting *Wilson v. DOJ*, 270 F.Supp. 248, 255 (D.D.C. 2017) (in turn quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (cleaned up))).

As to what overcomes that presumption, the evidence must take the form of "specific facts" (*Span v. DOJ*, 696 F.Supp.2d 113, 119 (D.D.C. 2010)), "'tangible evidence of bad faith' beyond mere allegations" (*Hiken v. Dep't of Def.*, 521 F.Supp.2d 1047, 1056 (N.D. Cal. 2007) (internal citation omitted)), or "clear evidence of bad faith."  *Dalal v. DOJ*, 643 F.Supp.3d 33, 54 n.6 (D.D.C. 2022) (internal quotation and citation omitted).  That evidence must be "sufficient to raise 'substantial doubt' concerning the adequacy of the agency's search."  *Budik v. Dep't of Army*, 742 F.Supp.2d 20, 32 (D.D.C. 2010) (internal citation omitted).  Or in the language of summary judgement, the requestor must "'produce 'countervailing evidence' suggesting that a genuine dispute of material fact exists as to the adequacy of the search.'"  *Cole v. Copan*, 485 F.Supp.3d 243, 250 (D.D.C. 2020) (quoting *Hunton & Williams LLP v. EPA*, 248 F.Supp.3d 220, 236 (D.D.C. 2017)).

Regardless, it is a "presumption" at play.  *See, e.g., United States v. Armstong*, 517 U.S. 456, 464–65 (1996).  Defendant is incorrect to the extent it submits that only uncontroverted evidence of bad faith can rebut the presumption.  The presumption can be rebutted even if there is substantial concrete evidence on both sides.  Moreover, if resolving the factual dispute is necessary to decide the action, it must be resolved in the normal adversarial manner.  *See, e.g.,*

8

*Wash. Post. Co. v. DHS*, 865 F.2d 320, 325–27 (D.C. Cir. 1989); *Long v. ICE*, 279 F.Supp.3d 226, 245 (D.D.C. 2017).

### B.    Defendant's Procedural Objection Lacks Merit.

Defendant's Opposition submits that "most of the evidence offered by Plaintiffs is objectionable on an evidentiary level and should not be considered by the Court in this posture." Def. Opp. at 11.  In Defendant's view, Plaintiffs cannot rely on the Joint Staff Report (ECF No. 36-3) because "the Staff Report paraphrases, characterizes, or (at best) selectively quotes numerous transcripts of witness interviews that are not appended to the report or available to Defendant or the Court."  Def. Opp. at 11.  "In this case, there is little question that Plaintiffs' one-sided quotes are unfair."  Def. Opp. at 12.  Defendant complains in particular about (alleged) one-sided quotations of David C. Weiss's ("Weiss") transcribed interview.  *E.g. id.* at 3 ("There is at least one obvious example of a misleadingly truncated quote, and neither the Defendant nor the Court knows how many others there may be"); *see also id.* at 12, 20–21.  This submission contains a number of flaws.

*First*.  While Defendant's submission may have some equitable appeal at first blush, it loses its luster on examination.  Take the transcribed interview of Weiss.  *Weiss was the witness*. Weiss presumably knows what he testified to and if the inaccuracies (or omissions) are so "glaring" (Def. Opp. at 20), Weiss can so state to this Court.  But he has not.  Moreover, the interviews were defended by senior attorneys from the Department.  The Department's lawyers know what was said as well.[5]  The only party who was not present is Plaintiffs.

*Second*.  Defendant's complaint is not actually with Plaintiffs.  Put properly, Defendant's

---

[5]  Defendant is thus incorrect when it states, "[o]nly by reviewing media coverage apparently based on review of the full transcript, cited below, can the Court get a more complete picture." *Id.* at 12.  Again, in some capacity, the Administration *was there*.

submission is that "[i]n this case, there is little question that [*the Committees'*] one-sided quotes are unfair." Def. Opp. at 12. This is not mere semantics. Congressional acts—just as much as those of the Executive Branch—are entitled to the presumption of regularity. *See Exxon Corp. v. FTC*, 589 F.2d 582, 589 (D.C. Cir. 1978); *Ashland Oil v. FTC*, 548 F.2d 977, 979 (D.C. Cir. 1977). Thus, Defendant's accusations falter at the threshold; the wrong standard is applied. It is presumed the Joint Staff Report does not selectively quote from transcripts to mislead.

