UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HERITAGE FOUNDATION, *et al.*,

    *Plaintiffs*,

v.

DEPARTMENT OF JUSTICE,

    *Defendant.*

No. 23-cv-1854 (DLF)

## MEMORANDUM OPINION

In this case, the Heritage Foundation and Mike Howell (together, "Heritage") seek records from the U.S. Department of Justice related to the investigation of Robert Hunter Biden, the son of the President of the United States Joseph R. Biden. Before the Court are the Department's Motion for Partial Summary Judgment, Dkt. 33, and Heritage's Cross-Motion for Partial Summary Judgment, Dkt. 35, addressing the adequacy of the Department's search for records. For the reasons that follow, the Court will grant the Department's motion and deny Heritage's.

**I.    BACKGROUND**

The Court previously described this case's background, *see Heritage Found. v. Dep't of Just.*, No. 23-cv-1854, 2023 WL 8880337, at *1–2 (D.D.C. Dec. 22, 2023), and recounts here only those facts relevant to its decision. On March 10, 2023, Heritage submitted a Freedom of Information Act ("FOIA") request to the Department of Justice seeking the following:

1.     All documents and communications sent or received by David Weiss or any employee of the U.S. Attorney's Office for the District of Delaware referring or relating to Special Counsel status for the investigation concerning Hunter Biden; and

2.     All documents and communications between or among employees of the U.S. Attorney's Office for the District of Delaware and employees of any

>other U.S. Attorney's Office with venue to bring charges against Hunter Biden or his associates in that jurisdiction.

Def.'s Statement of Undisputed Material Facts ¶ 1, Dkt. 33-1.  Upon receipt of the request, the U.S. Attorney's Office for the District of Delaware was tasked with searching for responsive records. *See id.* ¶ 5.  Eight custodians were involved: (1) David Weiss, the U.S. Attorney; (2) Shannon Hansen, the First Assistant U.S. Attorney; (3) Shawn Weede, the Criminal Chief of the U.S. Attorney's Office; (4) a line Assistant United States Attorney assigned to the Hunter Biden investigation; (5) another District of Delaware Assistant United States Attorney; and three administrative personnel.  *See* Decl. of Kara Cain ¶ 12, Dkt. 33-2.[1]  The custodians "were selected . . . because they were the personnel in the best position to find responsive records" and "to efficiently locate and pull the universe of potentially responsive records." *Id.* ¶ 15.  All of the custodians, with the exception of Weiss, conducted their own searches. *Id.* ¶ 21.  In Weiss's case, the U.S. Attorney's Office's information-technology staff conducted the search. *Id.*

As to Part 1 of Heritage's request—*i.e.*, records within the U.S. Attorney's Office concerning the Special Counsel investigation—the custodians searched for "515," "special counsel," and "special attorney." *Id.* ¶ 24.  As to Part 2—*i.e.*, communications between different U.S. Attorney's Offices—each custodian "searched for 10 names belonging to personnel at one or more other USAOs," and the five attorney custodians searched for "two additional names." *Id* ¶¶ 28–29.  Each custodian, with the exception of Weiss, reviewed the search-term results and returned responsive records for processing. *See id.* ¶¶ 25, 32.  All custodians were further

---

[1] In opposition to Heritage's preliminary-injunction motion, the Department submitted a declaration by Kara Cain.  *See* Decl. of Kara Cain, Dkt. 10-1.  The parties refer to the Cain Declaration submitted at summary judgment as the "second" Cain Declaration.  For simplicity's sake, the Court refers to Kara Cain's first summary-judgment declaration as simply the "Cain Declaration," Dkt. 33-2, and her declaration accompanying the Department's reply brief in support of its motion for summary judgment as the "Second Cain Declaration," Dkt. 38-2.

2

instructed "to search for any hard-copy records, including handwritten notes" and "whether they kept non-email, non-hard-copy records," including "inter-office and intra-office communications," emails, "MMS or SMS text messages," "instant messages," and communications on various "messaging systems." *Id.* ¶¶ 35, 37. "All eight custodians confirmed that they did not use any of those systems to communicate about 'Special Counsel status' or to communicate with other USAOs where venue might have been appropriate." *Id.* ¶ 38. The Department has "processed more than 3,000 pages and released—in whole or in part—all responsive, non-exempt records." *Id.* ¶ 41.