*Third*. Defendant's only specific evidentiary objection is that a "fraction of a transcript cannot be converted into admissible evidence later; it is objectionable precisely because it is incomplete." Def. Opp. at 12 n.6. At an initial level, Defendant's own authority defeats the proposition. Plaintiffs could simply subpoena, call, and cross examine the Department officials in question—starting with Weiss—and the Department could then cross examine.[6] *See Klayman v. Judicial Watch, Inc.*, 6 F.4th 1301, 1315–16 (D.C. Cir. 2021) (accepting calling a witness can cure hearsay objection).

On its own terms, the objection falls at a technical level. Parties submit portions of records in evidence all the time; merely because a portion of a document is to be used does not render it inadmissible. It appears that Defendant's real complaint is under the "rule of completeness" codified in Fed. R. of Evid. 106 ("Rule 106").

But Rule 106 "does not provide grounds to *exclude* evidence." *Cousins v. Hathaway*, No.

---

[6] Plaintiffs could also serve a trial subpoena on the House Committees for the relevant transcripts. To be sure, the Committees have the right to refuse to comply under the Speech or Debate Clause, but they often voluntarily comply with process as every Judge in this District knows from January 6 trial evidence. They could do so here. In that sense the evidence is "*capable* of being converted into admissible evidence." *Klayman*, 6 F.4th at 1315 (internal quotation and citation omitted) (emphasis added). This Court could also request copies of any transcripts it wishes to view as a coordinate branch of government seeking accommodation from another.

12-cv-1058 (CRC), 2015 WL 13659633, at *3 (D.D.C. July 9, 2015); *accord Wye Oak Tech., Inc. v. Republic of Iraq*, No. 1:10-cv-1182 (RCL), 2019 WL 1746326, at *4 (D.D.C. Apr. 19, 2019). Nor does Rule 106 apply to a situation like here where *neither* party has access to the complete record. (Here, the transcripts are under the control of a coordinate branch of the Government which has chosen to only make excerpts publicly available at this time).

Judge Cooper's analysis in a similarly unusual situation in *Cousins* illustrates this point. There, defendants sought to introduce a copy of a probation report they obtained via FOIA. 2015 WL 13659633 at 3. "[S]ignificant portions of the document were redacted under two FOIA exemptions before it was produced to the [defendants]" causing the plaintiff to object under Rule 106. *Id.* The Court reasoned on the background principles of law above that "[t]he rule says nothing about whether a document should be excluded because the opposing party has been denied an opportunity to review an unreacted copy of it." *Id.* In the Court's opinion, because "Cousins does not contend that the officers are taking a portion of the document out of context, but that he is deprived of the opportunity to learn whether any of the withheld information in the record would be helpful to his case", the applicable analysis was exclusion for "undue prejudice" under Federal Rule of Evidence 403. *Id.* Rule 106 did not apply. *See also United States v. Ehmer*, 87 F.4th 1073, 1125 (9th Cir. 2023) (Rule 106 did not apply where "the remainder of the recorded statement [(being introduced in part)] does not exist"). To be sure, here Defendant does allege selective quotation (albeit based on purely speculative news articles (Def. Opp. at 20–21)). But if any party is prejudiced by simply not knowing what is in the full transcripts, it is *Plaintiffs*. Defendant's personnel were the witnesses and Defendant's senior attorneys were present. *They know*. And there is no disputing that political appointees at the Department of Justice are themselves acting politically as concerns an impeachment investigation into the sitting President.

There is no issue of undue prejudice here.  *Cf. Cousins*, 2015 WL 13659633, at *3 ("While there may be information that is helpful to the plaintiff contained in the redacted material, that information may just as likely be helpful to the defense or entirely irrelevant.  Without more than this uncertainty, the Court will not exclude this evidence based solely on the fact that portions of the notice have been redacted by a third party pursuant to a FOIA exemption.").

### C.   Weiss Acted in Extreme Bad Faith.

With one breath Defendant acknowledges that Plaintiffs devote "19 pages" to discussing the factual basis for their conclusion that Weiss has a case to answer for his conduct in this matter under two criminal statutes (18 U.S.C. § 1001 & 1505).  Def. Opp. at 19.  But with the next, Defendant barely engages at all with these critical facts (*id.* 19–20) and refuses to engage in what it pejoratively terms "Plaintiffs' 19-page show trial," or "bizarre" submission.  *Id.* at 12, 13.  At a threshold level this entirely misses the point.  Plaintiffs discuss the criminal statutes to demonstrate that Weiss has a case to answer in order to clearly establish that they have overcome the presumption of good faith.  Surely, Defendant does not dispute that evidence sufficient to go to a jury on a criminal charge rebuts the presumption of good faith.  Moreover, Defendant's response speaks volumes.  One would expect that when an Administration's Special Counsel and U.S. Attorney is publicly accused of criminal misconduct the Administration would mount a vigorous and detailed factual defense.  Not so here.[7]