On June 26, 2023, Heritage filed suit against the Department of Justice. With the parties' consent, the Court bifurcated summary judgment—to first address the adequacy of the Department's search and then to turn to the Department's withholdings. Both parties moved for summary judgment on adequacy, *see* Dkts. 33, 35, and on March 11, 2024, the Court held a motion hearing. In their briefing and at the hearing, the parties devoted significant attention to whether the record custodians acted in good faith. Particular focus was placed on Heritage's use of a congressional Interim Staff Report containing a transcript from David Weiss's November 7, 2023 testimony. According to the Department, Heritage truncated the quote to misleading effect. Following the hearing, the Court solicited transcripts and/or additional affidavits relating to the Weiss testimony. Min Order of Mar. 11, 2024. Heritage submitted approximately 2,740 pages of materials in response, *see* Dkt. 45, and thereafter, in response to the Court's order, Min. Order of Mar. 26, 2024, the parties filed supplemental briefs addressing the newly filed material.

## II.   LEGAL STANDARDS

Rule 56 of the Federal Rules of Civil Procedure states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When a federal agency moves for summary judgment in a FOIA case, the court views all facts and inferences in the light most favorable to the requester, and the agency bears the burden of showing that it complied with FOIA.  *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009).

To prevail under Rule 56, a federal agency "must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the [FOIA's] inspection requirements."  *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (per curiam) (internal quotation marks omitted).  The agency "must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents," *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983), and must also explain why any of the nine enumerated exemptions listed in 5 U.S.C. § 552(b) apply to withheld information, *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 147 (D.C. Cir. 2006).  *Accord Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015) (noting an agency bears the burden of justifying the application of exemptions, "which are exclusive and must be narrowly construed").

"The peculiarities inherent in FOIA litigation, with the responding agencies often in sole possession of requested records and with information searches conducted only by agency personnel, have led federal courts to rely on government affidavits to determine whether the statutory obligations of the FOIA have been met."  *Perry*, 684 F.2d at 126.  A court may grant summary judgment based on an affidavit if it contains reasonably specific detail and neither contradictory record evidence nor evidence of bad faith calls it into question, *see Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013).  "[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

### III. ANALYSIS

#### A. Adequacy Framework

Courts apply a two-step framework to evaluate the adequacy of an agency's FOIA search. First, the agency must show that its search was reasonable, meaning it "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Watkins L. & Advoc., PLLC v. DOJ*, 78 F.4th 436, 442 (D.C. Cir. 2023) (cleaned up). Agencies "submit declarations that denote which files were searched and by whom those files were searched" and must prove they took a reasonable "systematic approach to document location." *Heartland All. for Hum. Needs & Hum. Rts. v. USCIS*, 406 F. Supp. 3d 90, 110 (D.D.C. 2019) (cleaned up). If the agency carries its burden of showing reasonableness, at step two, "the burden shifts to the FOIA requester to produce countervailing evidence suggesting that a genuine dispute of material fact exists as to the adequacy of the search." *Id.* (cleaned up). The requester must "rebut" the agency's showing of reasonableness with any "evidence . . . showing that the search was not conducted in good faith." *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996).

The parties disagree over how allegations of bad faith are analyzed under this framework. On one hand, Heritage argues that when a custodian has "been credibly accused of wrongdoing or [is] clearly bound up in or tainted by credible allegations of misconduct," it is not reasonable for that custodian to perform "self-collection and self-review." Cross Mot. for Summ. J. at 8, Dkt. 35. In other words, it asserts that, at step one, an agency must show that it was reasonable to permit a custodian's self-search notwithstanding allegations of conflict, bias, or the like. On the other hand, the Department accuses Heritage of conflating steps one and two. *See* Def.'s Reply at 6–7, Dkt. 38. In its view, the requester carries the burden of "offer[ing] clear evidence that the custodian(s)

5

has acted in bad faith" at step two, but custodians are afforded a "presumption of good faith," so it is reasonable at step one for a custodian, even a conflicted one, to self-search. *Id.* at 6–7 & n.4.