The facts largely turn on three letters written by Weiss.  *See* Letter from David Weiss to

---

[7] Defendant instead trots out an transparent red herring, attacking what is obviously a scrivener's error by Plaintiffs using the phrase "willingly" in one instance instead of "willful" as concerns 18 U.S.C. § 1001.  *See* Def. Mot. at 19 n. 9.  The nature of the scriveners' error is obvious.  Plaintiffs' analysis of the elements of 18 U.S.C. § 1001 correctly explains the "willful" requirement of the statute and Plaintiffs' papers use the correct phrase elsewhere.  *See* Plts. Mot. at 14, 23–25.  Plaintiffs apologize to all for this error.

Jim Jordan (ECF No. 1-18) (June 7, 2023) ("June 7 Letter"); Letter from David Weiss to Jim Jordan (ECF No. 14-2) (June 30, 2023) ("June 30 Letter"); Letter from David Weiss to Lindsey Graham (ECF No. 14-3) (July 10, 2023) ("July 10 Letter") (collectively the "Letters").  The Letters are subject to 18 U.S.C. §§ 1001 and 1505.  On the face of the Letters and Weiss's statements during a transcribed interview also subject to 18 U.S.C. §§ 1001 and 1505, the June 7 Letter was both false and misleading.  *See* Plts. Mot. at 14–23.

        Defendant offers only three truncated responses (aside from *ad hominems*).

        **1.**      First and foremost, Defendant repeatedly argues that "Plaintiffs' argument also largely ignores an express caveat in Mr. Weiss's description of his authority:  that it was subject to 'federal law, the Principles of Federal Prosecution, and Departmental regulations.'"  Def. Opp. at 19 (quoting June 7, 2023 Letter at 1); *see also id.* at 3–4 ("[T]o cast Mr. Weiss's letters to Congress as misleading, Plaintiffs engage pages of semantic argument, only to be caught removing critical language from the letters to make their point.  This misdirection is reason enough to reject their argument"); *id.* at 21 ("In the end, Plaintiffs grudgingly acknowledge that Mr. Weiss explained at his November 7, 2023 interview exactly how his statements were all consistent and accurate.").  False.  Plaintiffs methodically analyzed the facts and devoted an entire numbered section to candidly acknowledging Weiss's submissions and addressing them. Plts. Mot. at 23.  *Plaintiffs* cited the language (allegedly "remov[ed]") at the commencement of their argument as the "operative portion of the June 7 Letter".  *Id.* at 14.

        As Plaintiffs' Motion explained, the savings clause cannot do the work Weiss and the Department would ascribe to it.  Start with the operative language (quoting from Plaintiffs' allegedly misleading brief):

        I want to make clear that, as the Attorney General has stated, I have been granted ultimate authority over this matter, including responsibility for deciding where, when, and whether

to file charges and for making decisions necessary to preserve the integrity of the prosecution, consistent with federal law, the Principles of Federal Prosecution, and Departmental regulations.

June 7, 2023 Letter.

Consider the June 7, 2023 Letter's context.  As Plaintiffs explained (without contestation from Defendant) "[i]t is clear from the text and the context of the May 25 Letter that Chairman Jordan was conducting an inquiry into the independence of Weiss's investigation."  Plts. Mot. at 15.  Indeed, the production in this case shows that Weiss was well aware that Congress was repeatedly questioning the independence of his investigation and that there were calls for a Special Counsel.  *See* Ex. 1 to the Declaration of Eric Neal Cornett at 006, 012–014, 033–036, 052–053 (ECF No. 36-1) ("Cornett Decl.").  The specific reference to "as the Attorney General has stated," also brings in the Attorney General's repeated statements that the Robert Hunter Biden ("Hunter Biden") investigation would be free from political influence because Weiss was calling the shots, *i.e.*, Weiss would not be subject to the control of Biden Administration political appointees in the Hunter Biden matter.  *See* Compl. at ¶¶ 27–32 (ECF No. 1); Plts. Mot. for a Preliminary Injunction, at 9–11 (ECF No. 6).

Against that backdrop Weiss—and now the Department—claims that the savings clause suffices to make Weiss's claim of "ultimate authority" truthful (and not misleading to boot) even against the backdrop of overwhelming evidence that until he was appointed Special Counsel he *had* no more authority in Hunter Biden's case than he had in any other case in his District.[8]

---

[8]  Defendant waives its hand at an argument that the June 30 Letter "offer[s] a different interpretation" of the June 7 Letter demonstrating the June 7 Letter is somehow properly construed as accurate.  Def. Opp. at 19.  But again, Defendant ignores that Plaintiffs have explained at length that the "interpretation" offered by the June 30 Letter actually demonstrates the falsity of the June 7 Letter.  Plts. Mot. at 16–19.  It also ignores the basic principle that one cannot simply say they are "interpreting" a prior writing and change its unambiguous meaning and import.