The Court declines Heritage's invitation to accept as true its "credible" allegations of bad faith and consider evidence outside the agency's declarations at step one. To call such allegations "credible" would assume that Heritage has proved bad faith. A requester, like Heritage, may present any evidence of bad faith extrinsic to the agency's declarations at step two. *See, e.g.*, *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 586 (D.C. Cir. 2020) ("Appellant has provided us with no reason to doubt the veracity of the prison officials' response."); *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003) (noting the plaintiff may rebut the presumption of good faith with "countervailing evidence as to the adequacy of the agency's search" (cleaned up)). But the Court is aware of no authority assuming agency bad faith at step one based on evidence outside the agency's declarations.

Indeed, courts in this Circuit consistently look first within the four corners of the search (as laid out in the agency declarations and supporting exhibits) to assess whether the agency took reasonable measures to retrieve the requested records. *See Mack v. Dep't of the Navy*, 259 F. Supp. 2d 99, 105 (D.D.C. 2003). A requester can, of course, challenge whether the agency's search was "reasonably calculated to uncover all relevant documents."[2] *Weisberg*, 705 F.2d at 1351. And courts "afford a presumption of good faith *only if* [they] conclude that an agency's declaration is relatively detailed and non-conclusory and submitted in good faith." *Eddington v. DOD*, 35 F.4th

---

[2] At the March 11, 2024 hearing, the parties discussed whether "bad faith" may ever be raised at step one. For example, if the agency's declaration acknowledges a custodian's actual conflict of interest but otherwise remains silent as to how the conflict was neutralized, a question of unreasonableness may arise at step one. That, however, is not this case because Heritage makes no persuasive argument that a conflict is apparent on the face of the Department's declarations, only based on its extrinsic evidence. The Court thus need not resolve this issue.

833, 838 (D.C. Cir. 2022) (cleaned up).  Once that presumption attaches, the requester may submit any evidence of bad faith, whether related to how the agency conducted the search or the conduct of particular custodians.  *See* Moore, 916 F. Supp. at 35–36; *James Madison Project v. DOJ*, 267 F. Supp. 3d 154, 159 (D.D.C. 2017) ("When an agency has submitted such declarations, the requester then bears the burden of demonstrating a lack of good faith."); *Greenberg v. U.S. Dep't of Treasury*, 10 F. Supp. 2d 3, 13 (D.D.C. 1998) ("Once the agency has shown by convincing evidence that its search was reasonable, the burden shifts to the requester to show that the search was not in fact in good faith.").  The requester may do so with evidence beyond the declarations when it carries the burden of proving bad faith.  *See, e.g.*, *Weisberg*, 705 F.2d at 1358 ("What Weisberg is unable to show by a direct attack on the search itself he attempts to show indirectly by extensive allegations that the FBI has treated his request in bad faith.").

As discussed in Section III.B, *infra*, there is nothing on the face of the Department's declarations here to suggest the custodians were conflicted or biased.  As such, Heritage's use of evidence extrinsic to the declarations to prove bad faith is properly evaluated at step two.

Swimming against the current of precedent, Heritage criticizes district-court decisions broadly aligned with the Court's approach, *see* Cross Mot. for Summ. J. at 8–12, focusing principally on *Wadelton v. Department of State*, 106 F. Supp. 3d 139 (D.D.C. 2015).  In that case, the plaintiffs argued that the agency inappropriately tasked record custodians "with searching their own records for information about their own alleged misconduct," implicating "a major conflict of interest."  *Id.* at 148.  Judge Chutkan rebuffed the challenge, holding that "[a]lthough no court appears to have directly addressed the question, searches conducted by those who created or maintained the documents—even against a backdrop of allegations of wrongdoing—have been deemed reasonable when challenged."  *Id.*  In her view, self-searches are "logical in light of the

7

presumption of good faith,"³ and, in any event, the plaintiffs' "assumption" that the custodians "must have acted in bad faith . . . does not rise to the level of proof necessary to overcome this presumption." *Id.* at 149.