As Plaintiffs' Motion explained, the savings clause cannot naturally bear such a construction as it would drain "ultimate authority" of any meaning whatsoever and render the entire operative portion of the letter circular. (Of course, that may have been the whole game; but that merely shows the June 7 Letter was false and misleading). Defendant seems to miss Plaintiffs' point that such a construction is repugnant to the basic principles by which written instruments are construed—namely the cannon against surplusage. *See, e.g.*, A. Scalia and B. Garner, *Reading Law* at 174–179 (2012) (discussing cannon); *Ala. Assoc. of Realtors v. DHS*, 539 F.Supp.3d 29, 40 (D.D.C. 2021) (applying "a cardinal principle of statutory construction that [courts] must give effect, if possible, to every clause and word of a statute" to reject government's proposed reading of the "first sentence" of a statute that would "render the second sentence superfluous." (internal quotation and citation omitted)). The only coherent way to read the June 7 Letter is to give "ultimate authority" meaning. [9] Either: (1) Weiss had considerably more authority than he normally would such that he was insulated from President Biden's political appointees—limited only by standard principles applicable to any prosecution; or (2)

---

[9] Defendant advances the argument that the savings clause is the actual surplusage. *See* Def. Opp. at 19 ("Mr. Weiss need not have included that clause; it is true of every prosecutor in the Department—including Special Counsels"). Not so. As an initial matter this would not be true if Weiss were made Acting Attorney General for the Hunter Biden investigation as was done for Patrick Fitzgerald. It completely ignores the difference in geographic authority between Weiss as a U.S. Attorney and as a Special Counsel. *See* Plts. Mot. at 16. It also ignores the differences in present versus prospective and contingent authority. *See* Plts. Mot. at 16–18. Finally, this argument ignores the enhanced power of a Special Counsel. A Special Counsel need not comply with all the policies and procedures that may bind a U.S. Attorney and certainly is not subject to the same levels of review as a U.S. Attorney. *See* 28 C.F.R. § 600.7(a) (exempting certain decisions from normal "review and approval" procedures); *id.* at § 600.7(b) (deference to Special Counsel's "investigative or prosecutorial steps"); *United States v. Stone*, 394 F.Supp.3d 1, 21–22 (D.D.C. 2019) (discussing the foregoing); *United States v. Concord Mgmt. & Consulting LLC*, 317 F.Supp.3d 598, 609–10 (D.D.C. 2018) (noting ambiguity as to Department policies and procedures that bind the Special Counsel). And it is clear that a Special Counsel has an unparalleled amount of political cover against Department interference.

Weiss had been effectively made Acting Attorney General for the Hunter Biden case (as was done with Patrick Fitzgerald in the Valerie Plame case).

    **2.**    Defendant attacks what it views as a "glaring example of selective quotation" as concerns portions of Weiss's transcribed interview in which he testified he sought and was not given authority under 28 U.S.C. § 515 ("515") in February of 2022. *Compare* Def. Opp. at 20, *with* Plts. Mot. at 21–22. But there is nothing misleading. Review the language:

> Q. But [515 authority] wasn't granted, right?
> A. Yes. We have been over this. It wasn't granted. They said, follow the process. I followed the process. And in completing the process—
> Q. But, Mr. Weiss, when you ask for something and they don't give it to you, what is that?
> A. I asked for something, and in that conversation they didn't give it to me *I'm not—you want me to say it's a denial, but it's not. Not when I know that, weeks later, I was specifically told, "You can proceed." From my mind, it's a sequencing event. . . . It's not a denial in any way, shape or form.*

*See* Def. Opp. at 20 (Defendant's "added" language in italics). The totality of the above does nothing to help Weiss; it actually undermines him. It is clear Weiss asked for 515 authority *and was not given* it although he was told he *could* receive it in the future *if* conditions precedent were met. No matter how you characterize Weiss's testimony—a "denial" in American usage, "application refused" as the High Court in London would say, or "wasn't granted" in Weiss's usage—that central fact does not change. The June 7 Letter was false as it claimed *present* authority. *See, e.g.*, Plts. Mot. at 16–18 (discussing present authority versus the promise of future authority on conditions precedent). And there is nothing misleading about the quote, the portion in roman makes clear the game of equivocation at foot—Weiss admitted the operative fact, but would not use the word "denied."