Heritage urges the Court to reject *Wadelton* because Judge Chutkan failed to "address the reasonableness of self-search (or review) where there is a credible allegation of misconduct or implied misconduct." Cross Mot. for Summ. J. at 9. But that is not true. The plaintiffs in *Wadelton*, like Heritage here, advanced an unproven "assumption that [the custodians] must have acted in bad faith." 106 F. Supp. 3d at 149. Such "conclusory claims without an evidentiary basis" cannot rebut the presumption of good faith—*i.e.*, the reasonableness of the search—established at step one, *Cunningham v. DOJ*, 961 F. Supp. 2d 226, 243 (D.D.C. 2013). Heritage further asserts that Judge Chutkan inappropriately relied on *Defenders of Wildlife v. U.S. Department of the Interior*, 314 F. Supp. 2d 1 (D.D.C. 2004), because that case did not make an express holding on the "reasonableness of having the putative ethics violators search[ing] for responsive documents," *Wadelton*, 106 F. Supp. 3d at 148. But this misses the point. Judge Chutkan cited this case merely to point out that courts see no reason to question in the ordinary course "putative ethics violators search[ing] for responsive records." *Id.*

Heritage's other arguments fail to persuade. It directs the Court to "well-developed caselaw on e-discovery searches," Cross-Mot. for Summ. J. at 11, but the Court sees no need to borrow from that context given the well-established two-step adequacy-of-search inquiry that courts consistently apply in FOIA cases.

---

³ As discussed *supra*, the presumption of good faith does not apply by default; rather, the Court "afford[s] a presumption of good faith *only if* [it] conclude[s] that an agency's declaration is relatively detailed and non-conclusory and submitted in good faith." *Eddington*, 35 F.4th at 838 (cleaned up).

Based on the foregoing, at step one, an agency may rely on "government employees who created or maintained the requested records to conduct the search for those records" as part of its proof of reasonableness. *Wadelton*, 106 F. Supp. 3d at 149. And at step two, the requester may present evidence of bad faith satisfying "the level of proof necessary." *Id.* Accordingly, the Court will first analyze the reasonableness of the Department's search, and then, Heritage's allegations of bad faith.

### B.  Step One: Reasonableness

The Department satisfies step one. At this stage, the Department "must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Reps. Comm. for Freedom of the Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017) (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). The adequacy of a search "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." *Weisberg*, 745 F.2d at 1485. "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Id.* (emphasis in original). The requester may defeat summary judgment by marshaling "contradictory evidence in the record" to generate a "genuine dispute of material fact." *Eddington*, 35 F.4th at 841.

The Department provided the declaration of Kara Cain, an Attorney-Advisor with the FOIA staff of the Executive Office for United States Attorneys. *See* Cain Decl. ¶ 1. After Heritage filed its opposition and cross-motion, Cain submitted a short supplemental declaration. *See* Declaration of Kara Cain ("Second Cain Decl.") ¶ 1, Dkt. 38-2. Both "reasonably detailed" declarations demonstrate that the Department conducted a reasonable search for responsive records. *Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220, 236 (D.D.C. 2017).

Cain represents that the Executive Office for United States Attorneys determined that the U.S. Attorney's Office for the District of Delaware was best situated "to conduct a search for responsive records" given its central role in Heritage's request. Cain Decl. ¶¶ 7, 10. She goes on to identify—four by name and four by position—the record custodians, who reasonably "were selected . . . because they were the personnel" who oversaw and/or worked on the Hunter Biden investigation. *Id.* ¶¶ 13–15. From there, Cain details the U.S. Attorney's Office's email-archive system and the Proofpoint system for searching those records. *See id.* ¶¶ 19–22; Second Cain Decl. ¶ 2. She then explains that all eight custodians were given Heritage's FOIA request, *see* Cain Decl. ¶ 13, and worked to establish reasonable search terms.

Heritage's request was overbroad in certain respects, including its failure to include temporal limits or any subject-matter limits in Part 2. *See* Mot. for Summ. J. at 6. Cain captures, however, the Department's reasonable efforts to narrow the request to yield potentially responsive records, *see, e.g.*, Cain Decl. ¶ 23. For example, for both Parts of Heritage's request, the Department limited the search to 2020 forward—a reasonable limitation in light of the facts of the case. *See id.* ¶ 23. As to Part 2's substantive scope, Heritage sought "[a]ll documents and communications between or among employees of the U.S. Attorney's Office for the District of Delaware and employees of any other U.S. Attorney's Office with venue to bring charges against Hunter Biden or his associates." *Id.* ¶ 9. Instead of rejecting the request, the Department directed the record custodians to generate a list of "12 names" of employees in other U.S. Attorney's Offices with whom they likely corresponded based on their experience and work on the Hunter Biden investigation. *See id.* ¶¶ 28, 30. Such limitations were eminently reasonable.