    **3.**    Defendant finally attacks the fact that the testimony surrounding the now infamous October 7, 2022 meeting is (in Defendant's word) "contested." Def. Opp. at 21. But

the fact that other officials may have testified differently does not alter Gary Shapley's ("Shapley") facially credible testimony, his contemporaneous email documenting what he later testified to, and the concurrence of another attendee at that meeting, Darrel J. Waldon, with that account.  *See* Plts. Mot. 18–21.  That is specific, tangible, and clear evidence which rebuts the presumption of good faith.  Even if there is conflicting testimony (Defendant relies on news articles) that does not alter the fact that the presumption was rebutted which is dispositive here.

### D.     There is Credible Evidence AUSA Lesley Wolf Acted In Bad Faith.

Defendant frames allegations of substantial misconduct by Lesley Wolf ("Wolf") as reflections of "commonplace disagreements between investigators and prosecutors over isolated judgments, priorities, and investigative steps."  Def. Mot. at 23.  Not so.  Indeed, there is testimony on that exact point from career civil servant whistleblowers Shapley and Joseph Ziegler ("Ziegler") who both made clear in their testimony that as experienced investigators they understand and appreciate prosecutors may disagree with investigators, but that the episodes below were (as applicable) not mere disagreements in their informed opinion, but positive evidence of misconduct.  Ex. 1 to Second Declaration of Eric Neal Cornett, at *59 (Jan. 26, 2024); Ziegler Trans. at 28–29 (ECF No. 1-22).  And again, Defendant tellingly refuses to engage with these facts.

### 1.     FD-1023.

Defendant claims that Wolf's refusal to take a briefing on the FD-1023 is merely an allegation of "'unusual' communication issues" and that former U.S. Attorney Scott Brady's lack of knowledge of *why* Wolf refused to take a briefing on the FD-1023 somehow further illustrates that there's nothing to see here.  Def. Opp. at 22–23.  Not so.

Shapley testified "AUSA Wolf's comments made clear she did not want to cooperate

with the Pittsburgh USAO and that she had already concluded no information from that office could be credible, stating her belief that it all came from Rudy Giuliani."  Cornett Decl. Ex. 5 at ¶ 4.  But Scott Brady testified that he asked the Delaware USAO about the FD-1023 "multiple times" and made it "clear" to the Delaware USAO "that some of the information including this 1023 did not come from Mr. Giuliani.  Joint Staff Report at 24–25.  Brady ultimately "had to seek assistance from the Deputy Attorney General's office to resolve the reluctance from Weiss's office to take the briefing."  *Id*. at 24.  It took a direct order from the Principal Deputy Attorney General for Wolf to take the briefing.  *Id.* at 24–25.  Nothing is normal about that.

### 2.      Keeping the Biden Name Out of the Investigation.

Defendant does not engage with Wolf's efforts to keep the Biden name out of the investigation.  According to testimony from Shapley and Ziegler, Wolf instructed the criminal investigators to remove references to President Biden from search warrants and other investigative materials.  Shapley and Ziegler testified that they had never previously encountered a situation where a prosecutor allowed optics to dictate investigatory steps.  Joint Staff Report at 27.  In addition, Wolf prevented the criminal investigators from even asking questions about Joe Biden in interviews they conducted over the course of the investigation.  Shapley Trans. at 119.  That was the case even as to Hunter Biden's statement that he had to provide President Biden with a portion of the income he generated.  *Id.* at 18.  Again, that is not normal.  It is well known nothing stopped investigators from using the name "Trump" as concerned investigations touching on the prior President.

### 3.      The Storage Unit Search Warrant.

Defendant describes Wolf providing advance notice to Hunter Biden's legal team that criminal investigators intended to serve a search warrant on Hunter Biden's storage unit as "mere

disagreements between investigators and prosecutors."  Def. Mot. at 23.  That is not correct.

Defendant does not at all address the concrete testimony of impropriety—not mere disagreement.  *See* Plts. Mot. at 38–39.  Shapley testified about how irregular Wolf's actions were:  "Any other case I have ever worked, if the were like there's a storage unit with documents from the business and personal documents in the relation to the years under investigation—the risk was zero, because it's on a storage unit, it's not on a residence—there is no prosecutor I've ever worked with that wouldn't say, go get those documents."  *Id.* at 38.  Ziegler described Wolf's interference in the storage unit search warrant as "a defining moment for me in the investigation and where I truly thought that the Delaware U.S. Attorney's Office was providing preferential treatment to [Hunter Biden]" and that he pointed out to Wolf that her actions were not in accordance with "the normal investigative process."  Cornett Decl. Ex. 7; Cornett Decl. Ex. 9.