Cain further recounts how the custodians "reviewed the search-term results" and winnowed only those responsive records that "sufficiently 'refer[] or relat[e] to'" Heritage's request. Cain

10

Decl. ¶¶ 25–34. Moreover, she explains that "[a]ll eight custodians were . . . told to search for any hard-copy records"—yielding "[t]he bulk of the 162 pages identified in . . . the August 4, 2023 joint status report"—and any "non-email, non-hard-copy records"—yielding no responsive records. *Id.* ¶¶ 35–38. In the Court's view, the Cain declarations reflect the Department's more than adequate efforts to locate responsive records.

Heritage disagrees, focusing primarily on the alleged bad faith of the record custodians (addressed *infra*), but it musters only a few arguments challenging the reasonableness of the Department's search itself. None are persuasive. First, Heritage contends that the Department's "hard copy search is insufficiently documented." Cross Mot. for Summ. J. at 41. Pointing to *Lewis v. U.S. Department of the Treasury*, No. 17-cv-943, Heritage faults the Cain Declaration for "provid[ing] no detail on the instructions given as to the conduct of that search" or "whether a central hard-copy record existed," Cross Mot. for Summ. J. at 42. But *Lewis* is easily distinguishable. There, the Court deemed the Treasury Department's search inadequate because it (1) "fail[ed] to identify the specific search terms" used for electronic records; (2) "provide[d] no detail about how . . . employees searched their paper files"; and (3) did not "describe the yields of each . . . component's search." Mem. Op. at 3, *Lewis v. U.S. Dep't of the Treasury*, No. 17-cv-943 (D.D.C. July 2, 2018), Dkt. 23. The declaration in *Lewis* made only brief mention of hardcopy records, noting that "[t]o the extent the FOIA Officer instructed staff to search their personal files for letters or faxes, the scope of the search also included paper files." Second Decl. of Jamal El-Hindi ¶ 14, *Lewis*, No. 17-cv-943, Dkt. 20-1. Here, in contrast, the Cain Declaration lacks such conditional language and notes the Department's clear directive regarding hardcopy records: namely, "[a]ll eight custodians were also told to search for any hard-copy records, including handwritten notes, that would have been responsive." Cain Decl. ¶ 35. Also, at the March 11,

11

2024 hearing, the government represented that no central hardcopy repository exists. Even assuming the Department's representations fall somewhat short in this regard, *Lewis* reached its conclusion based on the confluence of three distinct deficiencies, especially the failure to identify search terms. The search terms here, as Heritage concedes, are not at issue, further weakening any comparison to *Lewis*.

Second, Heritage accuses the Department of "fail[ing] to search other systems." Cross Mot. for Summ. J. at 41. Although record custodians were directed to search "non-email, non-hard-copy records," Heritage blames the Department for "provid[ing] no information on how the custodians responded to this inquiry." *Id.* at 42–43. The Department was "silent on the nature of the record systems," and "individuals may not remember precisely how a communication was transmitted or routed." *Id.* at 43–44. These arguments are baseless. To start, Heritage misreads the Cain Declaration. Cain represents that all custodians were asked about whether they kept any "non-email, non-hard-copy records" on any of sixteen electronic systems to "communicate about 'Special Counsel status' or to communicate with other USAOs where venue might have been appropriate." Cain Decl. ¶¶ 37–38. "All eight custodians confirmed that they did not use any of those systems." *Id.* ¶ 38. It thus was eminently reasonable for the Department not to search additional record systems. *See id.* ¶ 38. Far from silent, the Department has provided more than an adequate explanation as to why it did not search additional record systems. Heritage's "purely speculative claims" about the custodians' faulty memory do not "rebut the good faith presumption." *Brown v. DOJ*, 742 F. Supp. 2d 126, 129 (D.D.C. 2010). Nor does the fact that a custodian may have forgotten about an additional "non-email, non-hard-copy record[]," such as telephony, undermine the presumption, Cain Decl. ¶ 37, because "the existence and discoverability

of *other* documents" does not render a search unreasonable, *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981) (emphasis added).