### 4.    Interviews with Hunter Biden's Adult Children.

With respect to allegations that Wolf interfered with criminal investigators efforts to interview Hunter Biden's adult children,  Defendant notes Plaintiffs do not "cite any law, regulation, policy, or principle of federal prosecution that would have required prosecutors to conduct specific interviews at a particular time."  Def. Mot at 23.  True, but irrelevant.  The concerns with Wolf's conduct blocking interviews of Hunter Biden's children are her reasons for *why* those interviews should not occur.  There is clear testimony Wolf prevented them from obtaining evidence relevant to the investigation, not based on a prudential investigatory concern, but because of *who* these individuals are.  Ziegler and Shapley testified that Hunter Biden's children were relevant fact witnesses because as Ziegler put it "there were expenses paid for the children, as well as potential credit card expenditures and Venmo payments that were deducted

on the tax return." Ziegler Trans. at 32; *see also* Shapley Trans. at 22. They testified that Wolf

blocked the interviews because it would "get us into hot water if we interview the President's

grandchildren." Ziegler Trans. at 32; Shapley Trans. at 22. That is improper.

### 5.   Campaign Finance Investigation.

Defendant posits that there is no requirement in law or DOJ policy to "follow a particular

lead." Def. Mot. at 23. Again, Plaintiffs are not claiming there is. However, according to

Shapley, Wolf blocked the pursuit of potential campaign finance violations because doing so

would require the inclusion of DOJ's Public Integrity Unit in the investigation and it would "take

authority away from her." Cornett Decl. Ex. 6. Refusing to follow a lead to maintain power in

an internal turf fight is wrong—it is not a mere "reasonable disagreement."

### 6.   CEFC Energy Investigation.

Finally, Defendant argues that there is no requirement in law or DOJ policy to "prioritize

obtaining a particular type of evidence." Def. Mot. at 23. Plaintiffs do not posit that there is.

Plaintiffs raise this issue because Shapely testified Wolf's interference in this instance represents

another "major deviations [from standard operating procedure] in [the Hunter Biden] case", and

that such leads would "normally" be followed. Joint Staff Report at 14–15. Again, the

Defendant ignores this testimony. It was not a mere disagreement; it was a deviation from what

would normally be done. Joint Staff Report at 15.

## III.   WEISS'S CONFLICTS ARE IMPUTED TO THE HUNTER BIDEN CASE TEAM ON THIS RECORD.

On this point Defendant maintains willful blindness to the nature of this lawsuit and the

posture of this motion. *See* Def. Opp. at 13–19. Rather than grapple with the factual allegations,

Defendant asserts "[i]t speaks volumes that Plaintiffs cannot find any FOIA case in which a court

has denied the presumption of good faith to custodians who have never been accused of

anything." Def. Opp. at 14.  But that is to be expected.  To reiterate, the facts here are

extraordinary.  Indeed, Plaintiffs are unaware of a factually similar case in the "thousands of

FOIA cases in the federal reporters"  Def. Opp. at 14.

1.     Because Defendant does not address the facts, it waves away the possibility that

Weiss's team, particularly his First Assistant and Criminal Chief, adhered to the proverbial "blue

wall."  Defendant's argument is that Weiss did not conduct a search and review the responsive

records, thus there could be no misconduct.  If there is no misconduct, it cannot be extrapolated

to his team.[10]

Defendant's rigid syllogism misses the point.  The custodians here were both the case

team and the team that participated in answers to Congress based on the limited set of records

available.  They were heavily involved in the subject matter.  *Cf.* Def. Opp. at 17–18.  It is not

enough to absolve the team by having only Weiss's search run by the Delaware U.S. Attorney's

Office's IT team.  The problems with that contention are apparent; for example, were Ms.

Hanson to have conducted her review of Mr. Weiss's responses prior to her search, that could

impact her search.

Defendant next challenges the legal basis for imputed misconduct.  To be sure,

*Competitive Enterprise Institute* and *CREW* have narrow application here—establishing

boundaries for bad faith analysis.  Whether the bad faith is *antecedent* or occurs during FOIA

processing is irrelevant, bad faith need not occur at every step along the way or by every

potential custodian to fully infect the agency response.  *See, e.g.*, *Competitive Enter. Inst. v.*

---

[10]  The question immediately presented by Defendant's argument is whether Ms. Hanson could
perform the review of ambiguous records that the Defendant argues is permissible and desirable
for the other custodians.  *See* Def. Mot. at 8–10.  If that is so, then Ms. Hanson was clearly so
involved in the investigation that any impropriety on Weiss's part could be imputed to her.