For these reasons, the Department's search was reasonable, and Heritage has not presented any evidence to create a genuine dispute of material fact on this issue. The Court next turns to Heritage's bad-faith arguments.

### C. Step Two: Bad Faith

After an agency satisfies step one, "[s]ummary judgment may be granted" unless the agency's search is "called into question . . . by evidence of agency bad faith." *Eddington*, 35 F.4th at 837 (cleaned up). "[T]o overcome the presumption of good faith," the requester carries the burden of "offer[ing] a concrete basis upon which the court may conclude that" the agency or custodians acted in bad faith. *Kay v. FCC*, 976 F. Supp. 23, 34 (D.D.C. 1997). The requester can accomplish this "either by contradicting the defendant's account of the search procedure or by presenting evidence showing the agency's bad faith." *Kim v. U.S. Dep't of the Interior*, 859 F. Supp. 2d 13, 18 (D.D.C. 2012). "[S]peculative and conclusory" evidence does not suffice. *Kay*, 976 F. Supp. at 34.

Heritage concedes that it does not have any evidence of bad faith against Weede and Hansen and instead challenges the searches conducted by David Weiss and an Assistant United States Attorney assigned to the Hunter Biden case. These allegations fall well short of establishing any bad faith on the part of the Department.

#### 1. *Weiss*

Heritage devotes the bulk of its cross-motion to allegations of Weiss's bad faith. But as the Department points out, Weiss did not conduct a self-search. *See* Mot. for Partial Summ. J. at 12. The IT team did instead. *Id*. at 2. Heritage presents no evidence that the IT team was in any

way tainted such that the search of Weiss's records was infected with bad faith. Even so, Heritage argues, without evidence or authority, that Weiss tainted the other search custodians such that bad faith can be imputed to all. The Court disagrees.

Heritage devotes nearly twenty pages of its briefing to brainstorming on a hypothetical criminal "prosecution" of Weiss. To support its bold claim, Heritage cites a December 5, 2023 Interim Staff Report authored by the House Committees on the Judiciary, Ways and Means, and Oversight and Accountability, *see* Dkt. 36-3, that contains letters Weiss sent to House and Senate Committees, *see, e.g.*, *id.* at 37–39, and a truncated transcript from his November 7, 2023 interview with the House Committee on the Judiciary, *see id.* at 45. *Accord* Cross Mot. for Summ. J. at 12–13. In Heritage's view, Weiss's June 7, 2023 letter to Representative Jim Jordan "was both false and misleading" because it claimed that Weiss was "granted ultimate authority over th[e] [Hunter Biden] matter, including responsibility for deciding where, when, and whether to file charges." *Id.* at 13–14 (citation omitted). Heritage argues that at various other times, Weiss represented the contrary—that he lacked such "ultimate authority." For example, he conveyed in other letters that he lacked "charging authority" outside the District of Delaware and would need a "partner on the case" in another district. *Id.* at 16. IRS investigators Gary Shapley, Jr. and Joseph Ziegler testified that behind closed doors Weiss acknowledged the limits of his charging authority. *See id.* at 18. Shapley testified that at an October 7, 2022 meeting, Weiss told investigators, "I'm not the deciding official on whether charges are filed," and "Biden-appointed D.C. U.S. Attorney Matthew Graves would not allow him to charge in his district." *Id.* (citation omitted). Further, Heritage invokes a particular exchange during Weiss's November 7, 2023 interview in which he allegedly acknowledged the denial of "Special Attorney" authority under 28 U.S.C. § 515 before sending

14

his July 7, 2023 letter claiming "ultimate authority."[4]  Relying on the Interim Staff Report, Heritage quotes the exchange as follows:

> Q.  But [515 authority] wasn't granted, right?
>
> A.  Yes.  We have been over this.  It wasn't granted.  They said, follow the process.  I followed the process.  And in completing the process—
>
> Q.  But, Mr. Weiss, when you ask for something and they don't give it to you, what is that?
>
> A.  I asked for something, and in that conversation they didn't give it to me[.]