*Office of Sci. & Tech. Policy*, 185 F.Supp.3d 26, 28 (D.D.C. 2016); *CREW v. DOJ*, 05-cv-2078, 2006 WL 1518964, at *2 (D.D.C. June 1, 2006); *cf. Jones v. FBI*, 41 F.3d 238, 242–43 (6th Cir. 1994) (ordering *in camera* review of FBI Black Nationalist COINTELPRO documents, "[e]ven where there is no evidence that the agency acted in bad faith with regard to the FOIA action" there was such evidence as concerned the COINTELPRO program generally).

Defendant then contends that the application of *Minkkinen* and *Dyess* is "inherently skewed" because the standard for recusal of a prosecutor is different than the "background 'presumption of good faith'" in a typical FOIA case.  Def. Mot. 15.  Again, there is no impediment to pouring old wine into new bottles if the principle carries through, as it does here. The *Minkkinen* ruling does not mince words on the imputation of a conflict:

> Recusing an office as a whole but allowing an attorney who remains employed by that office, whose promotions, commendations, job duties, and other conditions of employment remain largely at the discretion of the conflicted U.S. Attorney, to continue acting as lead counsel, creates an appearance of impropriety. . . .
>
> Given his role of seeking justice, Mr. Cogar's ability to fairly evaluate evidence from his boss could reasonably be questioned.  The public could reasonably, and likely would, question Mr. Ihlenfeld's credibility if called as a witness by the Defendants simply because his employee, AUSA Cogar, is the lead prosecutor on the other side of counsel table.  In fact, the "carve out", itself, would likely be questioned.

*United States v. Minkkinen* No. 22-cr-163 (ICB), 2023 WL 3587757, at *5–6 (S.D.W.Va. May 22, 2023).  As for *United States v. Dyess*, 231 F.Supp.2d 493 (S.D.W.Va. 2002), Defendant again misses Plaintiffs' point.  *Dyess* represents an acme of impropriety.  But that is not what is necessary to justify recusal; the *nature* of the conflict is what matters, not just its egregiousness.

    **2.**    Defendant attacks whether the other custodians were involved in the Hunter Biden investigation based solely on the fact Shapley did not testify to their involvement.  But that is neither here nor there.  Presumably they were involved—that is why they are custodians. Defendant cannot seriously dispute the obvious; the custodians were involved in key decision-

making (such as the October 7 meeting) as one would expect from, for example, the First
Assistant, and the Criminal Chief.  And what matters is their involvement in the subject matter.

3.      Defendant gets ahead of itself in asserting that neither Mr. Weede nor Ms. Wolfe
*sent* any emails in response to the Congressional inquiries.  First, they were copied.  Second, by
Plaintiffs' count, 593 pages have been withheld in full.  Again, involvement in the subject matter
is the key.

4.      While Weiss's name might not be signed to the 2022 response to Senators
Grassley and Johnson, the Delaware Office was involved in the response.  Weiss requested an
update on whether OLA's response was sent on June 7, 2023.  Cornett Decl. Ex. 1 at 87.  Ms.
Hanson, brought in at receipt of the request, was clearly involved in coordinating the response
with EOUSA.  *E.g.*, *id.* at 6.  Ms. Hanson's understanding that "only OLA can respond" may
well be true, but her emails and apparent call(s) with EOUSA indicate some level of involvement
in the 2022 response.  And again, there are substantial withholdings.

## IV.   DEFENDANT'S SEARCH OF NON-EMAIL RECORDS IS INFIRM.

### A.    Hard Copy Records.

It is unclear what hard copy records were searched—specifically whether any central files
were searched—and that dooms the hard copy search (absent a supplemental declaration).  *See*
Plts. Mot. at 42.[11]  Defendant's only response is that this is a distinction without a difference
because custodians were instructed to search for "any hard copy records."  *See* Def. Opp. at 25–
26 (quoting the Second Declaration of Kara Cain (ECF No. 33-2) ("Second Cain Declaration" or
"2d Cain Decl.").  But that is no answer.  One could easily—and in good faith—search only

---

[11] To be clear, the search may well have been adequate.  The issue is that the Second Cain
Declaration does not provide the necessary information and this is a point the Defendant could
readily put to bed in the Third Declaration of Cara Cain (ECF No. 38-2).  But it did not.

personal hard copy records.  Or one could reasonably assume another searched a central records system.  Because the Second Cain Declaration does not account for which hard copy records were actually searched or the results of that search, it is deficient under this Court's opinion in *Lewis v. U.S. Dep't of the Treasury*, No. 1:17-cv-943-DLF (D.D.C. July 2, 2018).