*Id.* at 22 (quoting Interim Staff Report at 45).  Based on the above exchanges, Heritage contends that "[t]he plain text of the June 7 Letter cannot bear th[e] interpretation" that Weiss actually had "ultimate authority" over the Hunter Biden case.  *Id.* at 23.  It thus concludes that Weiss should be charged under 18 U.S.C. § 1001 and § 1505 for false and misleading statements.  *Id.* at 27, 31.

Heritage's hypothetical "prosecution" rests on a shaky foundation.  To start, Weiss's June 7, 2023 letter about his "ultimate authority" contained a crucial caveat that must be read in context:

> While your letter does not specify by name the ongoing investigation that is the subject of the Committee's oversight, its content suggests your inquiry is related to an investigation in my District.  If my assumption is correct, I want to make clear that, as the Attorney General has stated, I have been granted ultimate authority over this matter, including responsibility for deciding where, when, and whether to file charges and for making decisions necessary to preserve the integrity of the prosecution, **consistent with federal law, the Principles of Federal Prosecution, and Departmental regulations**.

Interim Staff Report at 37 (emphasis added).  In full context, Weiss plainly acknowledged that his "ultimate authority" was subject to restrictions under federal law, the Justice Manual, and other regulation.  Contrary to Heritage's suggestion, Weiss's letter cannot fairly be read to proclaim

---

[4] In the November 7, 2023 interview, there is discussion differentiating "special counsel" status and "Special Attorney" status under 28 U.S. § 515.  *See, e.g.*, Resp. to Court Order ex. 1, pt. 2 at 746, Dkt. 45-2.  This difference is not material here, so the Court uses the terms interchangeably.

absolute prosecutorial power without exception or limitation. Indeed, as the Department notes, even without the caveat, Weiss's proclamation of "ultimate authority" must be construed against the background rule that prosecutors follow federal law and lack unchecked charging authority. *See* Reply in Supp. of Mot. for Summ. J. at 19.

Heritage resists this reading and argues that Weiss's "ultimate authority" statement "must be given *some* meaning" as it "delineates *some* sort of additional authority over the Hunter Biden case above and beyond any other case in the District of Delaware." Cross Mot. for Summ. J. at 23. But as Weiss himself explained in his various letters, "he was 'the decisionmaker in th[e] [Hunter Biden] case,'" Interim Staff Report at 55, and was "assured that, if necessary," he "would be granted § 515 [Special Counsel] Authority" to seek charges in any "district where charges could be brought in this matter," Letter from David C. Weiss to Chairman Jim Jordan on June 30, 2023 at 2, Dkt. 14-2. On the Court's reading, Weiss in fact had "additional [charging] authority" in the Hunter Biden case compared to other U.S. Attorneys because he could bring charges outside the District of Delaware. Cross Mot. for Summ. J. at 23. But to unlock that power he was required to comply with the procedures outlined in 28 U.S.C. § 515.

Further, as discussed at the March 11, 2024 hearing, Heritage quoted the Interim Staff Report's truncated transcript of Mr. Weiss's November 7, 2023 testimony. Following the Court's order, Heritage filed a full transcript of the hearing. Resp. to Ct. Order ex. 1, pt. 2 at 747–48, Dkt. 45-2. The relevant passage includes the following (with the new information emphasized):

> Q. But [515 authority] wasn't granted, right?
>
> A. Yes. We have been over this. It wasn't granted. They said, follow the process. I followed the process. And in completing the process—
>
> Q. But, Mr. Weiss, when you ask for something and they don't give it to you, what is that?

16

| | |
|---|---|
| A. | I asked for something, and in that conversation they didn't give it to me**,** **but at the—** |
| Q. | **All right. It's a simple question.** |
| A. | **—at the conclusion—** |
| Q. | **When you ask for something and they didn't give it to you, what is that?** |
| A. | **I'm not—you want me to say it's a denial, but it's not. Not when I know that, weeks later, I was specifically told "You can proceed." So it's the same question, it's the same request—** |
| Q. | **Maybe weeks later, but at that point what is it?** |
| A. | **It's, "Proceed, with this process. We're asking you to go through this process." From my mind, it's a sequencing event. It's not a denial in any way, shape, or form. That's the way I interpreted it.** |

*Id*. The full exchange between Weiss and Representative Jordan shows that Weiss plainly rebuffed the suggestion that his application for § 515 Special Attorney status was ever rejected. Rather, as he repeated several times during the exchange with Representative Jordan, he was told to follow the procedures for appointment under § 515. Indeed, Weiss's November 7, 2023 statement that he was told to "proceed", *id.*, corroborates his representation in a June 30, 2023 letter that he was "assured that" he "would be granted" additional "§ 515 Authority" upon request, Letter from David C. Weiss to Chairman Jim Jordan at 2 (June 30, 2023). This undermines any inference that Weiss was dishonest when he claimed "ultimate authority" in his June 7, 2023 letter.