**B.    Other Record Sources.**

**1.**    Defendant attempts to re-write the Second Cain Declaration.  *See* Def. Mot. at 26. On its face paragraph 37 is clear that custodians were asked if they kept non-email records *generally*.  No answer was provided, but Defendant's Opposition all but concedes that they do. *Id.* at 16 n.15.  If Plaintiffs' construction was error, Defendants could have clarified the issues for everyone's benefit in the Third Declaration of Cara Cain (ECF No. 38-2).  They did not.  That silence speaks volumes.

**2.**    Defendant fundamentally misunderstands Plaintiffs' submissions.  Start with the first principle that "[t]here is no statutory basis for treating text messages and call logs as categorically different from emails or any other type of government data commonly disclosed in response to FOIA requests."  *Hoffman v. USCIS*, No. 20-cv-6427, 2023 WL 4237096, at *11 (E.D. Penn. June 28, 2023).  Then consider that even presuming good faith one simply cannot "say" they have no responsive records and call that a search (unless the underlying request is so framed):  "[T]he bare assertion that the Deputy Under Secretary saw the FOIA request and that he stated that he had no responsive documents is inadequate because it does not indicate that he performed any search at all."  *Defs. of Wildlife v. U.S. Dept' of Agriculture*, 311 F.Supp.2d 44, 55 (D.D.C. 2004); *see also Harrison v. EOUSA*, No. 16-cv-1310 (JLS) (BGS), 2017 WL 1180183, at *5 (S.D. Cal. Mar. 30, 2023).

Defendant errs in submitting that a Declaration that no records exist on a certain records

system, not as a categorical matter of where records are stored, but as a matter of actual responsiveness, is sufficient.  For example, in *Ctr. for Biological Diversity*, Defendant ignores the fact that the Court rejected the declarant's assurance that certain subject matter experts stated that there were no responsive non-email records because either:  (1) a search was run and the *description* was deficient; or (2) defendant was required to "either conduct a search of these communications, or if it is unable to do so, explain how it is not feasible to search these messages for responsive material."  *Ctr. for Biological Diversity v. EPA*, 279 F.Supp.3d 121, 143 (D.D.C. 2017).  The directive to search was supported by citation to *Defs. of Wildlife*, *supra*. *Ctr. for Biological Diversity*, 279 F.Supp.3d at 143.  No third option—confirm that although custodians used those systems for work they did not do so for the subject of the request—was given.  *Accord Ctr. for Biological Diversity v. EPA*, 369 F.Supp.3d 1, 9, 12 (D.D.C. 2019).  The question should be framed in that light—if the *system* was used for business, it must be searched. *See, e.g.*, *Am. Oversight v. U.S. Gen. Servs. Admin.*, 486 F.Supp.3d 306, 316 (D.D.C 2020); *Cf. Bader Fam. Found.*, 630 F.Supp.3d at 44–45 (relevant inquiry for searching private accounts is whether accounts were used generally for agency business); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, No. 17-cv-1208, 2021 WL 918204, at *11 (D.D.C. Mar. 9, 2021) (similar); *but see, e.g.*, *Shteynlyuger v. CMS*, No. 20-cv-2982 (RDM), 2023 WL 6389139, at *12 (Sept. 30, 2023).

**3.**     Defendant also ignores that non-email communications do appear to have been used by custodians yet not searched.  *See* Transcribed Interview of David C. Weiss at 15–16 (Nov. 7, 2023) (discussing use of telephony).

## CONCLUSION

Defendant's Motion should be denied.  Plaintiffs' Motion should be granted.

Dated:  January 26, 2024

Respectfully submitted,

/s/ Samuel Everett Dewey
SAMUEL EVERETT DEWEY
(No. 999979)
Chambers of Samuel Everett Dewey, LLC
Telephone:  (703) 261-4194
Email:  samueledewey@sedchambers.com

ERIC NEAL CORNETT
(No. 1660201)
Law Office of Eric Neal Cornett
Telephone:  (606) 275-0978
Email: neal@cornettlegal.com

DANIEL D. MAULER
(No. 977757)
The Heritage Foundation
Telephone:  (202) 617-6975
Email:  Dan.Mauler@heritage.org

ROMAN JANKOWSKI
(No. 975348)
The Heritage Foundation
Telephone:  (202) 489-2969
Email:  Roman.Jankowski@heritage.org

*Counsel for Plaintiffs*