Heritage's additional submissions do not strengthen its allegations of bad faith. The cumulative evidence that Weiss's § 515 Special Attorney authority was "future contingent authority," Pls.' Br. Pursuant to the Ct.'s Mar. 26, 2024 Min. Order at 4, Dkt. 47, is consistent with Weiss's June 7, 2023 representation that he had "ultimate authority" to pursue charges in the Hunter Biden case subject to "federal law," including the procedures identified in 28 U.S.C. § 515. Interim Staff Report at 37. Heritage has thus failed to make a showing of bad faith by Weiss.

### 2. *Assistant United States Attorney*

Heritage also advances a litany of allegations against a line Assistant United States Attorney in the District of Delaware, largely based on the testimony of IRS Agents Shapley and Ziegler. Heritage contends that the attorney refused "to cooperate with the Pittsburgh USAO" about "allegations that then-Vice President Joe Biden and Hunter Biden each received a $5 million bribe from a Ukrainian oligarch," Cross Mot. for Summ J. at 33–34; "sought to keep the Biden name out of the investigation," *id.* at 35; declined to pursue a search of a storage unit and opted to negotiate with Hunter Biden's counsel over the disclosure of relevant documents, *see id.* at 37–39; informed investigators they would be in "hot water if [they] interview[ed] the President's grandchildren," *id.* at 39; directed investigators away from allegations of "campaign finance criminal violations," *id.* at 40; and "restricted line investigators from looking into Hunter Biden's connections with CEFC China Energy," *id.* At bottom, Heritage critiques how a line Assistant United States Attorney exercised her discretion.

The Court cannot stand in judgment of such prosecutorial decisions, the power over which the Constitution expressly vests in the Executive. *See* U.S. Const. art. II, cl. 1 ("The executive Power shall be vested in a President of the United States of America."). The President has "exclusive authority and absolute discretion to decide whether to prosecute a case," *United States v. Nixon*, 418 U.S. 683, 693 (1974), and this "special province of the Executive Branch" is "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). *Accord Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023) ("Because prosecutorial discretion lies within the executive's sphere, the exercise of such discretion is not generally reviewable by the courts."); *see also Trump v. United States*, No. 23-939, 2024 WL 3237603, at *15 (U.S. July 1, 2024) ("[P]rosecutorial decisionmaking is 'the special

province of the Executive Branch,' and the Constitution vests the entirety of the executive power in the President." (quoting *Heckler*, 470 U.S. at 832)) . Federal courts shall "refrain[] from overturning, at the instance of a private person, discretionary decisions of federal prosecuting authorities not to prosecute persons regarding whom a complaint of criminal conduct is made." *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 379 (2d Cir. 1973). All too often disputes between criminal investigators and prosecutors arise, and it is not the role of the courts to arbitrate such intrabranch disputes.

But even if the Court were willing to peer behind the prosecutorial curtain and credit the allegations relating to the Assistant United States Attorney, the Court cannot conclude that she acted unreasonably in light of the sensitivities surrounding an investigation of a sitting President and his family members. As the Department notes, Heritage fails to "explain *why* [her] actions (or inactions) amount to 'probable misconduct,'" Reply in Supp. of Mot. for Summ J. at 23, and the Court cannot speculate on Heritage's part.

\* \* \*

Falling short at step two, Heritage has not shown bad faith. Given the Department has proved the reasonableness of its search, it is entitled to partial summary judgment.

## CONCLUSION

For the foregoing reasons, the Court will grant the Department's Motion for Partial Summary Judgment, Dkt. 33, and deny Heritage's Cross-Motion for Partial Summary Judgment, Dkt. 35. A separate order consistent with this decision accompanies this memorandum opinion.

*[signature]*
DABNEY L. FRIEDRICH
United States District Judge

July 3, 2024